BRIAN L. BUDSBERG, WSBA#11225
Brian L. Budsberg, P.L.L.C.
P.O. Box 1489
Olympia, WA 98507-1489
Telephone: (360) 584-9093
Facsimile: (360) 252-8333
Attorney for Debtors

HONORABLE PAUL B. SNYDER
Location Tacoma
Chapter 11
**Hearing Date: April 19, 2010**
**Response Date: 9:00 a.m.**
 **Hearing Time: April 12, 2010**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| In re | |
|---|---|
| LIQUIDATION OUTLET, INC. | No. 10-42279 |
| Debtor. | DEBTOR'S MOTION FOR ORDER (1) AUTHORIZING INCURRENCE OF SECURED INDEBTEDNESS WITH PRIORITY OVER ALL OTHER SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING SECURITY INTERESTS, (3) PROVIDING FOR ADEQUATE PROTECTION, (4) APPROVING AGREEMENTS RELATING TO THE FOREGOING AND (5) GRANTING RELATED RELIEF |

**NOTICE**

TO:        The Clerk of the Court
AND TO:    All Creditors and Parties-In-Interest
AND TO:    U. S. Trustee

PLEASE TAKE NOTICE that Liquidation Outlet, Inc. ("Debtor") has filed a Motion (the "Motion") For entry of the proposed order (the "Order") in substantially the form attached hereto as **Exhibit "A"** (1) Authorizing Incurrence of Secured Indebtedness Over All Other Secured

Indebtedness and With Administrative SuperPriority, (2) Granting Security Interests, (3) Providing for Adequate Protection, (4) Approving Agreements Relating to the Foregoing and (5) Granting Related Relief. You and each of you are notified that unless objection is made, filed herein and served on Debtors' on or before April 19, 2010, Debtor will proceed to enter into the debtor-in-possession financing as detailed below.

The Debtor will proceed to enter an order with this Court authorizing the Debtor to enter into Debtor in Possession Financing and Granting Priority to LOI Capital, LLC at a hearing scheduled for April 19, 2010 at 9:00 a.m. (the "Hearing"), in the United States Bankruptcy Court, Room H, 1717 Pacific Avenue, Tacoma, Washington. Anyone having an objection to the Debtor's Motion must file a written objection with the Court and serve a copy on Debtor's counsel at the address indicated below, no later than April 12, 2010. Failure to file such written objection by the response date will allow movant to proceed with entering into the DIP (as defined below) and granting priority to LOI Capital, LLC without further notice of hearing.

## **MOTION**

COMES NOW Debtor pursuant to 11 U.S.C. § 364 and FBRP 2002 and 4001 and hereby moves the Court for an order authorizing the proposed debtor-in-possession ("DIP") financing and granting priority to LOI Capital, LLC ("Lender"). Debtor has requested that Lender provide DIP financing in an amount up to $2,000,000.00 in order to provide Debtor with the necessary capital to maintain its operations until a sale of Debtor's assets can be completed to Lender. Debtor is asking for approval of this sale in a separate motion being heard simultaneously. Additionally, Debtor is asking the Court grant first position lien on all of the assets of the Debtor, ahead of any currently existing secured liens or encumbrances. The factual circumstances

surrounding Debtor's need for the DIP, and an overview of the specific terms of this financing are all listed below.

## I. STATUS OF THE CASE AND JURISDICTION

1. Debtor continues in the possession of its property and is operating and managing the business as debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is core within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

3. Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. § 1408.

4. The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules.

## II. FACTUAL BACKGROUND

### A. Circumstances Regarding Need for DIP Financing

5. Debtor is a Washington corporation incorporated on June 5, 1992 and has been engaged since that time in the business of opening and operating retail stores throughout the states of Washington and Oregon under the trade name "The Dollar Store." Debtor currently operates at 38 different retail locations. Debtor employs 328 people throughout Washington and Oregon with a twice monthly payroll of $183,549.74. Debtor's main office and distribution center is located at 1025 Valley Avenue, Puyallup, Washington 98371.

6. The current economic recession has proved devastating to Debtor. Debtor's business is dependent upon its ability to acquire a continuous supply of merchandise to restock Debtor's shelves in appropriate mixes so that inventory turnover occurs rapidly. Debtor's rents

payable went from $441,600 in 2006 to $1,129,850 in 2007, a 256% increase. Debtor was able to absorb that additional liability because it leases its office and warehouse space from GA Development, LLC, ("GA Development") which is owned by the sole shareholder of Debtor, Mr. Gary Woodring. Debtor also leases its Yakima store location from Mr. Woodring. For the last several years, GA Development and Mr. Woodring have received checks from Debtor for payments under their respective leases, but did not present them for payment. Instead, they held the checks to allow Debtor to improve its cash position.

7. Debtor's sales went from $32,157,000 in 2008 to $25,637,000 in 2009, a 20% decrease. Debtor's income from operations went from $192,286 in 2008 to ($2,902,971) in 2009. Net income in 2009 was ($2,940,915). In 2008 it was 104,427. In 2007 net income was $671,824.

8. Debtor's net cash used by operating activities in 2009 was ($836,755). In 2008 it was ($206,273). As a result, Debtor had a decrease in inventory of $1,200,993 in 2009, and a net decrease in cash during 2009 of $1,106,272, leaving Debtor with only $343,527 in cash at the end of 2009. Without a present ability to restock Debtor's inventory, the shelves in Debtor's stores are thin and what merchandise is available is in product mixes not as desirable for its customer base. Consequently, that merchandise remains on the shelves unsold longer than is reasonable under Debtor's business model. Debtor is therefore losing customer base because customers stop coming to Debtor's stores, which exacerbates Debtor's financial difficulties.

9. Beginning in November of 2009, Debtor became unable to timely make payments under Debtor's store leases. That problem has accelerated in 2010. Debtor is currently in default under most of its leases. A majority of those landlords have sent letters or notices designed to

begin unlawful detainer processes. In several cases, unlawful detainer actions have been filed against Debtor.

10. Debtor has had a line of credit with US Bank since October, 2006 for the original maximum amount of $1,300,000. In July, 2008, US Bank required Debtor to reduce the maximum loan amount to $900,000 as a condition of renewing the line. In January, 2010, US Bank informed Debtor that it would not renew the line of credit past its maturity date of January 31, 2010. After substantial negotiations, US Bank agreed to a short-term extension of the loan to March 31, 2010. On that date, the entire unpaid balance on the line, which is roughly $900,000, will become due. It is secured against Debtor's inventory and cash collateral.

11. Over the course of the last three years, Debtor has engaged in an aggressive effort to find a purchaser for Debtor assets. Within the last several weeks, Debtor has negotiated a potential asset sale of assets with Hudson Capital Partners, based in Newton, Massachusetts and its subsidiary corporation, LOI Capital, LLC, Lender herein. However, this sale requires Court approval and entails a bidding process which will not be completed until approximately __ days after approval the sale. Debtor has an immediate need to be able purchase inventory to maintain existing operations and to build additional inventory in order to remain in business.

12. Lender has agreed to provide Debtor with pre-petition financing and DIP financing to be used to assist Debtor in acquiring the inventory it needed to maintain its operations. This presents Debtor's best chance of allowing a prospective purchaser, whether it is Lender or another party, the time necessary to determine which stores should be closed, which stores should be kept open in order to make the business profitable once again. **See Declaration of Gary Woodring in Support of First Day Motions.**

**B. The Pre-Petition Financing**

DEBTOR'S MOTION TO APPROVE FINANCING     5     BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

13. On October 24, 2006 U.S. Bank provided a line of credit revolving loan in the maximum amount of $1,300,000. The U.S. Bank facility is governed by the terms of that certain Loan and Security Agreement, dated as of October 24, 2006 ("U.S. Bank Prepetition Loan Agreement"). The maximum amount of the line was subsequently reduced by U.S. Bank to $900,000. The maturity date for the U.S. Bank loan is March 31, 2010. As of March 24, 2010, the outstanding balance under the U.S. Bank Prepetition Loan Agreement, excluding costs and legal expenses for which Debtor is liable, is approximately $700,000.00 ("U.S. Bank Prepetition Claim"). Pursuant to the U.S. Bank Loan Agreement and a UCC-1 filed on October 31,2006 with the Washington State Department of Licensing UCC division, U.S. Bank's Prepetition Claim is secured by a first priority security interest in substantially all of Debtor's assets.

14. On March 23, 2010, the Lender provided Debtor with $150,000 of pre-petition financing ("Lender Prepetition Claim"). This prepetition facility is governed by the terms of a certain Promissory Note (the "Lender Prepetition Loan Agreement"), dated March 15, 2010. Pursuant to the Loan Agreement, a Security Agreement dated March 15, 2010, and a UCC-1 filed on or about March 15, 2010 with the Washington State Department of Licensing UCC division, the Lender Prepetition Claim is secured by a second priority security interest in substantially all of Debtor's assets.

### III. BANKRUPTCY RULE 4001 CONCISE STATEMENT

15. By this Motion, Debtor requests:

    (a) the entry of a proposed Order authorizing Debtor:

        (i) to obtain postpetition financing up to an aggregate principal amount not to exceed $2,000,000.00 from Lender pursuant to the terms of the that certain Debtor In Possession Credit and Security Agreement (the "DIP Credit Agreement") substantially in the form annexed hereto as **Exhibit "B"**, between Debtor and Lender;

        (ii)    to grant Lender security interests in all of Debtor's presently owned and after-acquired property and Pre-Petition Collateral (collectively, the "**Post-Petition Collateral**") to secure any and all of the all the obligations of Debtor pursuant to the terms of the DIP Credit Agreement (the "DIP Obligations"); and

        (iii)    to use the proceeds of the DIP to (i) payoff all of the obligations of the Debtor pursuant to the terms of the U.S. Bank Prepetition Loan Agreement, (ii) payoff all of the obligations of the Debtor pursuant to the terms of the Lender Prepetition Loan Agreement and (iii) provide Debtor with required liquidity sufficient to allow it to acquire merchandise and maintain its operations until the sale of its assets can be approved by the Court and a sale transaction can be closed; and

        (iv)    to grant Lender priority in payment with respect to the DIP Obligations over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code.

(b)    in accordance with Bankruptcy Rule 4001(c)(2), that this Court schedule the Hearing and approve notice with respect thereto.

16.    The material provisions of the DIP are summarized as follows and set forth in the following sections of the DIP Credit Agreement and/or, as applicable, the Order:[1]

(a)    <u>Borrower</u>: Debtor. *See* page 1 of the DIP Credit Agreement.

(b)    <u>Lender</u>: Lender. *See* page 1 of the DIP Credit Agreement.

(c)    <u>Commitment</u>: The Lender agrees, subject to the terms and conditions of DIP Facility and the Financing Order, to make advances to the Debtor from time to time from the date that all of the conditions set forth in <u>Section 4.1</u> of the DIP Credit Agreement in the aggregate amount of $2,000,000.00 *See* Section 2.1 of the DIP Credit Agreement.

(d)    <u>Termination Date</u>: means the earliest of (i) the April __, 2010, (ii) the date the Borrower repays the Obligations in full and terminates the Credit Facility, or (iii) the date the Lender demands payment of the Obligations, following an Event of Default. *See* page 8 of the DIP Credit Agreement.

(e)    <u>Use of Proceeds</u>: The Borrower shall use the proceeds of Advances for (i) payment in full of the US Bank Obligations, (ii) payment in full of the Pre-Petition Obligations, and (iii) funding post-petition operations strictly

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

in accordance with the Budget. No proceeds of any Advance may be utilized by the Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing, any claims or causes of action against the Lender, or its counsel or advisors (including advisors to their counsel), arising from or relating to the Pre-Petition Credit Agreement or this Agreement, and/or investigating, challenging or raising any defenses to the obligations or liens under the Pre-Petition Credit Agreement or this Agreement. Notwithstanding the forgoing, any official committee(s) appointed in the Chapter 11 Case shall have the ability to investigate such matters subject to the terms of the Financing Order. *See* Section 2.8 of the DIP Credit Agreement.

(f) <u>Priority and Liens</u>: Effective immediately upon the execution of the Order, Lender shall be granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), 364(e)(3), and 364(d)(1) of the Bankruptcy Code, priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on¸ all present and after-acquired property of the Debtor of any nature whatsoever and wherever located. *See* Order, at paragraph 2(f)(ii).

(g) <u>Interest</u>: The Debtor's obligations under the DIP Credit Agreement shall bear interest at an annual interest rate equal to fifteen percent (15%). *See* Section 2.3 of the DIP Credit Agreement.

(h) <u>Events of Default</u>: The Events of Default under the DIP Credit Agreement include the following: (a) default in the payment of any amount owed by the Borrower to the Lender as and when due under the DIP Credit Agreement; (b) default in the performance, or breach, of any covenant or agreement of the Borrower contained in the DIP Credit Agreement; (c) any ownership interest of the Borrower shall be sold or transferred in any transaction other than in accordance with the terms of the Asset Purchase Agreement, or shall become subject to a Lien; (d) a Bidding Procedures Order has not been entered by the Bankruptcy Court on or before [April 9, 2010]; (e) a Sale Order has not been entered on of before [April 9, 2010]; (f) a sale of all or substantially all of the Borrower's assets pursuant to the terms and conditions of the Asset Purchase Agreement has not occurred on or before [May 15, 2010]; (g) any representation or warranty made by the Borrower in the DIP Credit Agreement or by the Borrower (or any of its Officers) in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with the DIP Credit Agreement shall prove to have been incorrect in any material respect when deemed to be effective; (h) the rendering against the Borrower of an arbitration award, a final judgment, decree or order for the payment of money in excess of $10,000 and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30

consecutive days without a stay of execution; (i) the Borrower shall liquidate, dissolve, terminate or suspend its business operation or otherwise fail to operate its business in the ordinary course, merge with another Person unless the Borrower is the surviving entity; or sell or attempt to sell all or substantially all of its assets, without the Lender's prior written consent; except as contemplated under the Asset Purchase Agreement and Sale Order; (j) an event of default shall occur under any Security Document; (k) default in the satisfaction of any Obligation owed by the Borrower to the Lender hereunder; (l) the Lender believes in good faith that the prospect of payment in full of any part of the Obligations, or that full performance by the Borrower under the Loan Documents, is impaired, or that there has occurred any material adverse change in the business or financial condition of the Borrower; (m) the indictment of any Director or executive Officer of the Borrower for a felony offence under state or federal law; (n) the Borrower shall fail to comply or shall default in the performance of any term of the DIP Credit Agreement, the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, the US Bank Loan Agreement, the Loan Documents, the Financing Order or the Sale Order; (o) the Borrower (except following the Lender's prior written request or with the Lender's express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Order or any of the Loan Documents, without the Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender); (p) the Borrower shall file, or any other person shall obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization which does not provide for the full, final, and irrevocable repayment of all of the Obligations of the Borrower to the Lender upon the effectiveness of such plan, unless the Lender has expressly joined in or consented to such plan in writing; (q) the Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Lender under the Financing Order or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Order; (r) the Bankruptcy Court shall not have entered the Financing Order or the Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court; (s) the Bankruptcy Court shall not have entered a Cash Collateral Order from and after the date of entry thereof by the Bankruptcy Court on or before [May 15, 2010]; (t) the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the

Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrower or to terminate any license, franchise, or similar agreement, where such termination could have a Material Adverse Effect; (u) if any creditor of the Borrower receives any adequate protection payment which is not fully acceptable to the Lender in its sole discretion, or any Lien is granted as adequate protection other than as set forth in the Financing Order; (v) Borrower suspends or discontinues, or is enjoined by any court or governmental agency from continuing to conduct, all or any material part of its business (in a manner inconsistent with the Substantial Asset Disposition, the Substantial Asset Disposition Schedule, or such other orderly wind-down acceptable to Lender), or if a trustee, receiver or custodian is appointed for Borrower or any of its properties; (w) conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; (x) the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender); (y) a trustee is appointed pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; (z) an examiner with special powers is appointed pursuant to Section 1104(a) of the Bankruptcy Code; and (aa) the Borrower fails to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Borrower in connection herewith.

(i) <u>Waiver of Applicable Nonbankruptcy Law Relating to Perfection</u>: The Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the postpetition liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the postpetition liens or to entitle the Lender to the priorities granted herein. *See* Order, at paragraph 4.

(j) <u>Challenge Period</u>: A party in interest (other than the Debtor) has until no later than sixty days from the entry of the Order (or such later date agreed to in writing by the Lender) to commence an adversary proceeding challenging the extent, validity, perfection, priority and enforceability of the Pre-Petition Lender's liens or any other claims whatsoever of the Pre-Petition Lender, including any claims arising from or related to the fees, charges, interest, commissions and expenses charged by the Pre-Petition Lender prior to the Petition Date pursuant to the Pre-Petition Loan Agreement. *See* Order, at paragraph 5.

(k) <u>Relief From Automatic Stay</u>: The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (1) permit the Debtor to grant the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Credit Agreement, the DIP Credit Facility and this DIP Order, and (2) authorize the DIP Lender to retain and apply payments hereunder. *See* Order, at paragraph 15(e).

## IV. RELIEF REQUESTED

17. By this Motion, the Debtor seeks the entry of Order regarding the relief requested herein. Such Order, will authorize the Debtor to obtain postpetition secured financing in an aggregate amount of up to $2,000,000.00, in accordance with the terms and conditions set forth in the proposed DIP Credit Agreement between Debtor and Lender.

18. This Motion also seeks approval of the DIP Credit Agreement, the material terms of which are described above.

## V. BASIS FOR RELIEF REQUESTED

19. Approval of the DIP Credit Agreement will provide Debtor with immediate and ongoing access to cash and borrowing availability to pay its current and ongoing expenses through the anticipated sale of substantially all of its assets. Unless Debtor's expenses are paid, it is likely that failure to pay such expenses will: (a) result in irreparable harm to the business, (b) deplete the value of Debtor's estate and quash the opportunity for a sale, and (c) jeopardize Debtor's ability to maximize the value of its estate. The credit provided under the DIP Credit Agreement will enable Debtor to preserve and enhance the value of its estate for the benefit of all stakeholders. Accordingly, the timely approval of the relief requested herein is imperative.

### A. <u>The Postpetition Financing</u>

20. In order to prevent the harm that would result from a failure to obtain sufficient debtor in possession financing, the Lender has agreed to provide Debtor with the DIP financing on the terms described in this Motion, and more particularly, in the DIP Credit Agreement.

DEBTOR'S MOTION TO APPROVE FINANCING     11     BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

21. The Lender is willing to provide DIP financing to facilitate the sale and a structured liquidation in chapter 11. Debtor has not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Thus, undertaking this financing is consistent with Debtor's obligation to seek to maximize the value of its assets for the benefit of creditors.

22. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, the Bankruptcy Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in Section 503(b) or 507(a)(2) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. *See* 11 U.S.C. § 364(c). Section 364(d) provides that, in appropriate circumstances, a debtor may incur debt secured by a senior, or "priming" lien. Debtor proposes to obtain the financing set forth in the DIP Credit Agreement by providing the Lender with, *inter alia,* a priming lien on all of Debtor's assets, as well as a superpriority claim, pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code. The DIP financing being provided by Lender, in an amount up to $2,000,000.00, will pay the secured claim of U.S. Bank in full and need for allowing a priming lien pursuant to 11 U.S.C. § 364(d) may not be necessary in this case.

23. Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under Section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). *See also In re Funding Systems Asset Management Corp.,* 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985). Business decisions are made in the board room, not the courtroom. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank*, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

24. The Debtor has exercised sound business judgment in determining that a postpetition credit facility is appropriate and has satisfied the legal prerequisites to enter into the financing pursuant to the terms of the DIP Credit Agreement. The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtor's estate. The delays, cost and expense of placing this loan with a new lender, assuming one could be found, would be detrimental to the estate and ultimately diminish creditor recoveries. Accordingly, the Debtor should be granted authority to enter into the DIP Credit Agreement and borrow funds from the Lender on the secured, administrative super-priority basis provided for therein and in the Order, pursuant to section 364(d) of the Bankruptcy Code, and take the other actions contemplated by the DIP Credit Agreement and the Order as requested herein.

25. Furthermore, Section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *See Bray v. Shenandoah Fed. Savings & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee was not required to seek credit from every possible lender and the information provided regarding unsuccessful contact with financial institutions in the geographic area was sufficient to establish that credit was not available without granting a senior lien); *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *In re Aqua Assocs.,* 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor was to obtain funding).

26. Substantially all of the Debtor's assets are encumbered by the U.S. Bank first position security interest and the Debtor has been unable to procure the required funding absent granting the proposed priming liens, superpriority claims, and liens. The Debtor submits that the circumstances of these cases require the Debtor to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Credit Agreement reflects the exercise of the Debtor's sound business judgment.

**B.** **The DIP Credit Agreement Terms are Fair, Reasonable, and Appropriate**

27. The proposed terms of the DIP Credit Agreement are fair, reasonable, and adequate under the circumstances. First and foremost, Debtor has made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. As discussed above, Debtor explored alternative sources of postpetition financing. Despite the best efforts of Debtor,

no other lender was willing to provide an adequate stand alone financing facility. Against this backdrop, Debtor carefully evaluated the proposed financing structure from the Lender, engaged in negotiations with the Lender regarding the proposed terms, worked with its attorneys to obtain the best possible terms from the Lender and, eventually, agreed to the Lender's proposal as the proposal best suited to Debtor's needs. In addition, the terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith, and were instituted for the purpose of enabling Debtor to meet ongoing expenses while in chapter 11 and implement an orderly sale and of its assets for the benefit of creditors.

**C.  The Automatic Stay Should Be Modified on a Limited Basis**

28.  The relief requested herein contemplates a modification of the automatic stay to permit Debtor to: (a) grant the security interests, liens, and superpriority claims described above with respect to the Lender and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) permit the Lender to exercise, all rights and remedies under the DIP Credit Agreement and the Order; and (c) implement the terms of the DIP Credit Agreement and the Order.

Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in Debtor's business judgment, are reasonable and fair under the present circumstances.

**D.  Professional Carveout**

29.  Notwithstanding anything herein to the contrary, DIP Liens shall be subordinate only to the to a carve-out for the payment of (i) the allowed claims of professionals on behalf of Debtor or any Committee whose employment is approved by this Court, and (ii) the claim of the

United States Trustee for the payment of fees under 28 U.S.C. § 1930(a) (the "Professional Carve-Out"). The Professional Carve-Out shall not exceed $200,000.

## VI. NOTICE

30. Notice of this Motion has been provided to: (i) the Office of the United States Trustee, (ii) the Internal Revenue Service, (iii) Debtor's twenty (20) largest unsecured creditors, (iv) counsel to Debtor, (v) counsel to the Pre-Petition Lenders (as defined below), (vi) counsel to the proposed DIP Lender, (vii) US Bank National Association, and (viii) Associated Petroleum Products, Inc. Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## VII. NO PRIOR REQUEST

No previous application for the relief sought herein has been made to this or any other court.

## VIII. CONCLUSION

Debtor prays that the Court enter an order approving DIP pursuant to the terms and conditions of the attached Exhibits A and B and grant additional relief as requested herein.

DATED this 25th day of March, 2010.

BRIAN L. BUDSBERG, PLLC

/s/ Brian L. Budsberg
Brian L. Budsberg, WSBA #11225
Benjamin J. Riley, WSBA #34949
Attorney's for the Debtor