BRIAN L. BUDSBERG, WSBA#11225
Brian L. Budsberg, P.L.L.C.
P.O. Box 1489
Olympia, WA 98507-1489
Telephone: (360) 584-9093
Facsimile: (360) 252-8333
Attorney for Debtor

HONORABLE PAUL B. SNYDER
Location Tacoma
Chapter 11
**Hearing Date:** **April 6, 2010**
**Hearing Time:** **2:30 p.m.**
**Response Date: April 6, 2010**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | No. 10-42279 |
| LIQUIDATION OUTLET, INC. | NOTICE AND MOTION FOR APPROVAL OF: (i) SALE, AT AUCTION, OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS; (ii) THE ASSET PURCHASE AGREEMENT; (iii) THE AGENCY AGREEMENT; (iv) BIDDING, NOTICE AND SALE PROCEDURES; (v) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (vi) REJECTION OF CERTAIN CUSTOMER CONTRACTS; (vii) PAYMENT FROM SALE PROCEEDS OF: (a) U.S. BANK SECURED CLAIM, AND (b) CERTAIN CURE COSTS; AND (viii) ADDITIONAL RELIEF |
| Debtor. | |

## <u>NOTICE</u>

TO:        The Clerk of the Court
AND TO:    Debtor(s) and Debtor(s)' Attorney
AND TO:    All Creditors and Parties-In-Interest
AND TO:    U. S. Trustee

PLEASE TAKE NOTICE that Liquidation Outlet, Inc. ("Debtor") has filed a Motion for

approval of: (i) sale of substantially all of Debtor's assets and business free and clear of all liens,

claims, interests and encumbrances pursuant to Bankruptcy Code §363; (ii) the Asset Purchase

Agreement (as hereinafter defined); (iii) the Agency Agreement (as hereinafter defined); (iv)

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

1

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

bidding and notice procedures; (vi) assumption and assignment of certain of Debtor's executory contracts; (vii) rejection of certain customer contracts; and certain cure costs; and (vii) additional relief. Each of you are notified that unless objection is made, filed herein and served on the Debtors on or before **April 6, 2010**, Debtors will proceed to enter an order determining adequate assurance of payment for future utility services.

The Debtors will proceed to enter an order with this Court approving the sale of substantially all of Debtor's assets and business at a hearing scheduled for April 6, 2010 at 2:30 p.m. in the United States Bankruptcy Court, Federal Building 500 W. 12th, Second Floor **Vancouver, WA** 98660. Anyone having an objection to the Debtor's Motion must file a written objection with the Court and serve a copy on Debtor's counsel at the address indicated below, no later than the date of the hearing. Failure to file such written objection by the response date will allow movant to proceed with approval of the Motion without further notice of hearing.

## MOTION

Liquidation Outlet, Inc., debtor-in-possession ( hereinafter, "Debtor"), moves the Court for approval of: (i) sale of substantially all of Debtor's assets and business free and clear of all liens, claims, interests and encumbrances pursuant to Bankruptcy Code §363; (ii) the Asset Purchase Agreement (as hereinafter defined); (iii) the Agency Agreement (as hereinafter defined); (iv) bidding and notice procedures; (vi) assumption and assignment of certain of Debtor's executory contracts; (vii) rejection of certain customer contracts; and certain cure costs; and (vii) additional relief as described herein. The Debtor will be submitting two orders in this case: 1) the first order to will be to approve bidding procedures for the auction of the subject property of this case; and 2) approval of the sale date and confirmation of the sale. Both Order will be pursuant to the terms and conditions set for in this motion, as well as the Asset Purchase

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Agreement and Agency Agreement attached hereto as Exhibit A.  This motion ("Sale Motion")
is based on the files and records herein and on the accompanying Declaration of Gary Woodring
(the "Woodring Declaration")


# I.    FACTUAL BACKGROUND

## A.    Debtor and Its Business

On March 22, 2010 ("Petition Date"), Debtor commenced this chapter 11 case by filing a
voluntary petition under chapter 11 of the Bankruptcy Code. Debtor is operating its business and
managing its affairs as a debtor-in-possession under 11 U.S.C. § § 1107 and 1108.

Debtor, a Washington corporation, is a retail sales chain headquartered in Puyallup,
Washington.  Its operations are described more fully herein.

## B.    Events Leading to Bankruptcy Filing

Debtor was incorporated on June 5, 1992 and has been engaged since that time in the
business of opening and operating retail stores throughout the states of Washington and Oregon
under the trade name "The Dollar Store." Debtor currently operates at 38 different retail
locations. Debtor employs 328 people throughout Washington and Oregon with a twice monthly
payroll of $183,549.74. Debtor's main office and distribution center are located at 1025 Valley
Avenue, Puyallup, Washington 98371.

The current economic recession has proved devastating to Debtor. Debtor's business is
dependent upon its ability to acquire a continuous supply of merchandise to restock Debtor's
shelves in appropriate mixes so that inventory turnover occurs rapidly. Debtor's rents payable
rose from $441,600 in 2006 to $1,129,850 in 2007, a 256% increase. Debtor was able to absorb

that additional liability because it leases its office and warehouse space from GA Development, LLC, ("GA Development") which is owned by the sole shareholder of Debtor, Gary Woodring. Debtor also leases its Yakima store location from Mr. Woodring. For the last several years, GA Development and Mr. Woodring have received checks from the Debtor for payments under their respective leases, but did not present them for payment. Instead, they held the checks to allow Debtor to improve its cash position.

Debtor's sales went from $32,157,000 in 2008 to $25,637,000 in 2009, a 20% decrease. Debtor's income from operations went from $192,286 in 2008 to ($2,902,971) in 2009. Net income in 2009 was ($2,940,915). In 2008 it was 104,427. In 2007 net income was $671,824.

Debtor's net cash used by operating activities in 2009 was ($836,755). In 2008 it was ($206,273). As a result, Debtor had a decrease in inventory of $1,200,993 in 2009, and a net decrease in cash during 2009 of $1,106,272, leaving Debtor with only $343,527 in cash at the end of 2009. Without a present ability to restock Debtor's inventory, the shelves in Debtor's stores are thin and what merchandise is available is in product mixes not as desirable for its customer base.. Consequently, that merchandise remains on the shelves unsold longer than is reasonable under Debtor's business model. Debtor is therefore losing customer base because customers stop coming to Debtor's stores, which exacerbates Debtor's financial difficulties.

Beginning in November of 2009, Debtor became unable to timely make payments under Debtor's store leases. That problem has accelerated in 2010. Debtor is currently in default under most of its leases. A majority of those landlords have sent letters or notices designed to begin unlawful detainer processes. In several cases, unlawful detainer actions have been filed against Debtor.

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

4

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Debtor has had a line of credit with US Bank since October, 2006 for the original maximum amount of $1,300,000. In July, 2008, US Bank required Debtor to reduce the maximum loan amount to $900,000 as a condition of renewing the line. In January, 2010, US Bank informed Debtor that it would not renew the line of credit past its maturity date of January 31, 2010. After substantial negotiations, US Bank agreed to a short-term extension of the loan to March 31, 2010. On that date, the entire unpaid balance on the line, which is roughly $700,000, will become due. It is secured against substantially all of Debtor's assets, including all of the Debtor's cash.

Over the course of the last three years, Debtor has engaged in an aggressive effort to find a purchaser for Debtor's assets. Within the last several weeks, Debtor has negotiated a potential sale of assets with LOI Capital, LLC ("Purchaser"), a Delaware limited liability company based in Newton, Massachusetts, which is affiliated with Hudson Capital Partners, LLC and Tiger Capital Group, LLC, two of the leading firms engaged in retail restructurings and dispositions. Purchaser has provided Debtor with certain pre-petition financing, and has further agreed to provide Debtor with pre-petition financing and Debtor–in- Possession ("DIP") financing to be used to bridge the Debtor to the sale of its assets.

Debtor's principal, Gary Woodring and his wife, Arlene, have run this business and similar businesses since the 1960s. Debtor has requested through a companion motion that the Court approve a cash collateral order that will enable Debtor to use cash generated from Debtor's existing operations, proceeds from the US Bank loan and Purchaser's pre-petition loan, to operate the business during the interim period between filing of the Chapter 11 petition and approval by the Court of an Order on Debtor In Possession financing. **See Declaration of Gary Woodring in Support of First Day Motions.**

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

**C.     Debtors' Prepetition Financing**

   **1.     U.S. Bank Prepetition Credit Agreement**

On October 24, 2006 U.S. Bank("U.S. Bank") provided a line of credit revolving loan in the maximum amount of $1,300,000.  The U.S. Bank facility is governed by the terms of that certain Loan and Security Agreement, dated as of October 24, 2006 ("U.S. Bank Prepetition Loan Agreement"), by and between Debtor and U.S. Bank.  The maximum amount of the line was subsequently reduced by US Bank to $900,000.  The maturity date for the U.S. Bank loan is March 31, 2010.  As of March 24, 2010, the outstanding balance under the U.S. Bank Prepetition Loan Agreement, excluding costs and legal expenses for which Debtor is liable, is approximately $700,000.00 ("U.S. Bank Prepetition Claim").

Pursuant to the U.S. Bank Loan Agreement and a UCC-1 filed on _____ with the Washington State Department of Licensing UCC division, U.S. Bank's Prepetition Claim is secured by a first priority security interest in substantially all of the Debtor's assets.

   **2.     Purchaser's Pre-Petition Financing**

 On March 15, 2010, Purchaser provided Debtor with $150,000 of prepetition financing ("Purchaser Prepetition Claim"). This prepetition financing facility is governed by the terms of that certain Loan Agreement, dated March 15, 2010 (the "Purchaser Prepetition Loan Agreement"), by and between Debtor and Purchaser.  Pursuant to the Loan Agreement, a Security Agreement (as such term is defined in the Purchaser Prepetition Loan Agreement) dated March 15, 2010, and a UCC-1 filed on March 17, 2010 with the Washington State Department of Licensing UCC division, the Purchaser Prepetition Claim is secured by a second priority security interest in substantially all of Debtor's assets, including all of the Debtor's cash.

**D.     Use of Cash Collateral**

Between the time that the Petition is filed and a final order on the proposed DIP financing is entered, Debtor will need to use revenue generated from its operations to pay certain operating expenses and will need to use proceeds from its pre-petition financing from U.S. Bank and Purchaser to purchase merchandise to replenish its inventory. Although Debtor anticipates that the time period involved would be no longer than 30 days, Debtor has put together a four week Cash Collateral Budget as follows:

| 4 Week Cash Flow Summary | | | | | |
|---|---|---|---|---|---|
| **Week Beginning** | **3/21/10** | **3/28/10** | **4/4/10** | **4/11/10** | **4 Week** |
| **Week Ending** | **3/27/10** | **4/3/10** | **4/10/10** | **4/19/10** | **Total** |
| | | | | | |
| *Charlie's Produce* | (40,000) | (40,000) | (40,000) | (40,000) | (160,000) |
| *Liberty Dairy & Others* | | (12,800) | | | (12,800) |
| *Pepsico* | | (17,000) | | | (17,000) |
| *Soil Conditioners* | (1,335) | (1,335) | (1,335) | (1,335) | (5,340) |
| *Imports* | | (6,246) | | (30,106) | (36,352) |
| *Domestic* | | (32,086) | (148,076) | (123,205) | (303,367) |
| *Total Merchandise Needed* | (41,335) | (109,467) | (189,411) | (194,646) | (534,859) |
| | | | | | |
| Cash from Operations | 202,957 | 725 | 3,468 | 228,320 | 435,470 |
| Cash Available for Merch. Purchasing | 161,622 | (108,742) | (185,943) | 33,674 | (99,389) |

Approval by this Court of the proposed usage of cash collateral and the sale of Debtor's assets under APA, notice and bidding procedures will, in combination, allow the Debtor to continue operation, acquire merchandise to restock its inventory, and obtain sale proceeds in amounts sufficient to enable all secured creditors to be paid in full, and to have funds available from which general unsecured creditors will receive payment.

**E.      DIP Financing and the Asset Purchase Agreement**

Debtor and Purchaser have reached agreement on the terms of both (i) a post-petition Loan and Security Agreement under which Purchaser proposes to extend DIP Financing to the Debtor, and (ii) an Asset Purchase Agreement ("APA"), pursuant to which Debtor proposes to dispose of all or substantially all of its assets to Purchaser, in the forms attached as Exhibit A and B to the Woodring Declaration, respectively.

**1. Purpose of DIP Financing.**

Pursuant to pleadings being heard simultaneously with the subject motion Debtor is moving for approval of Debtor in Possession Financing (the "DIP Financing"). The DIP Financing is necessary to allow for the Debtor to purchase inventory in an amount that will allow Debtor to remain in business during the time period of the approval of the sale and the completion of the auction process, and the closing of the APA, as further described below and ~~listed~~ in the APA. The proceeds from the DIP Financing will be used to: (1payoff all of the obligations of the Debtor pursuant to the terms of the U.S. Bank Prepetition Loan Agreement, (2) payoff all of the obligations of the Debtor pursuant to the terms of the Purchaser Prepetition Loan Agreement and (3) provide the Debtor with liquidity sufficient to allow it to acquire merchandise and maintain its operations until the sale of its assets can be closed

**2. The Asset Purchase Agreement.**

The APA sets forth the terms of a sale for substantially all of Debtor's assets (the "Sale") for a sale price of $5,240,000.00, based upon a projected retail value of Debtor's inventory of $~~13,100,000,~~13,100,000, to be verified by a physical inventory to be taken immediately after the closing of the sale ("the "Purchase Price""). At closing, the Purchaser will make an initial cash payment of $3,000,000. The Purchase Price is subject to adjustment pursuant to the terms of Paragraph D below and Section 2.6(c) of the APA. The proceeds from the Sale will be used first

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

8

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

to payoff the all amounts owed under the DIP Financing, including, without limitation, all interest, fees, expenses and other amounts due thereon. Following the closing of the Sale, the DIP Financing will be terminated.

Pursuant to the APA (and as further described below), the Purchaser is permitted, in its sole discretion, (1) for a period of 60 days following the closing under the APA, to designate for assumption and assignment to Purchaser or its designee(s), any or all of Debtor's leases of non-residential real property, (2) for a period of 30 days following the closing under the APA, to designate for assumption and assignment to Purchaser or its designee(s), any or all of Debtor's executory contracts, and (3) for a period of 30 days following the closing under the APA, designate for liquidation pursuant to the Agency Agreement (as further described below) through the Store Closing Sales (as defined in the APA and described in the Agency Agreement), any or all of the Debtor's retail store and distribution center locations, and the Merchandise and fixed assets located at such locations. All of the proceeds generated from the assumption and assignment of the Debtor's leases and executory contracts (if any) and proceeds generated from the liquidation of the Merchandise and fixed assets located at the Designated Liquidation Locations through the Store Closing Sales (as such terms are defined in the APA) shall be the property of the Purchaser, and the Debtor shall have no right, title and interest therein.

Based on Debtor's prepetition sale efforts and contacts with potentially interested parties, Debtor believes that the Purchase Price is fair and reasonable and is the highest and best offer received to date. Current financial and cash flow issues dictate that a sale be consummated quickly to ensure the value of Debtor's business is preserved. Without an expeditious sale, the value of Debtor as a going concern will be placed in severe jeopardy and Debtor would most likely be forced to liquidate.

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

9

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

### 3. The Agency Agreement.

As described above, pursuant to the APA, the Purchaser may, in its sole discretion, designate any or all of the Debtor's retail store and distribution center locations as Designated Liquidation Locations (as defined in the APA). In conjunction with the APA, and in order to facilitate the liquidation of the Merchandise and fixed assets at the Designated Liquidation Locations, Debtor and the Purchaser have entered into a certain Agency Agreement (the "Agency Agreement"), whereby Debtor has engaged the Purchaser to act as Debtor's exclusive agent for the limited purpose of selling all of the Liquidation Merchandise and Other Assets[1] located at the Designated Liquidation Locations.

The Agency Agreement provides (capitalized terms not defined in this Motion have the meanings given in the Agency Agreement):

(a) Purchaser shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims and encumbrances thereon (collectively, "Liens"), with any presently existing Liens encumbering all or any portion of the Merchandise or the Proceeds (if any) attaching only to the purchase price payable under the APA and other amounts to be received by Debtor the Agency Agreement;

(b) Subject to Purchaser's obligations to pay Expenses pursuant to Section 4.1 of the Agency Agreement, Purchaser shall have the right to use the Closing Locations and all related store services, furniture, fixtures, equipment and other assets of Debtor as designated under the Agency Agreement for the purpose of conducting the Sale, free of any interference from any entity or person;

(c) Purchaser, as agent for Debtor, is authorized to conduct, advertise, post signs and otherwise promote the Sale without further consent of any person (other than Debtor as provided for herein), in accordance with the terms and conditions of the Agency Agreement and the APA (as the same may be modified and approved by the Bankruptcy Court), and without further compliance with applicable federal, state or local laws governing, inter alia, the conduct of store closing sales (the "GOB Laws"), other than those designed to protect public health and safety and tax, labor, employment, environmental and consumer protection laws (including consumer laws relating to deceptive practices and false advertising);

---

[1] Liquidation Merchandise and Other Assets includes DSD Merchandise, as further described in Section 8.5 of the Agency Agreement.

(d)     all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Sale Order as binding and to allow Debtor and Purchaser to consummate the transactions provided for in the Agency Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by the Agency Agreement;

(e)     all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale;

(f)     the Bankruptcy Court shall retain jurisdiction over the parties to enforce The Agency Agreement;

(g)     Purchaser shall not be liable for any claims against the Debtor other than as expressly provided for in the Agency Agreement, and Purchaser shall have no successorship liabilities whatsoever;

(h)     Purchaser may, in its discretion and at its sole cost and expense, continue to supply the Designated Liquidation Locations throughout the Sale Term with "direct store inventory", including, without limitation, dairy products, bakery products and produce; and

(i)     Purchaser shall have, subject to Purchaser's obligation to pay the Purchase Price and Purchaser's obligations to pay the Expenses, a valid, duly perfected first priority Lien in the Merchandise, FF&E and any Proceeds to which Purchaser is entitled in accordance with the terms of the Agency Agreement.

Purchaser shall be unconditionally responsible for all expenses incurred in conducting the Store Closing Sales, which expenses shall be paid by Purchaser in accordance with Section 4.2 of the Agency Agreement.  Subject to the terms of the Sale Order, the Store Closing Sales shall commence immediately upon the Purchaser's designation of any location as a Designated Liquidation Location following the consummation of the closing under the APA. The Purchaser shall complete the Store Closing Sales, and shall vacate each of the Designated Liquidation Location premises in favor of Debtor (or any assignee of the lease of such Designated Liquidation Location) on or before July 31, 2010

NOTICE AND MOTION FOR APPROVAL          11
OF SALE AND BIDDING PROCESS

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

## II. SUMMARY OF TERMS OF PROPOSED SALE

The following is a summary of some of the material terms of the Sale as set forth in the APA. This description of the terms of the APA is intended solely to provide the Court and interested parties with an overview of the significant terms the APA. The Court and interested parties are respectfully referred to the APA for the complete terms of the Sale. In the event of a conflict between the terms included in this overview and the APA, the APA shall govern. Capitalized terms not defined in this Motion have the meanings given in the APA:

**A.   Assets to be Purchased.** The assets to be purchased (the "Acquired Assets") are set forth in Section 2.1 of the APA, and include all of include all of Debtor's rights, title, privileges, benefits and interests in and to:

2.1 Purchase and Sale.

(a)              the contracts, leases (other than Real Property Leases), warranties, commitments, purchase and sale orders, and agreements relating to Intellectual Property Rights, whether oral or written, identified on Schedule 2.l(a) which are related to the Business (collectively, the "Executory Contracts"), solely to the extent that such Executory Contracts are designated by Purchaser either on or prior to the date of the Auction or such other date prior to the expiration of the Executory Contract Option Period, to be assumed and assigned to Purchaser and to the extent such Executory Contracts are assignable under bankruptcy law or applicable non-bankruptcy law without the consent of the counterparty(ies) thereto (to the extent so designated, collectively, the "Assigned Contracts"), together with the right to receive income in respect of such Assigned Contracts on and after the Closing Date, and any causes of action relating to past or current breaches of the Assigned Contracts;

(b)              all of Seller's rights in and to those certain Real Property Leases  identified in Schedule 2.1(b), together with all permanent fixtures, improvements and appurtenances thereto and associated therewith, as the same may be designated by Purchaser for assumption and assignment to Purchaser or one or more of its designees prior to the expiration of the Lease Marketing Period (to the extent so designated, the "Assigned Leases");

(c)              Designation Rights with respect to the Real Property Leases;

(d)              all Merchandise;

(e)                   all accounts, accounts receivable, contract rights to payment, payment intangible notes, and other receivables and amounts owed to the Seller;

(f)                   any supplier rebate or credit;

(g)                   all prepaid assets and deposits (including utility deposits), security deposits, deposits with creditors and other deposits of any kind or nature whatsoever;

(h)                   the right to be engaged and serve as Seller's exclusive agent for the limited purpose of: (i) selling all of the Liquidation Merchandise located or to be located in the Designated Liquidation Locations by conducting the Store Closing Sale; and (ii) disposing of the Liquidated Other Fixed Assets, in each case in accordance with the terms of the Agency Agreement;

(i)                   all transferable Intellectual Property Rights related to the Business, including the items listed on Schedule 2.1(i), and any causes of action relating to past or current infringement of the Intellectual Property Rights;

(j)                   all owned FF&E, machinery, equipment, personal property, office equipment, furnishings, computer hardware and spare parts relating thereto, motor vehicles, fork lifts, rolling stock, wherever located, including the items listed on Schedule 2.1(j); provided, however, that any such personal property located in the Corporate Headquarters may be used by Seller to the extent necessary, without charge, in connection with the winding-up of the Seller's estate and/or the closing of the Bankruptcy Case and in connection with Seller's performance under the Agency Agreement, and any such personal property that is needed by Seller and is being so used by Seller shall not be removed from the Corporate Headquarters (without Seller's prior consent) until Seller no longer needs to use such assets (it being understood that any damage or loss to such personal property occurring after the Closing shall be the responsibility of Seller unless such damage or loss was caused by Purchaser or Purchaser's representatives or agents);

(k)                   all books, records and other documents (whether on paper, computer diskette, tape or other storage media) of Seller relating to the Business or the Acquired Assets (provided that Seller shall be entitled to retain copies of such books, records and other documents), including property records, purchase and sale records, credit data, marketing, advertising and promotional materials, personnel and payroll records of Transferred Employees (to the extent permitted by applicable law), accounting and financial records, fixed asset lists, customer lists, customer records and information (including internet mailing addresses and Household customers), inventory history, historical financing information (including reserve calculations), fixed asset information, mailing and supplier lists, parts lists, correspondence, studies, sales history, files and similar items, other than incorporation documents and corporate minute books (collectively, the

"Books and Records"); provided, however, Purchaser shall be entitled to exclude any Books and Records from Acquired Assets by giving written notice of the same to the Seller;

(l)          all advertising commercials, videos, photography, and advertising equipment used internally, together with all internal and external signage located in or used in connection with the Business;

(m)          all manuals, training materials, and other documentation relating to employee benefits, treatment and conduct, videos, DVDs, CDs or training software related to the Business (collectively, the "Employee Manuals"); provided, however, that Seller shall not provide Purchaser with employee personnel files or information therefrom without the express written permission of said employees;

(n)          proceeds of the Agency Agreement other than expenses payable to Seller by the Liquidating Agent under the Agency Agreement;

(o)          all causes of action relating to the Acquired Assets arising on or prior to the Closing Date, other than Avoidance Actions and other Excluded Assets;

(p)          all cash and cash equivalents (including undeposited checks, cash located in each of the registers located in the Stores, and cash located in banks or other financial institutions; and

(q)          all prepaid assets and deposits, including security deposits, deposits with creditors and other deposits of any kind or nature whatsoever, but only insofar as they are related to the Acquired Asset(s).

**B.     Excluded Assets.**     The assets to be excluded from the purchase (the "Excluded Assets")

are set forth in Section 2.2 of the APA, as follows:

2.2  Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the Acquired Assets shall not include any assets, properties or rights not specifically identified in Section 2.1, including the following (the "Excluded Assets"):

(a)          all Avoidance Actions;

(b)          the minute books and organizational documents of Seller;

(c)          all insurance policies relating to the Business, all claims arising under such policies (whether prior to or after the Closing), and all credits, premium refunds, proceeds, causes of action or rights thereunder;

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

(d)         all rights of Seller arising under this Agreement or the Agency Agreement or in connection with the Transactions;

(e)         any Tax refund, Tax rebate or Tax reimbursement due to Seller or its Affiliates and relating to the Business or any U.S. tax net operating loss of Seller;

(f)         any amounts payable to Seller under the Agency Agreement;

(g)         all books and records related to Excluded Assets or any Books and Records which Purchaser elects not to acquire pursuant to Section 2.1(i) hereof;

(h)         any unexpired lease or executory contract not identified as an Assigned Contract, Assigned Lease or Purchaser Assigned Real Property Lease;

(i)         any right to overfunding or refunded assets from any employee benefit plan or workers' compensation program; and

(j)         any other asset not included within the definition of Acquired Assets.

**C.    Assumed Obligations.**    The obligations assumed by the Purchaser (the "Assumed Obligations") are set forth in Section 2.3 of the APA, as follows:

2.3   Assumed Obligations. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Seller or the Business (the "Assumed Obligations"):

(a)         all Cure Costs for Assigned Contracts;

(b)         all Realty Cure Costs for Assigned Leases;

(c)         customer service and warranty claims arising after the Closing Date with respect to merchandise sold at the Stores or Distribution Centers (other than the Designated Liquidation Locations) on or after Closing Date;

(d)         all liabilities and obligations of Seller related to or arising under the Assigned Contracts, Assigned Leases, and Intellectual Property Rights from and after the Closing;

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

(e)  all costs, expenses and liabilities pro rated to Purchaser as set forth in this Agreement (including Section 9.3);

(f)  With respect to any Store or the Distribution Center which has not been designated as a Designated Liquidation Location, Real Estate Occupancy Expenses and payroll and benefits relative to employees of the Seller located in such Stores and Distribution Center.

**D.  Allocation and Adjustment of Purchase Price.**  As discussed *infra*, the Purchase Price of $5,240,000 is based upon (1) inventory provided by Debtor showing Merchandise as of December 31, 2009 having a Retail Value of not less than $13,100,000 (the "Inventory Threshold"), and (2) a value for Other Fixed Assets of $400,000. The APA establishes procedures to adjust the Purchase Price for changes to both the inventory value and value of the Other Fixed Assets.

**1.  Adjustment of Purchase Price Re: Higher Value for Other Fixed Assets.**  If the value of the Other Fixed Assets is greater than $400,000, the APA provides that the Purchase Price will be increased following the Closing. If the value of the Other Fixed Assets is less than $400,000, the Purchase Price is not reduced.  The process for this adjustment in the Purchase Price, and the amount of that adjustment is set forth in Section 2.6(c) of the APA:

(c)  The Purchase Price may be subject to increase based upon the value of the Other Fixed Assets as determined by the Parties following the Closing in accordance with the following provisions of this Section 2.6(c).

(i)  Within thirty (30) days (or such longer period as the Parties shall mutually agree) following the Closing Date (the "Liquidation Election Period"), Purchaser may elect (in its sole discretion) whether to continue the operation of the Business or to dispose of any or all of the Acquired Assets through liquidation (including, without limitation, any or all of the Other Fixed Assets ("Liquidated Other Fixed Assets")) pursuant to Section 3 hereof.  In the event that Purchaser does not elect to liquidate any or all of the Other Fixed Assets (such remaining Other Fixed Assets being referred to herein as (the "Retained Other Fixed Assets"), following the expiration of the Liquidation Election Period the Seller shall be entitled to select an auctioneer previously used by the Bankruptcy Court (the "Seller Appraiser") to estimate the net liquidation value of such Retained Other Fixed Asset(s) (the "ROFA Liquidation Value").  In the event that Purchaser disputes the ROFA Liquidation Value, Purchaser shall be

entitled to select an auctioneer previously used by the Bankruptcy Court or an auctioneer of recognized national standing to provide an alternate estimate of the ROFA Liquidation Value (the "Purchaser Appraiser") at Purchaser's expense. The Seller Appraiser and the Purchaser Appraiser shall select a third auctioneer previously used by the Bankruptcy Court or an auctioneer of recognized national standing (the "Referee Appraiser") to estimate the ROFA Liquidation Value. The average of the three appraisals shall conclusively determine the ROFA Liquidation Value. Each Party shall bear its own expenses, including attorney's fees, for any dispute in connection with determining the ROFA Liquidation Value.

(ii)     Following the completion of the liquidation of all Liquidated Other Fixed Assets by the Purchaser and determination of the ROFA Liquidation Value pursuant to the provisions of Section 2.6(c)(i) above with respect to Retained Other Fixed Assets, the Purchase Price shall be increased, if applicable, by an amount equal to 50% of the sum of (A) the total amount realized by Purchaser from liquidation of Liquidated Other Fixed Assets, less all actual out of pocket costs and expenses incurred by the Purchaser attributable to the disposition of such Other Fixed Assets, plus (B) the ROFA Liquidation Value of all Retained Other Fixed Assets.  Purchaser shall pay to Seller any such positive amount within ten (10) Business Days following the later of completion of liquidation of the Liquidated Other Fixed Assets or final determination of the ROFA Liquidation Value of the Retained Other Fixed Assets as provided above.

**2.      Adjustment of Purchase Price Re: Retail Value of Merchandise at Post-Closing Inventory.**  The APA provides that the Purchase Price will be adjusted depending upon the differential (if any) between (1) the actual Retail Value of the Merchandise as of the Closing Date (as determined through a physical inventory taking to be conducted within 30 days following the Closing Date), and (2) the Inventory Threshold. The adjustment to the Purchase Price is set forth in Schedule 2.6(b) of the APA, as follows:

Purchase Price Adjustment Schedule

A.   To the extent the aggregate Retail Value of the Merchandise *exceeds* the Inventory Threshold, the Purchase Price shall be adjusted upwards by $.50 for each dollar by which the aggregate Retail Value of the Merchandise exceeds the Inventory Threshold.

B.   To the extent the aggregate Retail Value of the Merchandise *is less than* the Inventory Threshold, the Purchase Price shall be adjusted downwards by an amount equal to the applicable Adjustment Factor set forth below multiplied by

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

the difference between the Inventory Threshold and the actual aggregate Retail Value of the Merchandise:

| Inventory Level | Adjustment Factor |
|---|---|
| $12,100,001 to $13,100,000 | 50% |
| $11,600,001 to $12,100,000 | 54% |
| $11,100,001 to $11,600,000 | 56% |
| $10,500,001 to $11,100,000 | 58% |
| $10,100,001 to $10,500,000 | 60% |
| Below $10,100,000 | 61% |

The following graph illustrates the application of the Adjustment Factor

| APA Purchase Price Adjustment | | | | |
|---|---|---|---|---|
| Inventory | Cumulative Decrement | Purchase Price | Step Down | Percentage |
| | | | | |
| 13,100,000 | | 5,240,000 | | |
| 12,600,000 | (500,000) | 4,990,000 | (250,000) | 50.0% |
| 12,300,000 | (800,000) | 4,840,000 | (400,000) | 50.0% |
| 12,100,000 | (1,000,000) | 4,700,000 | (540,000) | 54.0% |
| 11,600,000 | (1,500,000) | 4,400,000 | (840,000) | 56.0% |
| 11,100,000 | (2,000,000) | 4,080,000 | (1,160,000) | 58.0% |
| 10,600,000 | (2,500,000) | 3,740,000 | (1,500,000) | 60.0% |
| 10,100,000 | (3,000,000) | 3,410,000 | (1,830,000) | 61.0% |

## 3.     Liquidation of Certain Assets Assumption/Assignment Option Period

As further described above, the APA and the Agency Agreement provide that the Purchaser shall act as Debtor's Liquidating Agent for the purpose of liquidating the Liquidation Merchandise and Other Assets in certain locations identified in Schedule 3.1 of the APA, and additional locations as may be designated by Purchaser in writing prior to the expiration of the Liquidation Election Period through the conduct of "going out of business" sales. In addition, pursuant to Section 3.2 of the APA, the Purchaser has the exclusive right to act as Debtor's agent for the limited purpose of marketing and disposing of the Real Property Leases through the

NOTICE AND MOTION FOR APPROVAL          18
OF SALE AND BIDDING PROCESS

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

conclusion of the Lease Marketing Period, which is 60 days after the Closing Date, and to designate the ultimate assignee of all of Debtor's right, title and interest in and to such Real Property Leases, together with permanent fixtures and improvements therein (the "Designation Rights").

The Purchaser is obligated under Section 3.2(a) of the APA to reimburse Debtor for Real Estate Occupancy Expenses for the Designated Liquidation Locations during the Lease Marketing Period. Debtor has the obligation in Section 3.2(b) to cooperate with the Purchaser to arrange for the sale of Debtor's leasehold interests as determined by the Purchaser. The Purchaser has the right under Section 3.2(c) during the Lease Marketing Period to provide a written Lease Assumption Notice to Debtor of Purchaser's election to require the Seller to assume the applicable Real Property Lease and assign the same to Purchaser or Purchaser's designee. The Cure Costs under the Assigned Lease are paid for by the Purchaser (limited to the amounts described in Schedule to the APA). The attorney fees and costs to be incurred with respect to such assumption and assignment of an Assigned Lease are to be paid for by the Debtor. Under Section 3.2(d) of the APA, the Purchaser has the right during the Lease Marketing Period to provide written Property Dropout Notice to the Debtor of Purchaser's election to discontinue its efforts to market and attempt to sell any Real Property Lease, at which point Purchaser's obligation to pay Real Estate Occupancy Expenses for the Dropout Property shall cease and the affected Real Property Lease shall revert to the Debtor. Any election by Purchaser to cause the Debtor to assume and assign a Real Property Lease to the Purchaser or its designee shall, upon approval by the Bankruptcy Court of the same, be irrevocable, and the following approval by the Bankruptcy Court of the assignment of any Real Property Lease to Purchaser or

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

its designee, Purchaser shall no longer be permitted to designate such Real Property Lease as a Dropout Property.

        **4.**      **Conditions.**  Debtor's and Purchaser's respective obligations to consummate the transactions contemplated in the APA are subject to satisfaction of the conditions set forth in Section 10 of the APA. Consummation of the sale under the APA is conditioned upon, *inter alia,* entry of the Sale Order (as defined below in Section III), attached hereto as Exhibits A.

        **5.**      **Higher and Better Offers.**  The APA is subject to the submission by third parties of higher or better offers as set forth in the Sale Order.

### III.    PROPOSED SALE PROCEDURES

**A.**    **The Bidding Procedures and Break Up Fee**

        The Debtor and Purchaser recognize that the sale of the Acquired Assets as contemplated by the APA is subject to Debtor's receipt of higher and better offers.  Therefore, Debtor seeks authority to implement certain procedures to ensure that Debtor's estate will obtain the best return possible in respect of the Sale.  The Debtor thus requests that the Court enter the Sale Order (the "Sale Order") in the form attached hereto as Exhibit A approving the following bidding procedures (the "Bidding Procedures") to be employed with respect to the Sale.   The Sale is subject to competitive bidding as set forth herein and approval by the Court at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing").  Debtor will be asking for Court approval of this sales procedure and bidding process in a separate order on shortened time.  In an effort to ensure that due process and notice requirements that may effect this sale procedure are determined by the Court prior to notice being sent out to creditors and other interest parties, Debtor is asking for approval of bidding procedures in a separate order.  Both Orders will be pursuant to the terms and conditions set for in this motion, as well as the Asset

20

Purchase Agreement and Agency Agreement attached hereto as Exhibit A.The following alternative bid provisions and related bid protections are designed to compensate Purchaser for its efforts and agreements to date and the concomitant benefits conferred upon Debtor, and to facilitate a full and fair process designed to maximize the value of the Acquired Assets for the benefit of Debtor's stakeholders**:**

**1. Designation of Stalking Horse Bidder.**

Debtor has designated the bid of the Purchaser ("Stalking Horse Bidder") as the "stalking horse" bid ("Stalking Horse Bid"). As the Stalking Horse Bidder, Purchaser shall, upon entry of the Sale Order, be entitled to the Break-Up Fee (as defined below) and other standard stalking horse protections as discussed below. For purposes of these procedures, the Stalking Horse Bidder's obligations pursuant to the terms of the DIP Financing shall be deemed to satisfy any deposit requirement for the Stalking Horse Bidder.

The obligation of Purchaser to perform under the APA is conditioned on, among other things, the entry of the Sale Order by the Bankruptcy Court approving the Bidding Procedures and the Break-Up Fee.

**2. Auction Process.**

**Auction Date**. The auction shall take place on the business day prior to the day scheduled for the hearing on the Sale Motion at the offices of Oldfield & Helsdon, PLLC, 1401 Regents Boulevard, Suite 102, Fircrest, WA 98464, and noticed to all prospective bidders. To be eligible to participate in the auction, all Qualified Bidders must appear in person at this address. This summary of the Bidding Procedures terms is meant only as a summary of such terms and to the extent there is a conflict between this summary and the terms of the Bidding Procedures, the Bidding Procedures shall govern.

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

21

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

**Qualifications to Bid**. Only qualified bidders (as described below, the "Qualified Bidders") shall be allowed to participate in the auction. Purchaser shall be a Qualified Bidder for all purposes hereunder. To become a "Qualified Bidder," each prospective bidder shall, on or before 5:00 p.m. PST on the Business Day that is five (5) Business Days prior to the day scheduled for the hearing on the Sale Motion deliver (i) a good faith deposit in the amount of 10% of such bidder's Qualified Bid in cash into an escrow account designated by Debtor ("Escrow Account") and (ii) a binding letter agreement to Jeffrey Paul Helsdon of Oldfield & Helsdon, PLLC, counsel for Debtor, which contains the following:

(1) a binding offer to acquire the Acquired Assets for an amount that is not less than $250,000 more than the aggregate value of the Stalking Horse Bid ( "Overbid"), together with an executed copy of the APA with no changes thereto other than to reflect the name of such bidder as the Purchaser thereunder and the increase in the Purchase Price to reflect the amount of such bidder's Overbid;

(2) reasonably satisfactory evidence of its financial ability to (a) fully and timely perform if it is declared to be the Successful Bidder, and (b) provide adequate assurance of future performance of all contracts to be assigned;

(3) disclosure of any connections or agreements with Seller and/or any officer, director or equity security holder of Seller; and

(4) an agreement to accept and abide by the terms, conditions and procedures set forth herein.

Counsel for the Debtor shall promptly provide copies of any bids that he receives to the Stalking Horse Bidder, Purchaser and the Creditors' Committee, if one is appointed. Any party in interest (including Purchaser) shall have standing to challenge any prospective bidder's

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

22

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

compliance with these qualification requirements. Any dispute regarding a prospective bidder's compliance with these qualification requirements shall be resolved by the Bankruptcy Court prior to the auction.

The Stalking Horse Bid shall be considered the opening bid ("Opening Bid") at the auction. For all purposes of these bidding procedures and the auction contemplated herein, including, without, limitation, the determination of the Successful Bidder, (i) the Opening Bid shall be valued at an amount equal to the sum of $5,240,000.00

The highest Overbid submitted by a Qualified Bidder shall be the initial overbid at the auction ("Initial Overbid"). That bid must be $250,000 higher or the sum of 5,490,000. Subsequent Overbids ("Subsequent Overbids") shall be in increments of not less than $100,000 higher than the immediately preceding bid. The Initial Overbid and Subsequent Overbids shall be on substantially the same or better terms and conditions, taken as a whole, as those set forth in the Stalking Horse Bid. In determining the amount of any Subsequent Overbid submitted by Purchaser, Debtors shall take into account, and Purchaser shall be entitled to a credit equal to, the amount of the Break-Up Fee.

All bids shall be made in the presence of other bidders. Bidders shall have the right to request reasonable breaks during the pendency of the auction.

Upon the conclusion of the bidding, Debtor shall announce its determination of which bidder has submitted the highest and best bid ("Successful Bid"), and such bidder shall be declared the successful bidder ("Successful Bidder"). The Successful Bid, as determined by Debtor in accordance with these ~~Sales~~ Bidding Procedures, shall be submitted to the Bankruptcy Court for approval at the Sale Hearing. In the event that the Stalking Horse bidder is not the Successful Bidder, within three (3) business days of the entry of an order designating another

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

bidder as the Successful Bidder, the proceeds of the Successful Bidder's deposit shall be used to the pay the Break-Up Fee (as defined below) pursuant to the terms of this Motion. In the event that the bidder designated as the Successful Bidder fails to make the payment required by the previous sentence within three (3) business days after the entry of an order designating it as the Successful Bidder, such bidder shall be deemed to have forfeited its deposit which shall be applied by Debtor to repay all amounts owed pursuant to the terms of the DIP Financing then outstanding and, to the extent that any amount of such deposit remains thereafter, to Break-up fees outstanding. Within two (2) business days of the declaration of the Successful Bidder, the refundable deposits of all unsuccessful bidders shall be refunded with accrued interest. In the event a good faith dispute arises over whether a deposit is refundable or non-refundable, the deposit shall remain in the Escrow Account pending a determination of the dispute by the Bankruptcy Court or written agreement of the parties.

The transaction evidenced by the Successful Bid shall close no later than 20 days following the approval of the entry by the Court of the Sale Order ("Closing Date") at which time the Successful Bidder shall pay the balance of the Successful Bid into the Escrow Account; provided, however, if Purchaser is declared the Successful Bidder such date may be extended pursuant to the APA executed by the Stalking Horse Bidder. The Successful Bidder shall, at its expense, obtain all necessary governmental licenses, permits and approvals necessary to the consummation of its proposed transaction (provided, however, that this provision does not change any provision of the Asset Purchase Agreement or any bid regarding allocation of responsibility to pay taxes of Sellers). In the event Purchaser is not the Successful Bidder and Debtor consummates an Alternative Transaction, Purchaser shall be entitled to receive from Debtor's Bankruptcy estate upon the consummation of such Alternative Transaction (as defined

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

24

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

in the APA) a cash break-up fee payment in the amount of $100,000 for the reimbursement of Purchaser's reasonable and actual expenses incurred in connection with the proposed transactions contemplated by the Asset Purchase Agreement (collectively, "Break-Up Fee"). The Break-Up Fee shall be paid at the closing of the Alternative Transaction and shall be paid concurrently or ahead of any other distributions or payments by Seller contemplated in connection with such Alternative Transaction by the Successful Bidder; provided, however, that if the Purchaser does not receive the Break-Up Fee within one (1) Business Day of the consummation of such Alternative Transaction, Seller shall pay the Break-Up Fee to Purchaser and such shall be paid concurrently or ahead of any other distributions or payments by Seller contemplated in connection with such Alternative Transaction. The Break-Up Fee shall constitute an administrative expense of Debtor under Sections 503(b) and 507(a)(1) of the Bankruptcy Code. The Break-Up Fee shall not be payable to Purchaser if it breaches its obligations under the APA without having its performance excused under the terms of the APA.

In the event a bidder other than the Stalking Horse Bidder is declared to be the Successful Bidder and such bidder fails to timely perform any of its obligations as set forth above or pursuant to the Bankruptcy Court-approved definitive agreements, such declared Successful Bidder shall forfeit all deposits made as provided in such definitive agreements or for failure to enter into such definitive agreements without regard to Seller's ultimate damages occasioned by such failure; such deposits shall be applied in accordance with the terms of the APA, and shall not constitute liquidated damages; and, notwithstanding the foregoing, Debtor and the Bankruptcy estates shall retain all rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief. In the event that the Stalking Horse Bidder is declared the Successful Bidder, the terms of the APA shall govern.

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

25

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

In the event Debtor is unable to obtain Court approval of the Sale Motion, the sole remedy of any bidder shall be of the return of its deposit except, with respect to Purchaser, as otherwise provided in the APA with respect to the Break-Up Fee . All bids shall be in cash.

The proposed Bidding Procedures are in the best interests of Debtor, its creditors, and its estate. The Bidding Procedures are designed to strike a balance between inviting competing bids and enabling Debtor to close a sale with Purchaser within a reasonable time frame. The Bidding Procedures are fair, reasonable and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process. Moreover, debtors often employ bidding protections in order to encourage the making of an original offer subject to higher and/or better offers and ultimately to increase value for the estate.

Here, the Break-Up Fee is an integral part of Purchaser's offer. In fact, Purchaser's offer to purchase the Acquired Assets was – and remains – predicated and conditioned upon, *inter alia*, this Court's approval of the Break-Up Fee. As such, the assurance of the Break-Up Fee has "promoted more competitive bidding" because it induced a bid from Purchaser that otherwise might not have been made. Debtor submits that Purchaser should be reasonably reimbursed for its willingness to assume the role of the "stalking horse" as it is the only party ready and willing to serve in such role. Moreover, Purchaser's offer (including the Break-Up Fee) is also likely to serve as a catalyst to higher bids. Accordingly, Debtor respectfully submits that this Court should authorize and approve the Bidding Procedures, including the Break-Up Fee.

## IV.    LEGAL ANALYSIS

**A.     Approval Of Debtor's Entry Into the APA and the Agency Agreement is Warranted Pursuant To Bankruptcy Code Section 105(a) and 363 (b).**

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

26

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Section 363(b) of the Bankruptcy Code authorizes a debtor to sell its assets outside of the ordinary course of business. A debtor must show that each of the following elements has been met: (i) a sound business reason exists for the proposed transaction; (ii) the sale has been proposed in good faith; (iii) the sale price is fair and reasonable; and (iv) accurate and reasonable notice has been provided of the transaction.[1] Here, the proposed sale of the Acquired Assets pursuant to the APA meets each of these four factors.

**1. The Proposed Sale Is Supported by Sound Business Reasons.** Based upon the analysis of Gary and Arlene Woodring of Debtor's existing and future business prospects, they have concluded that, given the Debtor's current, severe liquidity crisis and the absence of a source of capital for its continued long-term operations, the Proposed Asset Sale represents the only viable way to maximize the value of Debtor's estates for the benefit of all creditors. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See*, *e.g.*, *Four B. Corp. v. Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in Bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well established principle of Bankruptcy law that the objective of Bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of Bankruptcy sales. *See In re*

---

[1] [6] *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994); *In re Stroud Ford, Inc.*, 163 B.R. 730 (Bankr. M.D. Pa. 1993); *In re Plabell Rubber Prods., Inc.*, 149 B.R. 475, 479 (Bankr. N.D. Ohio 1992); *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990).

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

27

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

*Integrated Res., Inc.*, 147 B.R. at 659 (sales procedures should "encourage bidding and []
maximize the value of the Debtors' assets").

Here, the proposed Bidding Procedures will allow and encourage interested parties to
submit competing bids in an Auction, thereby maximizing the value that Debtor will receive for
its assets. The Debtor believes that the Auction process will allow it to determine the highest and
best price possible for its assets. Without a prompt sale, the value of Debtor as a going concern
will significantly diminish because of the Debtor's cash flow difficulties.

The Debtor further submits that the proposed asset sale will preserve the substantial goodwill of
Debtor's Business, maintain valuable relationships with customers, preserve jobs, and avoid a
liquidation sale of Debtor's assets at severely depressed, "fire-sale" prices. Thus, Debtor
believes that the Proposed Asset Sale will realize the most cash possible for Debtor's estate and
creditors.

2.     **The Sale has Been Proposed in Good Faith.** "The requirement that a Purchaser
act in good faith … speaks to the integrity of his conduct in the course of the sale proceedings."
*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). "Typically, the
misconduct that would destroy a Purchaser's good faith status at a judicial sale involves fraud,
collusion between the Purchaser and other bidders or the trustee, or an attempt to take grossly
unfair advantage of other bidders." *Id.*

Here, the APA is the result of protracted, arm's length negotiations between Debtor and
Purchaser and their respective advisors. Purchaser thus is a good faith Purchaser within the
meaning of Section 363(m) of the Bankruptcy Code and should be entitled to all of the
protections thereof.

Additionally, the sale of the Acquired Assets is subject to higher or better offers and Debtor intends to provide notice of the Proposed Asset Sale to all potential bidders as more fully discussed below. Finally, Debtor has fully disclosed, and is requesting herein the Court's approval of, all of the terms and conditions of the proposed sale, notice and bidding procedures. Accordingly, the sale of the Acquired Assets has been proposed, and is, in good faith.

**3.** **The Purchase Price is Fair and Reasonable.** Debtor sought higher or better offers from other potential Purchasers prior to commencement of this Chapter 11 case and the filing of this Motion. Based upon those efforts, Debtor believes that the Purchase Price is fair and reasonable, is the highest and best offer received to date for the Acquired Assets, and that the likely alternative to the Proposed Asset Sale is a forced liquidation, with a resultant loss of substantial value to the Debtor's estate.

Debtor submits that the payment of the Break-Up Fee in the event of an Alternative Transaction is fair and reasonable. Purchaser has incurred and will continue to incur costs in continuing to make its offer available to Debtor. Purchaser has already incurred substantial out-ofpocket legal fees in conducting its due diligence and negotiating the APA and DIP Financing. If another bidder appears and pays substantially more than Purchaser's offer, Debtor will reap the benefits of Purchaser's first offer allowing for a higher subsequent offer. Indeed, courts have recognized that such fees are often a key component to significant sales conducted under section 363 of the Bankruptcy Code. *See In re Integrated Res., Inc.*, 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets … In fact, because the … corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values."). Here, the Break-Up Fee reasonably relates to Purchaser's "risk, effort and expenses …", *In re Integrated Res., Inc.*, 147 B.R. at 662,

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

29

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

was the result of arms-length negotiations, *In re 955 5th Avenue Associates*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989) and encourages bidding. *Id.* at 28. The Break-Up Fee should be approved and allowed in the event of an Alternative Transaction.

**4.**     **The Requirements of 11 U.S.C. § 363(f).** Section 363(f) of the Bankruptcy Code provides that the Trustee may sell property under subsection (b) or (c) of Section 363 free and clear of any interest in such property of an entity other than the estate, only if – (1) applicable non-Bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).   Those statutory conditions are present.   U.S. Bank, Debtor's principal secured creditor, consents to the Proposed Asset Sale. The only other valid secured lien is the Pre-Petition Financing provided by the Purchaser in the amount of $150,000.  To the extent that any of the Acquired Assets are subject to any valid and perfected liens other than those asserted by U.S. Bank and Purchaser, Debtor submits that such encumbered assets have a value far less than the Purchase Price being received for the Acquired Assets. Any liens on such assets shall attach to the proceeds from the Proposed Asset Sale. The transfer of the Acquired Assets free and clear of any liens, claims, interests, and encumbrances satisfies the statutory prerequisites of Section 363(f) of the Bankruptcy Code. Debtor seeks the entry of a Sale Order authorizing the sale of the Acquired Assets pursuant to Section 363.

**5.**     **A Successful Bidder Other Than Purchaser Should Be Required to Reimburse Purchaser for Amounts Advanced to the Debtor Pursuant to the DIP Financing**

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Pursuant to the APA, if an Alternative Transaction is approved, the Successful Bidder must remit to Purchaser an amount equal to the amounts Purchaser has at that time advanced to the Debtor pursuant to the DIP Financing and shall acquire Purchaser's rights and obligations under the DIP Financing obligation. The Court should approve this provision. The DIP Financing allow the Debtor to continue operations and maintain its going concern value for the benefit of its creditors. Purchaser is not a financing company and would not have advanced money to the Debtor absent the intention of acquiring the Acquired Assets. Reimbursement of the DIP Financing in the event of an Alternative Transaction takes into account the benefit Purchaser has provided to the estate and honors Purchaser's expectations in agreeing to provide the DIP Financing. Further, it does not impose any burden on a Successful Bidder that is greater than the value the DIP Financing. The Court should require a Successful Bidder to reimburse and acquire Purchaser's rights and obligations under the DIP Financing as provided in the APA.

Based upon the foregoing, Debtor has determined that entering into the APA together with the Agency Agreement with the Purchaser is in their best interest and the best interest of Debtor's stakeholders. Accordingly, Debtor should be permitted to enter into both the APA and the Agency Agreement.

**B.      Assumption and Assignment Contracts and Leases Pursuant to 11 U.S.C. § 365**

Section 365(a) of the Bankruptcy Code governs assumption of unexpired leases and other executory contracts and provides that, "[t]he trustee, subject to the court's approval, may assume or reject any executory contracts or unexpired lease of Debtor." Section 365(f) of the Bankruptcy Code provides, in pertinent part, that: (2) The trustee may assign an executory contract or unexpired lease of the debtor only if – (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

performance by the assignee of such contact or lease is provided, whether or not there has been a default in such a contract or lease. 11 U.S.C. § 365(f)(2). Debtor proposed assumption and assignment of the Assumed Contracts is a proper exercise of Debtor's business judgment as part of an integral component of the heavily negotiated asset sale. Additionally, as will be further evidenced at the Sale Hearing if and to the extent necessary, Purchaser is a competent, financially stable assignee. Debtor should be permitted to assume and assign the Assigned Contracts under Section 365 of the Bankruptcy Code.

## C. The Successful Bidder Is Entitled to Good Faith Purchaser Status Pursuant to SectIon 363(m) of the Bankruptcy Code

Debtor requests that the Court find that the Successful Bidder is qualified to acquire the Assets and will do so in good faith within the meaning of Bankruptcy Code Section 363(m). Specifically, Section 363(m) provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith …." 11 U.S.C. § 363(m). Pursuant to this section, "an appeal of a Bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property." *Mann v. Alexander Dawson, Inc.*, 907 F.2d 923, 926 (9th Cir. 1990).

Here, Purchaser needs assurance that the purchase of the Acquired Assets will not be subject to future attack by objecting creditors. Such assurance, Debtor believes, is required to generate the maximum purchase price for such assets at the Sale Hearing. These circumstances warrant a finding of good faith on the part of Purchaser. Lack of good faith is generally determined by the existence of fraudulent conduct or insider dealing during the sale process. *See*

NOTICE AND MOTION FOR APPROVAL
OF SALE AND BIDDING PROCESS

32

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

*In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983). Here, no such fraudulent conduct or dealings have occurred as of the date of this Sale Motion and will not occur prior to the Sale Hearing. The proposed sale will be the product of an open auction approved by the Court and to the extent necessary, arms-length, good faith negotiations between Debtor, on the one hand, and the successful bidder, on the other.

## V.     PROPOSED NOTICE OF PROPOSED ASSET SALE AND PROCEDURES

In order to ensure broad dissemination of notice of the Proposed Asset Sale, the Sale Hearing, and the Bidding Procedures, upon entry of the Sale Procedures Order, Debtor proposes to serve (a) the Sale Procedures Order and the proposed notice of sale ("Notice of Sale") attached hereto as Exhibit A on all creditors, equity holders and prospective bidders (or their counsel) that are known to Debtor and its advisors and (b) the Notice of Sale and the Sale Motion on (i) the Office of the United States Trustee; (ii) counsel to the Creditors' Committee, if one is appointed; (iii) the local, state and federal taxing authorities for each jurisdiction in which the Purchased Assets are located; (iv) counsel to the Purchaser; (v) counter-parties to Debtor's executory contracts and unexpired leases (each, a "Counter-Party"); (vi) all parties known to Debtor to have or to assert any lien, claim, encumbrance or other interest in any of the Acquired Assets; (vii) the Office of the United States Attorney; (~~ix~~viii) the Attorney General for the State of Washington; and (~~x~~ix) all persons who have filed requests for notice in these chapter 11 cases.

Debtor respectfully submits that such notice of the sale of the Acquired Assets satisfies the notice requirements of the applicable Bankruptcy Rules and § 363(b) of the Bankruptcy Code, constitutes good and sufficient notice, and that no other or further notice of this Motion, the ~~Proposed Asset~~ Sale, and the APA is required.

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

# VI. CONCLUSION

The Debtor respectfully request that this Court (i) at the conclusion of the initial hearing on the Sale Motion, (a) Aprrove the Bidding Procedure for the sale of Debtor's assets, (b) enter the Sale Order, and (c) approve the forms of the Sale Procedures and the Notice of Sale attached as exhibits to the Sale Order and (ii) grant such additional relief as requested herein.

DATED this 25th day of March, 2010.

BRIAN L. BUDSBERG, P.L.L.C.


/s/ Brian L. Budsberg
Brian L. Budsberg, WSBA# 11225
Attorney for Debtor