BRIAN L. BUDSBERG, WSBA#11225
Brian L. Budsberg, P.L.L.C.
P.O. Box 1489
Olympia, WA 98507-1489
Telephone: (360) 584-9093
Facsimile: (360) 252-8333
Attorney for Debtor

HONORABLE PAUL B. SNYDER
Location Tacoma
Chapter 11

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON

In re

LIQUIDATION OUTLET, INC.,

                Debtor.

No. 10-42279

INTERIM ORDER (1) AUTHORIZING INCURRENCE OF SECURED INDEBTEDNESS, (2) GRANTING SECURITY INTERESTS, (3) PROVIDING FOR ADEQUATE PROTECTION, (4) APPROVING THE DIP CREDIT AGREEMENT AS IT RELATES TO THE FOREGOING AND
(5) GRANTING RELATED RELIEF

THIS MATTER having come before the Court upon motion (the "**DIP Motion**") by Liquidation Outlet, Inc. (**the "Debtor"**), as a debtor and debtor-in-possession in the above captioned chapter 11 case (the "**Case**") seeking, among other things, entry of an interim order (this "**Interim Order**") authorizing the Debtor to:

(i)     Obtain credit and incur debt, pursuant to sections 363 and 364(c) of the Bankruptcy Code, on an interim basis for a period (the "**Interim Period**") from the commencement of the case through and including the date of the Final Hearing (as defined below) up to the aggregate committed amount of $1,000,000.00 (on terms and conditions more fully described herein) secured by perfected liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 1

amended (the "**Bankruptcy Code**") and referred to and defined in more detail herein as the "**DIP Liens**") on property of the Debtor's estate pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)    (a) Enter into and establish the financing arrangement (as amended, modified and in effect from time to time, the "**DIP Credit Facility**") provided for in that certain Debtor in Possession Credit and Security Agreement substantially in the form attached hereto as Exhibit A and (the "**DIP Credit Agreement**", and together with any other document in connection with the DIP Credit Facility, collectively, the "**DIP Documents**"), by and among the Debtor and LOI Capital, LLC (the "**DIP Lender**"), and (b) incur the "**Obligations**" under and as defined in the DIP Credit Agreement (collectively, the "**DIP Obligations**");

(iii)    Authorize the use of the proceeds of the DIP Credit Facility (net of any amounts used to pay fees under the DIP Credit Agreement) in a manner consistent with the terms and conditions of the DIP Credit Agreement and in accordance with the Approved Budget (as defined below) solely for (a) working capital and general corporate purposes to the extent set forth in the Approved Budget, (b) payment of costs of administration of the Case, and (d) payment of such prepetition expenses as contemplated in the Approved Budget or as consented to by the DIP Lender in its sole discretion and as approved by the Bankruptcy Court;

(iv)    Grant, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the DIP Lender perfected liens, subject and subordinate only to the Prepetition Liens and the adequate protection liens granted to U.S. Bank in the Interim Order Authorizing Use of Cash Collateral (Docket No. 39) ("U.S. Bank Adequate Protection Liens"), upon all of the Debtor's real and personal property

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 2

as provided in and as contemplated by this Interim Order, the DIP Credit Facility and the DIP Credit Agreement;

(v)     Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and this Interim Order;

(vi)    **Schedule a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the DIP Motion on a final basis and approve the form of notice with respect to the Final Hearing; and**

(viii)  Waive the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(h).

The Court having considered the DIP Motion, the Declaration of Gary Woodring in support of the Debtor's first day motions and orders, the exhibits attached thereto, such other declarations and evidence submitted prior to the Interim Hearing on behalf of LOI Capital, LLC in support of the Debtor's DIP Motion, the DIP Credit Facility and the DIP Credit Agreement, and the evidence submitted at the hearing on this Interim Order (the "**Interim Hearing**"); and in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), due and proper notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on April 8, 2010; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtor, its creditors, its estate and its equity holders, and is essential for the continued operation of the Debtor's businesses; and it further appearing that the Debtor is unable to secure unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code section

ORDER APPROVING POST-PETITION FINANCING ON AN INTERIM BASIS – Page 3

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

503(b)(1); and there is adequate protection of the interests of holders of liens on the property of the estate on which liens are to be granted, or such holders of liens have consented to the provisions of the DIP Credit Agreement and this Interim Order; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefore:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A.     **Petition Date**.  On March 25, 2010 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Washington (Tacoma Division). The Debtor has continued in the management and operation of its business and property as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.

B.     **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Committee Formation**.  An official committee of unsecured creditors has not been appointed in the Case.

D.     **Notice**.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtor, whether by telecopy, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the Internal Revenue Service, (iii) the Debtor's twenty (20) largest unsecured creditors, (iv) counsel to the Debtor, (v) counsel to the Pre-Petition Lenders (as defined below), (vi) counsel to the proposed DIP

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 4

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Lender, (vii) US Bank National Association, and (viii) all parties listed on the official mailing matrix maintained by the Clerk of the Bankruptcy Court.  Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(c).

E. **Debtor's Acknowledgements and Agreements**.  After consultation with its attorneys and financial advisors, but without prejudice to the rights of parties in interest as set forth in paragraph 5 below, the Debtor admits, stipulates, acknowledges and agrees that (collectively, paragraphs E(i) through E(iv) hereof shall be referred to herein as the "**Debtor's Stipulations**"):

> **(i)** __Pre-Petition Credit Liens__.  Prior to the commencement of the Case, the Pre-Petition Lenders (as defined below) made loans and advances and provided credit accommodations to the Debtor pursuant to (i) that certain US Bank Loan Agreement between the Debtor and US Bank National Association ("**US Bank**") dated as of October 26, 2006 (the "**US Bank Loan Agreement**" and, together with all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of US Bank, including, without limitation, the security agreements, notes, guarantees and Uniform Commercial Code ("**UCC**") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto, collectively, the "**US Bank Loan Documents**"), pursuant to which the Debtor is indebted to US Bank for certain pre-petition loans in the principal amount of $700,000 as of the Petition Date (together with all accrued but unpaid interest thereon, fees and expenses related thereto, collectively, the "**US Bank Obligations**"), and (ii) that certain Letter Agreement between the Debtor and LOI Capital, LLC ("**LOI Capital**", and collectively with US Bank, the "**Pre-Petition Lenders**") dated as of March 15, 2010 (the "**LOI Loan Agreement**", and together with all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of LOI Capital, including, without limitation, the security agreements, notes, guarantees and UCC financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto, collectively, the "**LOI Loan Documents**"; the LOI Loan Agreement and US Bank Loan Agreement are referred to herein collectively as the "**Pre-Petition Loan Agreements**"), pursuant to which the Debtor is indebted to LOI Capital for certain prepetition loans and advances in the principal amount of $150,000 as of the Petition Date (together with all accrued but unpaid interest thereon, fees and expenses related thereto, collectively, the "**LOI Obligations**, and together with the US Bank Obligations, collectively, the "**Pre-Petition Obligations**").

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 5

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

**(ii)** **Pre-Petition Obligations Amount**.  As of the Petition Date, the aggregate amount of all loans and other obligations in respect of the US Bank Loan Agreement equaled approximately $700,000, and the aggregate amount of all loans and other obligations in respect of the LOI Loan Agreement equaled $150,000, in each case plus all costs, expenses, fees (including attorneys' fees and legal expenses) and other charges, plus any further advances and less any collected and applied proceeds (collectively the **"Pre-Petition Debt"**).

**(i)** **Need for Post-Petition Financing**.  An immediate need exists for the Debtor to obtain funds from the DIP Credit Facility in order to continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations requires the availability of working capital from the DIP Credit Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders and the possibility for a successful sale of the Debtor's assets as a going concern or otherwise.  Based upon the pleadings and proceedings of record in the Case, the Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without the DIP Credit Facility.  The Debtor's ability to maintain business relationships with vendors, suppliers and customers, pay employees, make capital expenditures, make adequate protection payments, purchase and supply new inventory and otherwise finance their operations is essential to the Debtor's continued viability.  In addition, based on the record presented at the Interim Hearing: (i) the Debtor's critical need for financing is immediate; (ii) in the absence of the DIP Credit Facility, the continued operation of the Debtor's business would not be possible and serious harm to the Debtor would occur; and (iii) the preservation, maintenance and enhancement of the value of the Debtor's estate is of the utmost significance and importance.

**(ii)** **No Credit Available on More Favorable Terms**.  The Debtor has been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtor is also unable to obtain secured credit, allowable under

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 6

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order. The Debtor is not able to obtain sufficient long-term financing from sources other than the DIP Lender on terms more favorable than under the DIP Credit Facility, and is not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtor without providing the DIP Lender the DIP Liens (as defined below) in the DIP Collateral (as defined below), as provided herein. The Debtor is unable to obtain credit for borrowed money without the granting of liens on its assets.

(iii) **Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens are valid, senior, perfected and unavoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Prior Lien and or security interest. For the avoidance of doubt, subject to the liens of the DIP Lender, as provided for herein, the Pre-Petition Credit Liens have priority over and above all other liens except any liens which were valid, senior, perfected and otherwise unavoidable as of the Petition Date.

F. **Asset Purchase Agreement**. The DIP Lender and the Debtor are parties to that certain Asset Purchase Agreement dated as of March 24, 2010 (the "**Asset Purchase Agreement**") by and between the Debtor as seller, and the DIP Lender, in its capacity as purchaser, which provides for the sale or disposition pursuant to Section 363 of the Bankruptcy Code by Borrower of substantially all of the assets of the Debtor. As more fully described in the Debtor's motion to approve the Asset Purchase Agreement and the transactions contemplated thereby filed with the Bankruptcy Court, the Asset Purchase Agreement has been negotiated by the Debtor and the DIP Lender at arms length. The

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 7

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

DIP Lender has indicated that its willingness to provide post-petition financing to the Debtor pursuant to the DIP Credit Agreement is based in part upon the agreements set forth in the Asset Purchase Agreement for the sale or disposition pursuant to Section 363 of the Bankruptcy Code of substantially all of the assets of the Debtor; and the entry by the Debtor into the Asset Purchase Agreement, as well as the solicitation of higher and better offers for the purchase of the Debtor's assets through an auction process and consummation of such sale, are conditions to the obligation of the DIP Lender to provide financing to the Debtor under the DIP Credit Agreement. The Debtor acknowledges that the financing to be provided under the DIP Credit Agreement is essential to the Debtor's estate and that the DIP Lender is a good faith lender with respect to such financing.

G. **Use of Proceeds of the DIP Credit Facility**. Proceeds of the DIP Credit Facility (net of any amounts used to pay fees under the DIP Credit Agreement) shall be used in a manner consistent with the terms and conditions of the DIP Credit Agreement and in accordance with the Approved Budget (as defined below), solely for (a) working capital and general corporate purposes to the extent set forth in the Approved Budget, (b) payment of costs of administration of the Case, and (c) payment of such prepetition expenses as contemplated in the Approved Budget or as consented to by the DIP Lender in its sole discretion and as approved by the Bankruptcy Court.

H. **Extension of Financing**. The DIP Lender has indicated a willingness to provide financing to the Debtor in accordance with the DIP Credit Agreement and subject to (i) the entry of this Interim Order and a Final Order, and (ii) findings by the Court that such financing is essential to the Debtor's estate, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Credit Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 8

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

this Interim Order or the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

I.  **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The terms and conditions of the DIP Credit Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Credit Facility was negotiated in good faith and at arms' length between the Debtor and the DIP Lender.  Use of the proceeds to be extended under the DIP Credit Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the DIP Lender and is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

J.  **Notice**. Notice of the Interim Hearing and the entry of this Interim Order has been provided to: (i) the thirty (30) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee for the District of Washington (the "U.S. Trustee"); (iii) counsel to US Bank; (iv) Debtor's landlords; (v) US Bank National Association; (vii) all parties on the official mailing matrix maintained by the Clerk of the Bankruptcy Court (collectively, the "Notice Parties").  Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

K.  **Entry of Interim Order**.  For the reasons stated above, the Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Absent entry of this Interim Order, the Debtor's business, properties and estate will be harmed.  This Court concludes that entry of this Interim Order is in the best interest of the Debtor, its estate and creditors as its

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 9

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

implementation will, among other things, allow for the continued operation of the Debtor's existing businesses and enhance the value of the Debtor's estate.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     **Motion Granted**.  The DIP Motion is granted in its entirety subject to the terms and conditions set forth in this Interim Order and the DIP Credit Agreement.

2.     **DIP Credit Agreement Authorization**.

(a)     <u>**Approval of Entry Into DIP Credit Agreement**</u>. The Debtor is expressly and immediately authorized, empowered and directed to execute and deliver the DIP Credit Agreement and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Credit Agreement, and to deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Credit Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Credit Agreement. Subject to the terms of this Interim Order, the Debtor is hereby authorized and directed to pay the principal, interest, fees, expenses and other amounts described in the DIP Credit Agreement and all other documents comprising the DIP Credit Facility as such become due, including, without limitation, lender fees, facility fees, arranger fees, commitment fees, letter of credit fees and reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court. Upon execution and delivery, the DIP Credit Agreement shall

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 10

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with its terms.

(b) **Authorization to Borrow**.  In order to enable the Debtor to continue to operate its business, during the Interim Period and subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, documents comprising the DIP Credit Facility, and the Approved Budget (as defined below), the Debtor is hereby authorized under the DIP Credit Facility to request extensions of credit, and borrow,  up to a total committed amount of $1,000,000.00, of which the entire amount shall be authorized during the Interim Period to the extent provided in the DIP Credit Agreement and subject to the Approved Budget.   So long as the Debtor is not in default under the terms of this Interim Order or the DIP Credit Documents, the Debtor is immediately authorized to borrow from the DIP Lender under the DIP Credit Facility (a) in accordance with the terms and provisions of the DIP Documents and the Interim Order, (b) to the extent required to pay those expenses enumerated in the Approved Budget, as and when such expenses come due,

(c) **Application of DIP Proceeds**.  The Debtor is authorized to borrow pursuant to the DIP Credit Facility, and the proceeds of the DIP Credit Facility (net of any amounts used to pay fees under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Approved Budget (as defined below) solely for (a) working capital and general corporate purposes to the extent set forth in the Approved Budget, (b) payment of costs of administration of the Case, and (c) payment of such prepetition expenses as contemplated in the Approved Budget or as consented to by the DIP Lender in its full discretion, and as approved by the Court.

(d) None of the DIP Collateral (including proceeds thereof) or borrowings under the DIP Credit Facility may be used directly or indirectly by the Debtor, any Committee (defined

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 11

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

below), or any other person or entity to object to or contest in any manner the DIP Obligations, the DIP Documents, the DIP Liens or to assert or prosecute any actions, claims or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) against the DIP Lender. In addition, except as expressly provided therein, without the consent of the DIP Lender, no portion of the DIP Collateral (including proceeds thereof) or borrowings under the DIP Credit Facility shall be used or available for use or applied by any party (including the Debtor) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Replacement Liens (as each term is defined below).

(e) **Conditions Precedent**. The DIP Lender shall have no obligation to make any loan under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan or advance under the DIP Credit Agreement have been satisfied in full or waived by the DIP Lender in its sole discretion.

(f) **Post-Petition Liens**.

(i) Upon due execution and delivery to the DIP Lender, the DIP Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of such DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

(ii) Effective immediately upon the execution of this Interim Order, DIP Lender is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), 364(e)(3) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable and automatically perfected

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 12

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

postpetition security interests in and liens on, subordinate only to the Prepetition Liens and the U.S. Bank Adequate Protection Liens¸ all present and after-acquired property of the Debtor of any nature whatsoever and wherever located (collectively, the "**DIP Liens**"), (which DIP Liens shall be effective upon the date of this Interim Order, without the necessity of the execution by the Debtor or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the DIP Lender ), including, without limitation: all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, accounts, chattel paper and electronic chattel paper, deposit accounts, documents, furniture, fixtures, equipment, general intangibles, goods, instruments, inventory, investment property, leases, vehicles, rolling stock, proceeds of leases of real property, letter-of-credit rights, letters of credit, cash and cash equivalents, including sums on deposit in any deposit or escrow account, together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of the Borrower that now or hereafter come into the possession, custody, or control of the DIP Lender; (vii) proceeds of any and all of the foregoing; all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrower now has or hereafter acquires any rights (the "**Collateral**[1]").

---

[1]     All defined terms used in the description of the DIP Collateral as set forth in **paragraph 7** shall have the meanings ascribed thereto in the DIP Credit Agreement.  All terms not specifically defined in the DIP Credit Agreement and used in

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 13

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

(iii) In no event shall any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code, or any person or entity who pays (or through the extension of credit to Debtor, causes to be paid) any of the DIP Obligations, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted in favor of, or conferred upon the DIP Lender by the terms of the DIP Credit Agreement or this Interim Order, until such time as all of the DIP Obligations shall be indefeasibly paid in full in cash in accordance with the DIP Credit Agreement and this Interim Order. Upon (a) the Final Order becoming final and non-appealable and (b) the expiration of the Challenge Period Termination Date (as defined below), all pre-petition liens and security interests of the Pre-Petition Lenders in the Pre-Petition Credit Collateral shall be deemed to be assigned (and not terminated or released to the extent so assigned) to the DIP Lender as additional collateral security for so much of the DIP Obligations as shall at any time have been used to repay or refinance the Pre-Petition Debt, and such assignment shall be in addition to, and shall not limit, prejudice or impair in any way any of the claims or liens of the DIP Lender in the Collateral granted pursuant to the DIP Credit Agreement and this Interim Order.

(g) **DIP Lien Priority**. The DIP Liens to be created and granted to the DIP Lender, as provided herein, (a) are created pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, (b) are valid, prior, perfected, unavoidable and are subject and subordinate only to the Carve Out and the Prepetition Liens and the U.S. Bank Adequate Protection Liens, and shall secure all DIP Obligations. The DIP Liens shall not be made subject to or *pari passu* with any lien or

---

**paragraph 7** shall have the meanings assigned to such term in Article 8 or 9 of the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the Commonwealth of Massachusetts.

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 14

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

security interest by any court order heretofore or hereafter entered in the Case; and such DIP Liens shall be valid and enforceable against any trustee appointed in the Case, upon the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Case"), and/or upon the dismissal of any of the Case.

(h)     PACA Claims.  Notwithstanding any other provision of this Order, holders of valid and enforceable prepetition and postpetition Perishable Agricultural Commodities Act ("PACA") Trust Claims shall retain their trust rights, if any, to the extent provided by law against all prepetition and post petition assets of the Debtors and their estates and Debtors will pay valid and enforceable PACA trust claims, provided however, that such PACA Trust Claims shall not be paid until such time as the sale of the Debtor's assets contemplated by the parties is consummated, or as provided Budget attached hereto as Exhibit B.

(i)     **Enforceable Obligations**.  The DIP Credit Agreement shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successors thereto and its creditors, in accordance with its terms.

(j)     **Protection of DIP Lender and Other Rights**.  The DIP Lender shall have no obligation to make any extension of credit pursuant to the DIP Credit Facility unless all of the conditions precedent to the making of such extension of credit under the DIP Credit Facility are satisfied or waived by the DIP Lender in its sole discretion. From and after the Petition Date, the Debtor shall use the proceeds of the extensions of credit under the DIP Credit Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Interim Order and in compliance with the Approved Budget.

3.     **Authorization to Use Proceeds of DIP Credit Agreement**.  Attached to this Interim Order as Exhibit B is the Debtor's 3-week operating Approved Budget (the "**Approved Approved**

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 15

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

**Budget**") setting forth the Debtor's projected financial operations, anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtor expects to incur during each week during the 3-week period covered by the Approved Budget starting March 25, 2010, which Approved Budget shall be in form and substance satisfactory to the DIP Lender, and shall in any event include projected available cash, sales, cash flow, inventory, trade payables, and expenses. Pursuant to the terms and conditions of this Interim Order, the DIP Credit Facility and the DIP Credit Agreement, and in accordance with the Approved Budget, the Debtor is authorized to use advances under the DIP Credit Agreement during the period commencing immediately after entry of the Interim Order and terminating upon the earlier to occur of notice being provided by the Debtor that an Event of Default (as defined in paragraph 14 of this Interim Order) has occurred and is continuing, and the Commitment Termination Date (as hereinafter defined), in accordance with the Approved Budget. The Approved Budget may be updated (with the consent and/or at the request of the DIP Lender) from time to time, provided that such updated Approved Budget shall be in form and substance acceptable to the DIP Lender and approved by the DIP Lender in its sole discretion, and the Debtor shall be required always to comply with the Approved Budget pursuant to the terms of the DIP Credit Facility. As set forth above, the Debtor's authorization to use the proceeds of the DIP Credit Agreement shall terminate upon notice being provided by the DIP Lender to the Debtor that an Event of Default has occurred and is continuing, provided, however, during the Remedies Notice Period (as defined below) the Debtor may use the DIP Credit Agreement solely to meet payroll obligations and pay expenses essential to the preservation of the Debtor and its estate and as agreed by the DIP Lender, provided that any such payments are made in a manner consistent with the terms and provisions of the Approved Budget. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 16

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Case 10-42279-PBS    Doc 89    Filed 04/08/10    Entered 04/08/10 17:25:56    Page 16 of 78

business or other proceeds resulting therefrom, except as permitted in the DIP Credit Facility and the DIP Credit Agreement and in accordance with the Approved Budget. .The Debtor represents and warrants that the Approved Budget has been prepared on a reasonable basis and in good faith by the Debtor. Furthermore, the Debtor represents and warrants, in its independent business judgment, that the amounts set forth in the Approved Budget are appropriate and necessary to effectuate a successful sale of the Debtor's assets

        (a)    **Approved Budget Covenants**.  In accordance with the terms of the DIP Documents, the Debtor shall provide the DIP Lender, within two (2) Business Days after the end of each week  (or if such day is not a business day, the immediately preceding business day) from the Closing Date until the Termination Date (as defined in the DIP Loan Agreement), a report for such week and the period from the first full week after the Petition Date through the end of such week.  The Debtor acknowledges and agrees that (i) the incurrence or payment by the Debtor of expenses (x) other than amounts in connection with the itemized amounts set forth in the Approved Budget and (y) in excess of the amount set forth in the Approved Budget Variances (as defined below), or (ii) other violation of the terms and condition of this sub-paragraph (b), shall constitute an "Event of Default" (as defined in the DIP Loan Agreement).

        (b)    **Return of Inventory**.  The Debtor shall not, without the consent of the DIP Lender: (i) enter into any agreement to return any inventory to any of its creditors for application against any prepetition indebtedness under section 546(h) of the Bankruptcy Code; or (ii) consent to any creditor taking any set-off against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

        4.    **Post-Petition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 17

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Case. The Debtor shall execute and deliver to the DIP Lender all such financing statements, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

5.      **Post Petition Rent.** The Debtor shall timely pay the full amount of its post-petition payment obligations under all of its real property leases (including without limitation rent, CAM charges and taxes, where applicable).   In addition, the Debtor shall comply with all other obligations Bankruptcy Code § 365(d)(3).

6.      **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. Nothing in this Interim Order or the DIP Credit Agreement shall prejudice whatever rights any official committee(s) or any other party in interest with requisite standing other than the Debtor may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 18

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

validity, extent, perfection or priority of the security interests and liens of the Pre-Petition Lenders in and to the Pre-Petition Collateral, or (ii) the validity, allowability, priority, status or size of the Pre-Petition Debt, or (b) to bring suit against the Pre-Petition Lenders in connection with or related to the Pre-Petition Credit Agreement, or the actions or inactions of Pre-Petition Lenders arising out of or related to the Pre-Petition Credit Agreement; provided, however, that, unless any official committee(s) or any other party in interest with requisite standing commences a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Pre-Petition Lenders in the nature of a setoff, counterclaim or defense to the Pre-Petition Debt (including but not limited to, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Credit Agreement Lender), within (a) [60] days following the appointment of the official committee of unsecured creditors, or (b) if no official committee of unsecured creditors is appointed, 60 days following entry of the Final Order (as defined below) (collectively, (a) and (b) shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any official creditors' committee(s) and any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Case) shall be deemed to be forever waived and barred, and the Pre-Petition Debt shall be deemed to be allowed in full and, to the extent of the value of the Pre-Petition Credit Collateral on the Petition Date, shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with this Case and the Debtor's Stipulations shall be binding on all creditors, interest holders and parties in interest.

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 19

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

7. **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtor, any official committee or of any Person or shall affect the right of the DIP Lender, the Pre-Petition Lenders to object to the allowance and payment of such fees and expenses.

8. **Collateral Rights**. Unless the DIP Lender has provided its prior written consent or all DIP Obligations have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), all commitments to lend have terminated, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes any of the following:

(a) the obtaining of credit or the incurring of indebtedness that is secured by a security or collateral interest or other lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Lender; or

(b) the enforcement of any claimed junior security, mortgage, or collateral interest or other junior lien of any person other than of the DIP Lender on all or any portion of the Collateral; or

(c) the Debtor's return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code.

9. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of paragraph 7 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Lender's obligation to make loans and advances under the DIP Credit Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtor, the Debtor's estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b),

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 20

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

364(c) or 364(d) in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender in reduction of the DIP Obligations.

10. **Commitment Termination Date**. All (i) DIP Obligations of the Debtor to the DIP Lender shall be immediately due and payable, and (ii) authority to use the proceeds of the DIP Credit Agreement shall cease, both on the date (the "**Commitment Termination Date**") that is the earliest to occur of:

(a)     May 15, 2010;

(b)     the closing of the transactions contemplated by the APA;

(c)     the date in which the Debtor repays the DIP Obligations in full and terminates the DIP Credit Facility;

(d)     the date that is a "**Termination Declaration Date**" as defined herein; and

(e)     the date the DIP Lender demands payment of the DIP Obligations, following an Event of Default, pursuant to Section 7.2 of the DIP Loan Agreement.

11. **Payment from Proceeds of Collateral**. Net proceeds of all Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions of Collateral, whether or not in the ordinary course) will be applied to reduce the DIP Obligations, in accordance with the DIP Credit Agreement.

12. **Disposition of Collateral**. The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, or assume, reject or assign any Lease (as defined in the DIP Credit Agreement) without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender or an order of this

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 21

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Court), except as otherwise provided for in the DIP Credit Agreement and this Interim Order and as approved by the Bankruptcy Court.

13. **Events of Default.** The occurrence of any of the following events shall constitute an Event of Default under this Interim Order:

(a) Failure by the Debtor to comply with any term of this Interim Order.

(b) The occurrence of an "**Event of Default**" as defined in the DIP Credit Agreement.

14. **Rights and Remedies Upon Event of Default.**

(a) Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Lender may declare all obligations owing under the DIP Credit Agreement to be immediately due and payable and may declare the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains (the declaration of any of the foregoing being herein referred to as a "**Termination Declaration**" and the date of such declaration being herein referred to as the "**Termination Declaration Date**" ), (ii) the DIP Lender may declare a termination, reduction or restriction of the ability of the Debtor to use any proceeds of the DIP Credit Agreement, (iii) the DIP Lender may increase the rate of interest applicable to the Loans to the Default Rate under the DIP Credit Agreement.

(b) In addition to the remedies described above and other customary remedies, upon DIP Lender's determination that an Event of Default has occurred, any automatic stay otherwise applicable to the DIP Lender is hereby modified so that the DIP Lender shall be authorized to set a hearing before the Bankruptcy Court upon three (3) days electronic notice to the Debtor, any official committee(s) appointed in the Case, any affected real property lessor, and the United States Trustee, for a determination that such Event of Default has occurred and relief from

ORDER APPROVING POST-PETITION FINANCING ON AN INTERIM BASIS – Page 22

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

such automatic stay to enable the DIP Lender to exercise rights and remedies under the [DIP Loan Agreement]. Upon such determination by the Bankruptcy Court, the automatic stay shall be deemed terminated without further notice or order, and the DIP Lender is and shall be entitled to foreclose on all or any portion of the DIP Collateral, collect accounts receivable and apply the proceeds thereof in accordance with the section 7.2 of the DIP Credit Agreement, and shall be permitted to occupy the Debtor's premises to complete inventories, fulfill orders and sell inventories, execute going out-of-business sales or otherwise exercise remedies against the DIP Collateral and as permitted by applicable non-bankruptcy law; provided, however, that to the extent that the DIP Lender occupies any premises of the Debtor, the DIP Lender shall be obligated to pay per diem rent and occupancy charges for the number of days that it actually occupies the given premises, in the amounts and categories required under the applicable lease; and provided further, that (A) the DIP Lender shall not occupy any premises of the Debtor past July 31, 2010, and (B) the DIP Lender shall be obligated to comply with the terms of the real property lease governing any such premises (other than any provision of such lease prohibiting the conduct of a liquidation or going out of business sale at such premises).

(c) If the DIP Lender exercises any of its rights and remedies upon the occurrence of an Event of Default, the DIP Lender may sell or retain one or more agents to sell, lease or otherwise dispose of the DIP Collateral in accordance with the provisions of the DIP Credit Agreement. In any exercise of its rights and remedies upon an Event of Default under the DIP Credit Agreement, the DIP Lender is authorized to proceed under or pursuant to the DIP Credit Agreement.

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 23

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

(d)     All proceeds realized from any of the foregoing shall be turned over to the DIP Lender for indefeasible application in accordance with the provisions of the DIP Credit Agreement and this Interim Order.

(e)     **Modification of Automatic Stay**.   The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (1) permit the Debtor to grant the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Credit Agreement, the DIP Credit Facility and this Interim Order, and (2) authorize the DIP Lender to retain and apply payments hereunder.

(f)     **Other Remedies**.   Nothing included herein shall prejudice, impair, or otherwise affect (1) the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtor, or (2) the DIP Lender's rights, as provided in the DIP Credit Agreement or the DIP Credit Facility, to suspend or terminate providing any form or type of financial accommodation to the Debtor, including, without limitation, in relation to any of the DIP Obligations, the DIP Credit Agreement, or the DIP Credit Facility, in accordance with the terms of and to the extent provided for in the DIP Credit Agreement.

15.     **Proofs of Claim**.  DIP Lender will not be required to file proofs of claim in any of the Case or Successor Case.

16.     **Insurance Policies**.   Upon entry of this Interim Order, on each insurance policy maintained by the Debtor which in any way relates to the Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured; and (ii) the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as loss payee. The Debtor is authorized and directed to take any actions necessary to have the DIP Lender, be

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 24

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

added as an additional insured and loss payee on each insurance policy maintained by the Debtor which in any way relates to the Collateral.

17.    **Protection Under Section 364(e)**.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations incurred prior to the actual receipt by the DIP Lender of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any incurrence of DIP Obligations by the Debtor prior to the actual receipt by the DIP Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to the incurrence of DIP Obligations.

18.    **Other Rights and Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code No Modification or Stay of this Interim Order.**  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Credit Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby.  Notwithstanding any such

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 25

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

modification, amendment or vacation, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Interim Order, the obligations owed the DIP Lender prior to the effective date of any stay, modification or vacation of this Interim Order cannot, as a result of any subsequent order in the Case, or in any Successor Case, be subordinated, lose its lien priority or superpriority, administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Interim Order and/or the DIP Credit Agreement.

(b)    **Expenses**.   As provided in the DIP Credit Agreement, including, without limitation, reasonable, documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses of the DIP Lender in connection with the DIP Credit Facility will be paid by the Debtor, whether or not the transactions contemplated hereby are consummated. Payment of such fees shall not be subject to allowance by the Court. The DIP Lender shall provide to the U.S. Trustee and counsel to any committee(s) appointed in the Case, on a monthly basis, the total amount of professional fees incurred per calendar month in the Case. Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines.

(c)    **Binding Effect**.   The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor and its respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

or with respect to the property of the estate of the Debtor) whether in the Case, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

(d) **No Waiver**.  The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Credit Agreement, the DIP Credit Facility or this Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lender to (i) request conversion of any of the Case to a case under Chapter 7, dismissal of the Case, or the appointment of a trustee in the Case (but only in the event an Event of Default has occurred and is continuing), or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Lender.

(e) **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f) **No Marshaling**.  The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral,

(g) **Section 552(b)**.  The DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the Collateral.

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 27

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

(h) **Amendment**.  The Debtor and the DIP Lender may amend or waive any provision of the DIP Credit Agreement, provided that such amendment or waiver, in the judgment of the Debtor and the DIP Lender, is either non-prejudicial to the rights of third parties or is not material. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtor and the DIP Lender (after having obtained the approval of the DIP Lender as provided in the DIP Credit Agreement) and approved by the Bankruptcy Court.

(i) **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in the Case, (ii) converting the Case to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Case, and the terms and provisions of this Interim Order as well as the DIP Protections granted pursuant to this Interim Order and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain its priority as provided by this Interim Order until all the obligations of the Debtor to the DIP Lender pursuant to the DIP Credit Agreement, and all the obligations of the Debtor to the Pre-Petition Lenders under the Pre-Petition Credit Agreement, are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Credit Facility which survive such discharge by its terms). The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  The Debtor shall not propose or support any Plan that not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 28

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

(j) **Inconsistency**. In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement and of this Interim Order, the provisions of this Interim Order shall govern and control.

(k) **Liability**. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtor's estate, it being understood, however, that the Debtor shall be liable to the DIP Lender in accordance with the terms of the DIP Credit Facility and the DIP Credit Agreement.

(l) **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nun pro tunc* to the Petition Date immediately upon execution hereof

(m) **Objections Overruled**. All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(n) **No Waivers or Modification of Interim Order**. The Debtor irrevocably waives any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

(o) **Interim Financing Term**. The authorization of Debtor to obtain loans from the DIP Lender in accordance with the DIP Credit Agreement and this Interim Order shall expire twenty-five (25) days from the commencement of the Case, unless a Final Order in form and substance satisfactory to the DIP Lender is entered on or before such date.

(p) **Waiver of the Fourteen (14) Day Stay Under Bankruptcy Rule 6004(h)**. The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Interim Order.

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 29

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

19. **Findings of Fact and Conclusions of Law**. This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

20. **Discharge Waiver**. Absent the consent of the DIP Lender, the DIP Obligations evidenced by the DIP Documents, shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization. The Debtor shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full, on or prior to the effective date of such plan of reorganization or sale, of all DIP Obligations unless the DIP Lender has otherwise consented in writing to such plan or sale.

21. **Controlling Effect of Interim Order**. To the extent any provision of this Interim Order conflicts with any provision of the Motion, any prepetition agreement or any DIP Documents, the provisions of this Interim Order shall control.

22. **Final Hearing**. The Final Hearing to consider entry of the Final Order and final approval of the DIP Credit Facility is scheduled for April 19, 2010 the United States Bankruptcy Court for the District of Washington, Tacoma, Washington. On or before April _9_, 2010, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order, the proposed Final Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for any official committee(s), if any; (d) the Securities and Exchange Commission; (e) the

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 30

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Internal Revenue Service; and (f) any known holders of Prior Liens. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than April 15, 2010, at 4:00 p.m. prevailing Pacific time. In the event this Court modifies any of the provisions of this Interim Order or the Financing Agreements following such further hearing, such modifications shall not affect the rights and priorities of DIP Lender pursuant to this Interim Order with respect to the Collateral, and any portion of the DIP Obligations which arises or is incurred, advanced or paid prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

23.    **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

SO ORDERED by the Court this 8th day of April, 2010.

United States Bankruptcy Judge
(Dated as of Entered on Docket date above)

Presented by:

BRIAN L. BUDSBERG, P.L.L.C.

By /s/ Benjamin J. Riley
Brian L. Budsberg, WSBA #11225
Benjamin J. Riley, WSBA #34949
Attorney for Liquidation Outlet, Inc.,
Debtor-in-Possession

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 31

BRIAN L. BUDSBERG, PLLC
P.O. Box 1489
Olympia, Washington 98507
360-584-9093

Approved as to Form; Notice of
Presentation Waived:

BUSH STROUT & KORNFELD                    ROBERT D. MILLER, Jr.
                                          Acting United States Trustee

By: /s/ Christine M. Tobin- Presser
    Christine M. Tobin-Presser, WSBA #27628    By: /s/ Marjorie S. Raleigh
    Gayle E. Bush, WSBA #07318                     Marjorie S. Raleigh, WSBA #8544
    Attorneys for LOI, Capital, L.L.C.

FARLEIGH WADA WITT                        BAROKAS MARTIN & TOMLINSON

By/s/ Tara Schleicher                     By/s/ John Tomlinson, Jr.
   Tara Schleicher, WSBA #26884              John Tomlinson, Jr. WSBA # 14124
Attorneys for Safeway                     Attorneys for .Inland Western Lakewood, LLC

JAMES P. DAVIS, PLLC                      RYAN SWANSON & CLEVELAND

By/s/ James P. Davis                      By/s/ Timothy W. Dore
   James P. Davis, WSBA #15258               Timothy W. Dore, WSBA #17131
Attorneys for Capital Village Associates and    Attorneys for ABC-Pacific Corporation
Sylvan Associates

MILLER NASH LLP

By/s/ John R. Knapp, Jr.
   John R. Knapp, Jr., WSBA #29343
Attorneys for U.S. Bank

ORDER APPROVING POST-PETITION FINANCING ON AN
INTERIM BASIS – Page 32

# Exhibit A

**DEBTOR IN POSSESSION
CREDIT AND SECURITY AGREEMENT**

**BY AND BETWEEN**

**LIQUIDATION OUTLET, INC.**

**AND**

**LOI CAPITAL, LLC**

**March __, 2010**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................2

    Section 1.1   Definitions.................................................................................2

ARTICLE II AMOUNT AND TERMS OF THE CREDIT FACILITY ........................................9

    Section 2.1   Revolving Advances ......................................................9
    Section 2.2   Procedures for Requesting Advances ...........................9
    Section 2.3   Intentionally Omitted.................................**Error! Bookmark not defined.**
    Section 2.4   Intentionally omitted.................................**Error! Bookmark not defined.**
    Section 2.5   Interest; Default Interest Rate; Application of Payments;
                  Participations; Usury..................................................................9
    Section 2.6   Fees. ...........................................................................10
    Section 2.7   Time for Interest Payments; Payment on Non-Business Days;
                  Computation of Interest and Fees. ............................................11
    Section 2.8   Lockbox and Collateral Account; Sweep of Funds**Error! Bookmark not defined.**
    Section 2.9   Voluntary Prepayment; Reduction of the Maximum Line Amount
                  Termination of the Credit Facility by the Borrower. ..................11
    Section 2.10  Mandatory Prepayment..............................................11
    Section 2.11  Revolving Advances to Pay Indebtedness. **Error! Bookmark not defined.**
    Section 2.12  Use of Proceeds........................................................12
    Section 2.13  Liability Records.......................................................12
    Section 2.14  Single Loan ...............................................................12
    Section 2.15  Grants, Rights and Remedies......................................12
    Section 2.16  Perfection. .................................................................12
    Section 2.17  Waiver of any Priming Rights and Violative Use of Cash
                  Collateral..................................................................................12
    Section 2.18  Waiver of Claims to Surcharge..................................13

ARTICLE III SECURITY INTEREST; OCCUPANCY; SETOFF.............................................13

    Section 3.1   Grant of Security Interest...........................................13
    Section 3.2   Lien Perfection; Further Assurances...........................13
    Section 3.3   Superpriority Administrative Expense Claim..............14
    Section 3.4   Notification of Account Debtors and Other Obligors..............14
    Section 3.5   Assignment of Insurance............................................15
    Section 3.6   Occupancy.................................................................15
    Section 3.7   License. .....................................................................16
    Section 3.8   Intentionally omitted.................................**Error! Bookmark not defined.**
    Section 3.9   Setoff........................................................................16
    Section 3.10  Collateral...................................................................16
    Section 3.11  Survival.....................................................................16

ARTICLE IV CONDITIONS OF LENDING ...................................................................17

Section 4.1    Conditions Precedent to the Initial Advances...........................................17
Section 4.2    Conditions Precedent to All Advances. ....................................................18

ARTICLE V REPRESENTATIONS AND WARRANTIES.........................................19

Section 5.1    Existence and Power; Name; Chief Executive Office; Inventory
and Equipment Locations; Federal Employer Identification
Number and Organizational Identification Number ...............................19
Section 5.2    Intentionally omitted.................................**Error! Bookmark not defined.**
Section 5.3    Authorization of Borrowing; No Conflict as to Law or
Agreements. ...........................................................................................19
Section 5.4    Legal Agreements. .................................................................................20
Section 5.5    Subsidiaries. ...........................................................................................20
Section 5.6    Budget....................................................................................................20
Section 5.7    Litigation................................................................................................20
Section 5.8    Regulation U. .........................................................................................20
Section 5.9    Taxes......................................................................................................20
Section 5.10   Title and Liens. ......................................................................................20
Section 5.11   Intellectual Property Rights ...................................................................20
Section 5.12   Plans.......................................................................................................21
Section 5.13   Default....................................................................................................21
Section 5.14   Environmental Matters............................**Error! Bookmark not defined.**
Section 5.15   Submissions to Lender............................................................................21
Section 5.16   Financing Statements .............................................................................22
Section 5.17   Rights to Payment ..................................................................................22
Section 5.18   Administrative Priority; Lien Priority.....................................................22
Section 5.19   Appointment of Trustee or Examiner; Liquidation ..................................22
Section 5.20   The Chapter 11 Case ..............................................................................22

ARTICLE VI COVENANTS ...............................................................................23

Section 6.1    Reporting Requirements .........................................................................23
Section 6.2    Financial Covenants...............................................................................24
Section 6.3    Permitted Liens; Financing Statements ...................................................25
Section 6.4    Indebtedness...........................................................................................25
Section 6.5    Guaranties. .............................................................................................25
Section 6.6    Investments and Subsidiaries..................................................................25
Section 6.7    Dividends and Distributions. ..................................................................26
Section 6.8    Salaries...................................................................................................26
Section 6.9    Substantial Asset Disposition. ................................................................26
Section 6.10   Books and Records; Collateral Examination, Inspection and
Appraisals .............................................................................................26
Section 6.11   Account Verification...............................................................................26
Section 6.12   Compliance with Laws. .........................................................................27
Section 6.13   Payment of Taxes and Other Claims. ......................................................27
Section 6.14   Maintenance of Properties. .....................................................................27
Section 6.15   Insurance................................................................................................28
Section 6.16   Preservation of Existence........................................................................28

-2-

Section 6.17   Delivery of Instruments, etc.................................................................28
Section 6.18   Sale or Transfer of Assets; Suspension of Business Operations................29
Section 6.19   Consolidation and Merger; Asset Acquisitions.**Error! Bookmark not defined.**
Section 6.20   Sale and Leaseback...................................**Error! Bookmark not defined.**
Section 6.21   Restrictions on Nature of Business. ........................................................29
Section 6.22   Accounting..............................................................................................29
Section 6.23   Discounts, etc...........................................**Error! Bookmark not defined.**
Section 6.24   Plans.........................................................**Error! Bookmark not defined.**
Section 6.25   Place of Business; Name..........................................................................29
Section 6.26   Constituent Documents; S Corporation Status. ........................................29
Section 6.27   Performance by the Lender......................................................................29
Section 6.28   Financing Order; Administrative Priority; Lien Priority; Payment
               of Claims..................................................................................................30

ARTICLE VII EVENTS OF DEFAULT, RIGHTS AND REMEDIES .....................................30

Section 7.1    Events of Default. ...................................................................................30
Section 7.2    Rights and Remedies................................................................................33
Section 7.3    Certain Notices.......................................................................................34

ARTICLE VIII MISCELLANEOUS .................................................................................34

Section 8.1    No Waiver; Cumulative Remedies; Compliance with Laws. ...................34
Section 8.2    Amendments, Etc....................................................................................34
Section 8.3    Notices; Communication of Confidential Information; Requests for
               Accounting...............................................................................................34
Section 8.4    Further Documents..................................................................................35
Section 8.5    Costs and Expenses.................................................................................35
Section 8.6    Indemnity. ..............................................................................................35
Section 8.7    Participants..............................................................................................36
Section 8.8    Execution in Counterparts; Telefacsimile Execution. ..............................36
Section 8.9    Retention of Borrower's Records. ...........................................................36
Section 8.10   Binding Effect; Assignment; Complete Agreement; Sharing
               Information. .............................................................................................36
Section 8.11   Severability of Provisions. ......................................................................37
Section 8.12   Headings. ................................................................................................37
Section 8.13   Governing Law; Jurisdiction, Venue; Waiver of Jury Trial. ....................37
Section 8.14   NO ORAL AGREEMENTS; ENTIRE AGREEMENT**Error! Bookmark not defined.**
Section 8.15   Lender as Party-in-Interest.....................................................................37
Section 8.16   Waiver of Right to Obtain Alternative Financing.....................................37
Section 8.17   Credit Bids .............................................................................................38
Section 8.18   Application of Payments to Obligations; Application of Proceeds
               of Collateral. ...........................................................................................38

# DEBTOR IN POSSESSION
## CREDIT AND SECURITY AGREEMENT

LIQUIDATION OUTLET, INC., a Washington corporation (the "<u>Borrower</u>"), and [LOI CAPITAL, LLC] a Delaware limited liability company (as more fully defined in <u>Article I</u> herein, the "<u>Lender</u>") hereby agree as follows:

## RECITALS

WHEREAS, on March __, 2010 (the "<u>Petition Date</u>"), the Borrower commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Washington, and the Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as debtor-in-possession; and

WHEREAS, the Borrower is a party to that certain U.S. Bank Loan Agreement between the Borrower and U.S. Bank dated as of October 24, 2006 (the "<u>US Bank Loan Agreement</u>"), pursuant to the Borrower is indebted to US Bank for certain pre-petition loans in an amount equal to $700,000 (including, without limitation, accrued but unpaid interest, fees and expenses, collectively, the "<u>US Bank Obligations</u>"); and

WHEREAS, the Borrower and the Lender are party to that certain Letter Agreement dated March 11, 2010 (the "<u>Pre-Petition Credit Agreement</u>"), pursuant to which the Lender has made and the Borrower is indebted to the Lender for certain prepetition loans, advances and other amounts thereunder (including, without limitation, accrued but unpaid interest, fees and expenses, collectively, the "<u>Pre-Petition Obligations</u>"); and

WHEREAS, Borrower is unable to obtain funds or credit on any other terms; and

WHEREAS, the Borrower has asked the Lender to make post-petition loans and advances to the Borrower consisting of a debtor-in-possession credit facility in an aggregate principal amount not to exceed $2,000,000 at any time outstanding; and

WHEREAS, Lender is willing to provide such financing, subject to the terms and conditions set forth herein, including that all of the Obligations hereunder and under the other Loan Documents constitute allowed superpriority administrative expense claims pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code in the Chapter 11 Cases and are secured by a priming first priority lien on substantially all of Borrower's personal property, in each case as set forth herein and in the Financing Order;

NOW THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.    Except as otherwise expressly provided in this Agreement, the following terms shall have the meanings given them in this Section:

"Accounts" shall have the meaning given it under the UCC.

"Advance" means a Revolving Advance.

"Affiliate" or "Affiliates" means any Person controlled by, controlling or under common control with the Borrower, including any Subsidiary of the Borrower.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Debtor in Possession Credit and Security Agreement, as amended, supplemented or modified from time to time.

"Asset Purchase Agreement" shall mean (i) the Asset Purchase Agreement dated as of even date herewith by and between the Borrower as seller, and the Lender, in its capacity as purchaser, providing for the sale or disposition pursuant to Section 363 of the Bankruptcy Code by Borrower of substantially all of the assets of Borrower, which agreement shall serve as a "stalking horse" bid by which Borrower may solicit higher and better offers for the purchase of such assets as more fully set forth in the Sale Motion, or (ii) an asset purchase agreement submitted by an alternative bidder in conformity with the bidding procedures included in the [Sale Motion][Bidding Procedures Motion], in each case containing terms and conditions acceptable to the Lender in its sole discretion and approved by the Bankruptcy Court.

"Authorized Officer" means, as to any Person, the chief executive officer, the chief financial officer or any officer designated in writing by an Authorized Officer of such Person.

"Bankruptcy Code" means Title 11, United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

"Bankruptcy Court" means the United States Bankruptcy Court, District of Washington or any other court having competent jurisdiction over the Chapter 11 Case.

"Bidding Procedures Motion" shall mean a motion filed in the Bankruptcy Case seeking approval by the Bankruptcy Court of bidding procedures relative to the proposed sale of substantially all of the Borrower's assets pursuant to the Asset Purchase Agreement, which motion shall be in form and substance satisfactory to the Lender.

"Bidding Procedures Order" means a final order approved by the Bankruptcy Court and no longer subject to appeal or the possibility of appeal, approving the Bidding Procedures Motion, in form and substance satisfactory to Lender.

"Borrower" has the meaning set forth in the Preamble to this Agreement.

-2-

"Budget" means the projections showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for the Borrower delivered to the Lender pursuant to Sections 5.6 and 6.1(c), covering the period commencing on the Closing Date and ending on May 15, 2010. The Budget shall be substantially in the form of Exhibit A annexed hereto and made a part hereof.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Cash Collateral Motion" shall mean a motion filed in the Bankruptcy Case seeking approval by the Bankruptcy Court of the use of cash collateral, which motion shall be in form and substance satisfactory to the Lender.

"Cash Collateral Oder" means a final order approved by the Bankruptcy Court and no longer subject to appeal or the possibility of appeal, approving the Cash Collateral Motion, in form and substance satisfactory to Lender.

"Chapter 11 Case" means the Chapter 11 case commenced by the Borrower on the Petition Date in the Bankruptcy Court.

"Claim" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

"Closing Date" means the date upon which the Financing Order has been entered and all conditions precedent to the making of the first Advance hereunder have been satisfied or waived.

"Collateral" means all of the Borrower's Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, Investment Property, Leases, vehicles, rolling stock, leases of real property, letter-of-credit rights, letters of credit, all sums on deposit in any Collateral Account, and any items in any Lockbox; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of the Borrower that now or hereafter come into the possession, custody, or control of the Lender; (vii) proceeds of any and all of the foregoing; (viii) books and records of the Borrower, including all mail or electronic mail addressed to the Borrower; and (ix) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrower now has or hereafter acquires any rights; provided, however, that Collateral shall exclude Borrower's causes of action arising under Chapter 5 of the Bankruptcy Code.

"Commitment" means the Lender's commitment to make Advances to the Borrower.

"Constituent Documents" means with respect to any Person, as applicable, such Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such

BOS 46,601,241v3 3-22-10

Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Control Agreement" means each deposit account control agreement or similar agreement executed by a financial institution in favor of Lender with respect to any deposit account, securities account or other account of Borrower, and pursuant to which Lender has "control" of such account, as contemplated by Section 9-104 of the UCC.

"Credit Facility" or "Credit Agreement" means the credit facility under which Advances may be made available to the Borrower by the Lender under Article II hereof.

"Cut-off Time" means 12:00 noon Eastern Time.

"Default" means an event that, with giving of notice or passage of time or both, would constitute an Event of Default.

"Default Period" means any period of time beginning on the day a Default or Event of Default occurs and ending on the date identified by the Lender in writing as the date that such Default or Event of Default has been cured or waived.

"Default Rate" means an annual interest rate in effect during a Default Period or following the Termination Date, which interest rate shall be equal to five percent (5%) over the applicable Interest Rate.

"Director" means a director if the Borrower is a corporation, a governor or manager if the Borrower is a limited liability company, or a general partner if the Borrower is a partnership.

"Effective Date" means the date upon which a plan of reorganization has become effective that provides for the termination of all of the Lender's commitments to make further loans or advances under this Agreement and payment in full, in cash, of all Obligations and the cash collateralization of all Letters of Credit issued hereunder, in a manner satisfactory to the Lender.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the UCC.

"Event of Default" is defined in Section 7.1.

"Financial Covenants" means the covenants set forth in Section 6.2.

"Financing Order" means a final order of the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code, approving this Agreement, the other Loan Documents and authorizing on a final basis the incurrence by the Borrower of permanent post-petition secured and super priority indebtedness in accordance with this Agreement, and as to which no stay has been

-4-

entered and which has not been reversed, modified, vacated or overturned, in substantially the form of <u>Exhibit F</u> hereto and which is in form and substance satisfactory to the Lender.

"<u>Funding Date</u>" is defined in <u>Section 2.1</u>.

"<u>GAAP</u>" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described in <u>Section 5.6</u>.

"<u>General Intangibles</u>" shall have the meaning given it under the UCC.

"<u>Hazardous Substances</u>" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"<u>Indemnified Liabilities</u>" is defined in <u>Section 8.6</u>.

"<u>Indemnitees</u>" is defined in <u>Section 8.6</u>.

"<u>Infringement</u>" or "<u>Infringing</u>" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"<u>Intellectual Property Rights</u>" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"<u>Interest Payment Date</u>" is defined in <u>Section 2.5(a)</u>.

"<u>Interest Rate</u>" means an annual interest rate equal to fifteen percent (15%).

"<u>Inventory</u>" shall have the meaning given it under the UCC.

"<u>Investment Property</u>" shall have the meaning given it under the UCC.

"<u>Leases</u>" shall have the meaning given it under the UCC.

"<u>Lender</u>" means LOI Capital, LLC.

"<u>Licensed Intellectual Property</u>" is defined in <u>Section 5.11(c)</u>.

"<u>Lien</u>" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"<u>Loan Documents</u>" means this Agreement, the Revolving Note, and the Security Documents, together with every other agreement, note, document, contract or instrument to which the Borrower now or in the future may be a party and which is required by the Lender.

-5-

BOS 46,601,241v3 3-22-10

"Maturity Date" means the earlier of (i) May 15, 2010, or (ii) the closing of the transactions contemplated by the Asset Purchase Agreement.

"Material Adverse Effect" is defined in Section 5.13.

"Maximum Line Amount" means $2,000,000, unless such amount is reduced pursuant to Section 2.7, in which event it means such lower amount.

"Net Cash Proceeds" means in connection with any asset sale, the cash proceeds (including any cash payments received by way of deferred payment whether pursuant to a note, installment receivable or otherwise, but only as and when actually received) from such asset sale.

"Obligations" means each and every other debt, liability and obligation of every type and description which the Borrower may now or at any time hereafter owe to the Lender or its Affiliates or Subsidiaries, including without limitation, all Advances, indebtedness and other obligations hereunder and under the other Loan Documents, whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving the Lender alone or in a transaction involving other creditors of the Borrower, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several, and including all ndebtedness of the Borrower arising hereunder and under any Loan Document between the Borrower and the Lender, whether now in effect or subsequently entered into.

"Off-the-Shelf Software" is defined in Section 5.11(b).

"Officer" means with respect to the Borrower, an officer if the Borrower is a corporation, a manager if the Borrower is a limited liability company, or a partner if the Borrower is a partnership.

"OFAC" is defined in Section 6.12(c).

"Operating Account" means the Borrower's bank accounts with banks identified on Schedule 1.1 attached hereto, which account shall at all times be subject to a Control Agreement in form and substance satisfactory to Lender.

"Owned Intellectual Property" is defined in Section 5.11(a).

"Owner" means with respect to the Borrower each Person having legal or beneficial title to an ownership interest in the Borrower or a right to acquire such an interest.

"Permanent Facility" means the revolving loan facility made available to the Borrower under this Agreement, as approved by the Financing Order.

"Permitted Lien" and "Permitted Liens" are defined in Section 6.3(a).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

BOS 46,601,241v3 3-22-10

"Petition Date" has the meaning set forth in the recitals of this Agreement.

"Premises" means all locations where Borrower conducts its business or has any rights of possession, including the locations legally described in Exhibit D attached hereto.

"Pre-Petition Advance Documents" means the Pre-Petition Credit Agreement and each of the "Loan Documents" as defined therein.

"Pre-Petition Credit Agreement" has the meaning set forth in the recitals of this Agreement.

"Pre-Petition Obligations" has the meaning set forth in the Recitals.

"Pre-Petition Security Agreement" means the Security Agreement defined in, and executed in connection with, the Pre-Petition Credit Agreement.

"Revolving Advances" is defined in Section 2.1.

"Revolving Note" means the Borrower's revolving promissory note, payable to the order of the Lender in substantially the form of Exhibit B hereto, as same may be renewed and amended from time to time, and all replacements thereto.

"Sale Motion" shall mean a motion filed in the Bankruptcy Case seeking approval by the Bankruptcy Court of the sale of substantially all of the Borrower's assets in accordance with and pursuant to the terms of the Asset Purchase Agreement, which motion shall be in form and substance satisfactory to the Lender.

"Sale Order" means a final order approved by the Bankruptcy Court and no longer subject to appeal or the possibility of appeal, approving the Substantial Asset Disposition in form and substance satisfactory to Lender.

"Security Documents" means the Pre-Petition Security Agreement, this Agreement, and any other document delivered to the Lender from time to time to secure Pre-Petition Obligations and Post-Petition Obligations.

"Security Interest" is defined in Section 3.1.

"Subsidiary" means any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by a Borrower, by a Borrower and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Substantial Asset Disposition" shall mean the sale or disposition pursuant to Section 363 of the Bankruptcy Code, by Borrower of all, substantially all, or a significant portion of the assets of Borrower (other than sales or other dispositions of Inventory in the ordinary course of Borrower's business) pursuant to the terms and conditions of the Asset Purchase Agreement.

BOS 46,601,241v3 3-22-10

"Substantial Asset Disposition Schedule" shall mean the following schedule of events by which the Substantial Asset Disposition is to occur and be accomplished on or prior to the applicable date:

i.   March 25, 2010, the Bidding Procedures Motion shall have been filed with the Bankruptcy Court;

ii.  March 25, 2010, the Sale Motion shall have been filed with the Bankruptcy Court;

iii. April 8, 2010, the Bidding Procedures Motion shall have been approved by the Bankruptcy Court;

iv.  April 23, 2010 Borrower shall have completed the auction relative to the Substantial Asset Disposition;

v.   April 26, 2010, the Substantial Asset Disposition Motion shall have been approved by the Bankruptcy Court; and

vi.  April 28, 2010, the Substantial Asset Disposition shall be consummated pursuant to the terms of the Asset Purchase Agreement.

"Termination Date" means the earliest of (i) the Maturity Date, (ii) the date the Borrower repays the Obligations in full and terminates the Credit Facility, or (iii) the date the Lender demands payment of the Obligations, following an Event of Default, pursuant to Section 7.2.

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"US Bank Loan Agreement" is defined in the Recitals hereto.

"US Bank Obligations" is defined in the Recitals hereto.

Section 1.2   Other Definitional Terms; Rules of Interpretation.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP.  All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC.  References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or".  Defined terms include in the singular number the plural and in the plural number the singular.  Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in

-8-

accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor.  Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.

## ARTICLE II

## AMOUNT AND TERMS OF THE CREDIT FACILITY

Section 2.1    Revolving Advances. The Lender agrees, subject to the terms and conditions of this Agreement and the Financing Order, to make advances ("Revolving Advances") to the Borrower from time to time from the date that all of the conditions set forth in Section 4.1 are satisfied (the "Funding Date") to and until (but not including) the Termination Date in an amount not in excess of the Maximum Line Amount.  The Lender shall have no obligation to make a Revolving Advance to the extent that after giving effect to the requested Advance the outstanding principal balance of the Credit Facility exceeds (i) the amount set forth in the Budget for the date on which such Advance is to be made, or (ii) the Maximum Line Amount.  The Borrower's obligation to pay the Revolving Advances shall be evidenced by the Revolving Note and shall be secured by the Collateral.  Within the limits set forth in this Section 2.1, the Borrower may borrow, prepay pursuant to Section 2.7, and reborrow.

Section 2.2    Procedures for Requesting Advances.       The Borrower shall comply with the following procedures in requesting Revolving Advances:

(a)    Time for Requests.   The Borrower shall request each Advance so that it is received by Lender not later than the Cut-off Time two Business Days prior to the day on which the Advance is to be made.  Each request that conforms to the terms of this Agreement shall be effective upon receipt by the Lender, shall be in writing or by telephone or telecopy transmission, and shall be confirmed in writing by the Borrower if so requested by the Lender, by an Officer of the Borrower.  The Borrower shall repay all Advances even if the Lender does not receive such confirmation and even if the Person requesting an Advance was not in fact authorized to do so.  Any request for an Advance, whether written or telephonic, shall be deemed to be a representation by the Borrower that the conditions set forth in Section 4.2 have been satisfied as of the time of the request.  Notwithstanding anything to the contrary set forth herein, the Borrower shall not be entitled to request more than one (1) Advance per calendar week, unless the Lender shall otherwise agree.

(b)    Disbursement.    Upon fulfillment of the applicable conditions set forth in Article IV, the Lender shall disburse the proceeds of the requested Advance by wire transfer to the Borrower's Operating Account unless the Lender and the Borrower shall agree to another manner of disbursement.  The Lender with notice to Borrower may also initiate an Advance and disburse the proceeds to any third Person in such amounts as the Lender, in its commercially reasonable discretion, deems necessary to protect its interest in any Collateral.

Section 2.3    Interest; Default Interest Rate; Application of Payments; Usury.

BOS 46,601,241v3 3-22-10

(a) <u>Interest</u>. Except as provided in <u>Section 2.5(b)</u>, the principal amount of each Advance shall bear interest at the Interest Rate.

(b) <u>Default Interest Rate</u>. At any time during any Default Period or following the Termination Date, in the Lender's sole discretion and without waiving any of its other rights or remedies, the Obligations shall bear interest at the Default Rate or such lesser rate as the Lender may determine, effective as of the day any such Default Period begins through the last day of such Default Period, or any shorter time period that the Lender may determine. The decision of the Lender to impose a rate that is less than the Default Rate or to not impose the Default Rate for the entire duration of the Default Period shall be made by the Lender in its sole discretion and shall not be a waiver of any of its other rights and remedies, including its right to retroactively impose the full Default Rate for the entirety of any such Default Period or following the Termination Date.

(c) <u>Application of Payments</u>. Payments shall be applied to the Obligations on the Business Day of receipt by the Lender, but the amount of principal paid shall continue to accrue interest at the interest rate applicable under the terms of this Agreement from the calendar day the Lender receives the payment, and continuing through the end of the first Business Day following receipt of the payment. Lender shall apply payments in satisfaction of Obligations in the order set forth in <u>Section 8.18</u>.

(d) <u>Usury</u>. Notwithstanding anything to the contrary contained in any Loan Document, all agreements which either now are or which shall become agreements between the Borrower and the Lender are hereby limited so that in no contingency or event whatsoever shall the total liability for payments in the nature of interest, additional interest and other charges exceed the applicable limits imposed by any applicable usury laws. If any payments in the nature of interest, additional interest and other charges made under any Loan Document are held to be in excess of the limits imposed by any applicable usury laws, it is agreed that any such amount held to be in excess shall be considered payment of principal hereunder, and the indebtedness evidenced hereby shall be reduced by such amount so that the total liability for payments in the nature of interest, additional interest and other charges shall not exceed the applicable limits imposed by any applicable usury laws, in compliance with the desires of the Borrower and the Lender. This provision shall never be superseded or waived and shall control every other provision of the Loan Documents and all agreements between the Borrower and the Lender, or their successors and assigns.

Section 2.4    <u>Fees</u>.

(a) <u>Origination Fee</u>. The Borrower shall pay the Lender a fully earned and non-refundable origination fee in an amount equal to 2.0% of the Maximum Line Amount $40,000, which origination fee earned in full on the date hereof and shall be included in the principal amounts owing hereunder and paid in full in cash by the Borrower on the Termination Date.

(b) <u>Monitoring Fees</u>. Borrower shall pay to Lender a weekly collateral monitoring fee in the amount $2,500 per week, payable on the first Business Day of each week, commencing on the date of entry of the Financing Order to and including the Termination Date, to compensate Lender in respect of costs and expenses incurred in monitoring and administering the Collateral, and Borrower's business and operations.

-10-

(c)    Other Fees and Charges.  The Lender may from time to time impose additional fees and charges as consideration for Advances made in excess of the amount set forth in the Budget on such date or for other events that constitute an Event of Default or a Default hereunder, including fees and charges for the late delivery of reports, which may be assessed in the Lender's sole discretion on either an hourly, periodic, or flat fee basis, and in lieu of or in addition to imposing interest at the Default Rate.

Section 2.5    Time for Interest Payments; Payment on Non-Business Days; Computation of Interest and Fees.

(a)    Time For Interest Payments.  Accrued and unpaid interest shall be due and payable on the first day of each month and on the Termination Date (each an "Interest Payment Date"), or if any such day is not a Business Day, on the next succeeding Business Day. Interest will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of advance to the Interest Payment Date.  If an Interest Payment Date is not a Business Day, payment shall be made on the next succeeding Business Day.

(b)    Payment on Non-Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances or the fees hereunder, as the case may be.

(c)    Computation of Interest and Fees.  Interest accruing on the outstanding principal balance of the Advances and fees hereunder outstanding from time to time shall be computed on the basis of actual number of days elapsed in a year of 360 days.

Section 2.6    Voluntary Prepayment; Reduction of the Maximum Line Amount Termination of the Credit Facility by the Borrower.  Except as otherwise provided herein, the Borrower may prepay the Advances in whole at any time or from time to time in part.  The Borrower may terminate the Credit Facility or reduce the Maximum Line Amount at any time upon at least ten (10) days advance written notice prior to the proposed Termination Date.  Any reduction in the Maximum Line Amount shall be in multiples of $100,000, and with a minimum reduction of at least $100,000.    If the Borrower terminates the Credit Facility or reduces the Maximum Line Amount to zero, all Obligations shall be immediately due and payable, and if the Borrower gives the Lender less than the required ten (10) days advance written notice, then the interest rate applicable to borrowings evidenced by the Revolving Note shall be the Default Rate for the period of time commencing ten (10) days prior to the proposed Termination Date through the date that the Lender actually receives such written notice.

Section 2.7    Mandatory Prepayment.  If on any date the outstanding principal balance of the Credit Facility exceeds the amount forecasted for such date in the Budget, without notice or demand, unless the Lender shall otherwise consent in a written agreement that sets forth the terms and conditions which the Lender in its discretion may deem appropriate, then the Borrower shall immediately prepay the Revolving Advances to the extent necessary to eliminate such excess.  Any voluntary or mandatory prepayment received by the Lender may be applied to the Obligations, in such order and in such amounts as the Lender in its sole discretion may determine from time to time.

-11-

Section 2.8    Use of Proceeds.  The Borrower shall use the proceeds of Advances for (i) payment in full of the US Bank Obligations, (ii) payment in full of the Pre-Petition Obligations, and (iii) funding post-petition operations strictly in accordance with the Budget.  No proceeds of any Advance may be utilized by the Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing, any claims or causes of action against the Lender, or its counsel or advisors (including advisors to their counsel), arising from or relating to the Pre-Petition Credit Agreement or this Agreement, and/or investigating, challenging or raising any defenses to the obligations or liens under the Pre-Petition Credit Agreement or this Agreement.  Notwithstanding the forgoing, any official committee(s) appointed in the Chapter 11 Case shall have the ability to investigate such matters subject to the terms of the Financing Order.

Section 2.9    Liability Records.  The Lender may maintain from time to time, at its discretion, records as to the Obligations.  All entries made on any such record shall be presumed correct until the Borrower establishes the contrary.  Upon the Lender's demand, the Borrower will admit and certify in writing the exact principal balance of the Obligations that the Borrower then asserts to be outstanding.  Any billing statement or accounting rendered by the Lender shall be conclusive and fully binding on the Borrower unless the Borrower gives the Lender specific written notice of exception within 30 days after receipt.

Section 2.10    Single Loan.  All Advances to Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured by all of the Collateral.

Section 2.11    Grants, Rights and Remedies. The Liens, security interests and the administrative priority granted pursuant to Article III may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Financing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

Section 2.12    Perfection. The Liens and security interests securing the Obligations, as granted in Article III, shall be deemed valid and perfected by entry of the Financing Order.  The Lender shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Financing Order or any other Loan Document shall be deemed perfected without Lender taking any action whatsoever.  Notwithstanding the foregoing, Borrower agrees, promptly upon request by Lender to take all actions reasonably requested by Lender to perfect a first priority Lien in all or any portion of the Collateral.

Section 2.13    Waiver of any Priming Rights and Violative Use of Cash Collateral. As of the Closing Date, on behalf of itself and its estates, and for so long as any Obligation shall be outstanding, the Borrower hereby irrevocably waives any right pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations except as expressly set forth in this Agreement or the Financing Order, or otherwise agreed to by the Lender.

-12-

Section 2.14   Waiver of Claims to Surcharge.   In accordance with the Financing Order, Borrower, its Subsidiaries and Affiliates and the Borrower's bankruptcy estate hereby waives and shall cause each of their respective Subsidiaries to waive, any claims to surcharge the Collateral under section 506(c) of the Bankruptcy Code, excluding, however, any such claims for matters provided for in the Budget and incurred prior to the occurrence of an Event of Default and termination of the Credit Facility but not paid by the Borrower (subject to Lender's rights to object                     to                     any                     such                     claims).

## SECURITY INTEREST; OCCUPANCY; SETOFF

Section 3.1   Grant of Security Interest.   The Borrower hereby pledges, assigns and grants to the Lender a continuing and priming first priority lien and security interest (subject only to liens permitted under Section 6.3(a) of this Agreement), in accordance with sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of all Obligations arising hereunder.   Upon request by the Lender, the Borrower will grant the Lender a priming first priority security interest in all commercial tort claims that the Borrower may have against any Person.

Section 3.2   Lien Perfection; Further Assurances.   The  Financing  Order  shall  be sufficient and conclusive evidence of the validity, perfection and priorities of the Lender's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the liens of the Lender in and to the Collateral or to entitle the Lender to the priorities granted herein, provided, however, the Borrower may execute such instruments, assignments, mortgages or documents as are necessary to perfect Lender's Liens upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of Lender's Liens upon the Collateral.  The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the Commonwealth of Massachusetts or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of Borrower's location for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  The Borrower agrees to furnish any such information to the Lender promptly upon request.  The Borrower also ratifies its authorization for the Lender to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.  No such filing or recordation shall be necessary or required in order to create or perfect any such Lien.  The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.   At Lender's request, Borrower shall also promptly execute or cause to be executed and shall deliver to Lender any and all documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of the Loan Documents.

-13-

For purposes of any such financing statements, the Borrower represents and warrants that the following information is true and correct:

Name and address of Borrower:

Liquidation Outlet, Inc.
1025 Valley Avenue
Puyallup, Washington 98371
Attn: Mr. Gary Woodring
Federal Employer Identification No. 91-1566019
UBI No. 601393504

Name and address of Secured Party:

LOI Capital, LLC
c/o Hudson Capital Partners, LLC
One Gateway Center, Suite 402
Newton, Massachusetts 02452

Section 3.3    <u>Superpriority Administrative Expense Claim</u>.    The Obligations of the Borrower arising hereunder after the Closing Date shall constitute, in accordance with Sections 364(c) and 364(d) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code. Lender shall have a superpriority administrative expense claim against the Borrower's estate pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code for the Obligations and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the Financing Order. The Obligations of the Borrower hereunder are claims to be afforded priority over administrative expenses pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, as provided herein and/or in the Financing Order and secured by liens pursuant to Section 364 of the Bankruptcy Code as provided herein.

Section 3.4    <u>Notification of Account Debtors and Other Obligors</u>.    The Lender may at any time (whether or not a Default Period then exists) notify any account debtor or other Person obligated to pay the amount due that such right to payment has been assigned or transferred to the Lender for security and shall be paid directly to the Lender. The Borrower will join in giving such notice if the Lender so requests. At any time after the Borrower or the Lender gives such notice to an account debtor or other obligor, the Lender may, but need not, in the Lender's name or in the Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such right to payment, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor. The Lender may, in the Lender's name or in the Borrower's name, as the Borrower's agent and attorney-in-fact, notify the United States Postal Service to change the

-14-

address for delivery of the Borrower's mail to any address designated by the Lender, otherwise intercept the Borrower's mail, and receive, open and dispose of the Borrower's mail, applying all Collateral as permitted under this Agreement and holding all other mail for the Borrower's account or forwarding such mail to the Borrower's last known address.

Section 3.5   <u>Assignment of Insurance</u>.   As additional security for the payment and performance of the Obligations, the Borrower hereby assigns to the Lender any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and the Borrower hereby directs the issuer of any such policy to pay all such monies directly to the Lender.   At any time, whether or not a Default Period then exists, the Lender may (but need not), in the Lender's name or in the Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy.   Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Lender to be applied, at the option of the Lender, either to the prepayment of the Obligations or shall be disbursed to the Borrower under staged payment terms reasonably satisfactory to the Lender for application to the cost of repairs, replacements, or restorations.   Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

Section 3.6   <u>Occupancy</u>.

(a)   The Borrower hereby irrevocably grants to the Lender the right to take exclusive possession of the Premises at any time during a Default Period upon three (3) days prior written notice to Borrower.

(b)   During any such period of occupancy, the Lender may use the Premises only to hold, process, manufacture, sell, use, store, liquidate, realize upon or otherwise dispose of goods that are Collateral and for other purposes that the Lender may in good faith deem to be related or incidental purposes.

(c)   The Lender's right to hold the Premises shall cease and terminate upon the earlier of (i) payment in full and discharge of all Obligations and termination of the Credit Facility, and (ii) final sale or disposition of all goods constituting Collateral and delivery of all such goods to purchasers.

(d)   The Lender shall not be obligated to pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises; <u>provided</u>, <u>however</u>, that if the Lender does pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises, the Borrower shall reimburse the Lender promptly for the full amount thereof.   In addition, the Borrower will pay, or reimburse the Lender for, all taxes, fees, duties, imposts, charges and expenses at any time incurred by or imposed upon the Lender by reason of the execution, delivery, existence, recordation, performance or enforcement of this Agreement or the provisions of this <u>Section 3.6</u>.

-15-

Section 3.7    License.  Without limiting the generality of any other Security Document, the Borrower hereby grants to the Lender a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of the Borrower for the purpose of:  (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by the Borrower for its own manufacturing and subject to the Borrower's reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

Section 3.8    Setoff. The Lender may at any time or from time to time, at its sole discretion and without demand and without notice to anyone, setoff any liability owed to the Borrower by the Lender, whether or not due, against any Obligation, whether or not due.  In addition, each other Person holding a participating interest in any Obligations shall have the right to appropriate or setoff any deposit or other liability then owed by such Person to the Borrower, whether or not due, and apply the same to the payment of said participating interest, as fully as if such Person had lent directly to the Borrower the amount of such participating interest.

Section 3.9    Collateral. This Agreement does not contemplate a sale of accounts, contract rights or chattel paper, and, as provided by law, the Borrower is entitled to any surplus and shall remain liable for any deficiency.  The Lender's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Lender need not otherwise preserve, protect, insure or care for any Collateral. The Lender shall not be obligated to preserve any rights the Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application.  The Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.  The Borrower waives any right it may have to require the Lender to pursue any third Person for any of the Obligations.

Section 3.10    Survival.   The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Financing Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    No costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Borrower in respect of any Obligation;

(b)    The Liens in favor of the Lender set forth in Section 3.1 hereof shall constitute valid and perfected priming first priority Liens and security interests, subject only to

-16-

Permitted Liens, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)     the Liens in favor of the Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Lender file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

## ARTICLE IV

## CONDITIONS OF LENDING

Section 4.1    Conditions Precedent to the Initial Advances.  The Lender's obligation to make the initial Advance shall be subject to the condition precedent that the Lender shall have received all of the following, each properly executed by the appropriate party and in form and substance satisfactory to the Lender:

(a)     This Agreement;

(b)     The Revolving Note;

(c)     The Financing Order shall have been entered by the Bankruptcy Court not later than April 19, 2010, and the Lender shall have received a certified copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender and the Borrower;

(d)     Certified copies of all documents evidencing any necessary corporate (or other similar) action, consents and governmental approvals (if any) required for the execution, delivery and performance by Borrower of the documents referred to in this Section 4.1(d);

(e)     A certificate of the Secretary or an Assistant Secretary of Borrower as of the date hereof certifying the names of the officer or officers of such entity authorized to sign the Loan Documents to which such entity is a party, together with a sample of the true signature of each such officer (it being understood that Lender may conclusively rely on each such certificate until formally advised by a like certificate of any changes therein);

(f)     Certificates of the insurance required hereunder, with all hazard insurance containing a lender's loss payable endorsement in the Lender's favor and with all liability insurance naming the Lender as an additional insured;

(g)     Payment of all fees due under the terms of this Agreement through the date of the initial Advance, and payment of all expenses incurred by the Lender through such date and that are required to be paid by the Borrower under this Agreement, including all legal expenses incurred by Lender through the date of this Agreement;

(h)     A Customer Identification Information form and such other forms and verification as the Lender may need to comply with the U.S.A. Patriot Act;

-17-

BOS 46,601,241v3 3-22-10

(i)     On or before the Closing Date, Lender shall have received the Budget, in form and substance satisfactory to the Lender.  The Budget will be in the form of the 4-week Budget dated March 23, 2010, and annexed hereto as <u>Exhibit A</u>, with such modifications (if any) as are agreed to by the Borrower and Lender;

(j)     The Borrower shall have entered into the Asset Purchase Agreement and filed the Sale Motion with the Bankruptcy Court seeking entry of the Sale Order;

(k)     The Borrower shall have confirmed the Sale Order has not been entered by the Bankruptcy Court;

(l)     Concurrently with the making of the initial Advance, the Pre-Petition Obligations owing to Lender shall have been paid in full, and pursuant to the Financing Order Borrower shall have released in favor of the Lender any and all claims and defenses that may be asserted by the Borrower relative to the Pre-Petition Obligations; <u>provided</u>, <u>however</u>, that the official creditors' committee appointed in the Bankruptcy Case will have the ability to investigate such matters and the foregoing releases and acknowledgements shall be binding on the estates if the creditors' committee does not initiate an adversary proceeding within sixty (60) days after its appointment;

(m)     Concurrently with the making of the initial Advance, the US Bank Obligations shall have been paid in full and security interest granted pursuant to the terms of the US Bank Loan Agreement shall be terminated and/or released; and

(n)     Such other documents as the Lender in its sole discretion may require in its reasonable discretion.

Section 4.2     <u>Conditions Precedent to All Advances</u>. The Lender's obligation to make each Advance shall be subject to the further conditions precedent that:

(a)     the representations and warranties contained in <u>Article V</u> are correct on and as of the date of such Advance as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date;

(b)     no event has occurred and is continuing, or would result from such Advance which constitutes a Default or an Event of Default;

(c)     before and after giving effect to any such requested Advance, the aggregate outstanding balance of the Advances shall not exceed the amount set forth in the Budget for the date on which such Advance is to be made;

(d)     the making of such Loan shall not contravene any law, rule or regulation applicable to the Lender;

(e)     the Lender shall have received such other agreements, instruments, approvals, and other documents, each in form and substance satisfactory to the Lender, as the Lender may reasonably request;

(f)     On the date of any such Advance, the Financing Order shall have been signed by the Bankruptcy Court, and the Lender shall have received a certified copy of the same and such

order shall be in full force and effect and shall not have been reversed, stayed, modified or amended absent the consent of the Lender; and

(g)     On the date of any Advance, Borrower shall have timely met all deadlines set forth in the Substantial Asset Disposition Schedule, unless otherwise agreed to in writing by Lender in its sole discretion.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender as follows:

Section 5.1     Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number.     The Borrower is duly organized, validly existing and in good standing under the laws of the State of Washington and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.  The Borrower has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, the Loan Documents.  During its existence, the Borrower has done business solely under the names set forth in Schedule 5.1.  The Borrower's chief executive office and principal place of business is located at the address set forth in Schedule 5.1, and all of the Borrower's records relating to its business or the Collateral are kept at that location. The Borrower's federal employer identification number and organization identification number are correctly set forth in Section 3.2.

Section 5.2     Capitalization.  Schedule 5.2 sets forth a correct and complete list of all ownership interests of Borrower and all rights to acquire ownership interests, including, without limitation, the record holder, number of interests and percentage interests on a fully diluted basis.

Section 5.3     Authorization of Borrowing; No Conflict as to Law or Agreements.  The execution, delivery and performance by the Borrower of the Loan Documents and the borrowings from time to time hereunder have been duly authorized by all necessary corporate action and do not and will not (i) require any consent or approval of the Borrower's Owners; (ii) other than the entry of Financing Order, require any authorization, consent or approval by, or registration, declaration or filing with, or notice to, any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any third party, except such authorization, consent, approval, registration, declaration, filing or notice as has been obtained, accomplished or given prior to the date hereof; (iii) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to the Borrower or of the Borrower's Constituent Documents; (iv) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Borrower is a party or by which it or its properties may be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or hereafter acquired by such Borrower.

-19-

Section 5.4    Legal Agreements.  This Agreement constitutes and, upon due execution by the Borrower, the other Loan Documents will constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, subject to the entry of Financing Order acceptable to the Lender in its sole discretion.

Section 5.5    Subsidiaries.  Except as set forth in Schedule 5.5 hereto, the Borrower has no Subsidiaries.

Section 5.6    Budget.    Borrower has furnished the Budget to the Lender.  The Budget has been prepared on a reasonable basis and in good faith by the Borrower, and is based on assumptions believed by the Borrower to be reasonable.  The Borrower is not be aware of any facts or information that would lead it to believe that the Budget is incorrect or misleading in any material respect.

Section 5.7    Litigation.  There are no actions, suits or proceedings pending or, to the Borrower's knowledge, threatened against or affecting the Borrower or any of its Affiliates or the properties of the Borrower or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to the Borrower or any of its Affiliates, would result in a final judgment or judgments against the Borrower or any of its Affiliates in an amount in excess of $10,000.00, apart from those matters specifically listed in Schedule 5.7.

Section 5.8    Regulation U.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

Section 5.9    Taxes.  The Borrower and its Affiliates have paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by each of them.  The Borrower and its Affiliates have filed all federal, state and local tax returns which to the knowledge of the Officers of the Borrower or any Affiliate, as the case may be, are required to be filed, and the Borrower and its Affiliates have paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by any of them to the extent such taxes have become due.

Section 5.10    Title and Liens.  The Borrower has good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens.  No financing statement naming the Borrower as debtor is on file in any office except to perfect Permitted Liens.

Section 5.11    Intellectual Property Rights.

(a)    Owned Intellectual Property Rights.  Schedule 5.11 is a complete list of all patents, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which the Borrower is the owner of record (the "Owned Intellectual Property").  Except as disclosed on

-20-

BOS 46,601,241v3 3-22-10

Schedule 5.11, (i) the Borrower owns its Owned Intellectual Property free and clear of all restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, writs or Liens, whether by written agreement or otherwise, (ii) no Person other than the Borrower owns or has been granted any right in its Owned Intellectual Property, (iii) all Owned Intellectual Property is valid, subsisting and enforceable and (iv) the Borrower has taken all commercially reasonable action necessary to maintain and protect its Owned Intellectual Property.

(b)     Intellectual Property Rights Licensed from Others.  Schedule 5.11 is a complete list of all agreements under which the Borrower has licensed Intellectual Property Rights from another Person ("Licensed Intellectual Property") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("Off-the-Shelf Software") and a summary of any ongoing payments the Borrower is obligated to make with respect thereto. Except as disclosed on Schedule 5.11 and in written agreements, copies of which have been given to the Lender, the Borrower's licenses to use its Licensed Intellectual Property are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs, whether by written agreement or otherwise.  Except as disclosed on Schedule 5.11, the Borrower is not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(d)     Other Intellectual Property Needed for Business.  Except for Off-the-Shelf Software and as disclosed on Schedule 5.11, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct the Borrower's business as it is presently conducted or as the Borrower reasonably foresees conducting them.

(e)     Infringement.  Except as disclosed on Schedule 5.11, the Borrower has no knowledge of, and has not received any written claim or notice alleging, any Infringement of another Person's Intellectual Property Rights (including any written claim that the Borrower must license or refrain from using the Intellectual Property Rights of any third party) nor, to the Borrower's knowledge, is there any threatened claim or any reasonable basis for any such claim.

Section 5.12   Plans.  Borrower does not maintain any "employee benefit plan" (as such term is defined in section 3(3) of ERISA) that is or within six years preceding the date hereof has been, sponsored, maintained or contributed to by the Borrower or with respect to which the Borrower may have any liability.

Section 5.13   Default.  Except as set forth on Schedule 5.13, the Borrower is in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which could have a material adverse effect on the Borrower's financial condition, properties or operations ("Material Adverse Effect").

Section 5.14   Submissions to Lender.  All financial and other information provided to the Lender by or on behalf of the Borrower in connection with the Borrower's request for the credit facilities contemplated hereby (i) is true and correct in all material respects, (ii) does not omit any material fact necessary to make such information not misleading and, (iii) as to

-21-

projections, valuations or proforma financial statements, present a good faith opinion as to such projections, valuations and proforma condition and results.

Section 5.15    Financing Statements.    Notwithstanding the provisions of Section 3.2 hereto, the Borrower has authorized the filing of financing statements sufficient when filed to perfect the Security Interest and the other security interests created by the Security Documents. When the Financing Order is entered, the Lender will have a valid and perfected security interest in all Collateral which is capable of being perfected by filing financing statements.  None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing is in effect with respect thereto.

Section 5.16    Rights to Payment.  Each right to payment and each instrument, document, chattel paper and other agreement constituting or evidencing Collateral is (or, in the case of all future Collateral, will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim, of the account Borrower or other obligor named therein or in the Borrower's records pertaining thereto as being obligated to pay such obligation.

Section 5.17    Administrative Priority; Lien Priority.

(a)    The Obligations of the Borrower will, at all times after the Closing Date, constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code;

(b)    Pursuant to Section 364(d)(1) of the Bankruptcy Code and the Financing Order, all Obligations will be secured by a perfected priming first priority Lien on the Collateral; and

(c)    On the Effective Date and upon entry of the Financing Order, the Financing Order shall be, in full force and effect and have not been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the Lender and are not subject to a pending appeal or stayed in any respect.

Section 5.18    Appointment of Trustee or Examiner; Liquidation.  No order has been entered or is pending in the Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (iii) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

Section 5.19    The Chapter 11 Case.  The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and has not been dismissed as of the date of this Agreement.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules and the rules and procedures of the Bankruptcy Court.

# ARTICLE VI

## COVENANTS

So long as the Obligations shall remain unpaid, or the Credit Facility shall remain outstanding, the Borrower will comply with the following requirements, unless the Lender shall otherwise consent in writing:

Section 6.1    <u>Reporting Requirements</u>.    The Borrower will deliver, or cause to be delivered, to the Lender each of the following, which shall be in form and detail acceptable to the Lender:

      (a)    <u>Weekly Reports</u>.

      (i) Within two (2) Business Days after the end of each week, a reconciliation, in form and substance acceptable to the Lender substantially consistent with the Borrower's form of Budget annexed hereto as <u>Exhibit A</u>, of the actual cash receipts and disbursements of the Borrower and existing Advances under this Agreement for such week to the budgeted line item amounts set forth in the Budget for such week.

      (ii) On a weekly basis, a report in form and detail satisfactory to the Lender and certified by an Authorized Officer of the Borrower as being accurate and complete providing the total amount of the Borrower's (A) cash and cash equivalents, (B) accounts payable as of the last Business Day of the preceding week, (C) employee obligations incurred as of the last Business Day of the preceding week reconciled to all employee obligation paid through the same time period, and (D) sales taxes collected by the Borrower as of the as of the last Business Day of the preceding week reconciled to all sales taxes remitted through the same time period, such report to be delivered on or before the second Business Day of each week.

      (b)    <u>Operating Reports</u>.  All operating reports provided to the Office of the United States Trustee for the District of Washington.

      (c)    <u>Litigation</u>.  Immediately after the commencement thereof, notice in writing of all litigation and of all proceedings before any governmental or regulatory agency affecting the Borrower which seek a monetary recovery against the Borrower in excess of $10,000.

      (d)    <u>Defaults</u>.  When any Officer of the Borrower becomes aware of the probable occurrence of any Default or Event of Default, and no later than one (1) day after such Officer becomes aware of such Default or Event of Default, notice of such occurrence, together with a detailed statement by a responsible Officer of the Borrower of the steps being taken by the Borrower to cure the effect thereof.

      (f)    <u>Officers and Directors</u>.  Promptly upon knowledge thereof, notice of any change in the persons constituting a Borrower's Officers and Directors.

*BOS 46,601,241v3 3-22-10*

(g) <u>Collateral</u>. Promptly upon knowledge thereof, notice of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of payment thereof.

(h) <u>Commercial Tort Claims</u>. Promptly upon knowledge thereof, notice of any commercial tort claims the Borrower may bring against any Person, including the name and address of each defendant, a summary of the facts, an estimate of the Borrower's damages, copies of any complaint or demand letter submitted by the Borrower, and such other information as the Lender may request.

(i) <u>Reports to Owners</u>. Promptly upon their distribution, copies of all financial statements, reports and proxy statements which the Borrower shall have sent to its Owners.

(j) <u>Chapter 11 Case Pleadings</u>. Promptly after filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrower in the Chapter 11 Case, which papers and documents shall also be given or served on the Lender and the Lender's counsel.

(k) <u>Committee Reports</u>. Promptly after sending thereof, copies of all written reports given by the Borrower to any official or unofficial creditors' committee in the Chapter 11 Case, other than any such reports subject to privilege; <u>provided</u> that the Borrower may redact any confidential information contained in any such report if it provides to the Lender a summary of the nature of the information so redacted.

(l) <u>Tax Returns of Borrower</u>. As soon as possible, and in any event no later than five (5) days after they are due to be filed (as said date may be extended for Borrower by the relevant taxing authorities), copies of the state and federal income tax returns and all schedules thereto of the Borrower.

(m) <u>Violations of Law</u>. Promptly upon knowledge thereof, notice of the Borrower's violation of any law, rule or regulation, the non-compliance with which could materially and adversely affect the financial condition, properties or operations of the Borrower.

(n) <u>Other Reports</u>. From time to time, with reasonable promptness, any and all receivables schedules, inventory reports, collection reports, deposit records, equipment schedules, copies of invoices to account Borrowers, shipment documents and delivery receipts for goods sold, and such other material, reports, records or information as the Lender may request.

Section 6.2    <u>Financial Covenants.</u>

(a) <u>Compliance with Budget</u>. Borrower shall at all times comply with the Budget on a line-item by line-item basis. On each Monday of each week, a responsible officer of the Borrower shall submit to the Lender a report showing (i) actual collections, disbursements, on a weekly and cumulative basis through the previous Friday, and (ii) a comparison to the same periods in the Budget. To the extent disbursements set forth in the Budget for a Budget period are not, in fact, disbursed during the Budget period, the budgeted disbursements for subsequent

-24-

Budget periods shall be amended so that the Borrower may carry forward any unspent budgeted disbursements from prior periods.

Section 6.3    Permitted Liens; Financing Statements.

(a)    The Borrower will not create, incur or suffer to exist any Lien upon or of any of its assets, now owned or hereafter acquired, to secure any indebtedness; excluding, however, from the operation of the foregoing, the following (each a "Permitted Lien"; collectively, "Permitted Liens"):

(i)    In the case of any of the Borrower's property which is not Collateral, covenants, restrictions, rights, easements and minor irregularities in title which do not materially interfere with the Borrower's business or operations as presently conducted;

(ii)    Liens listed in Schedule 6.3 hereto, securing indebtedness for borrowed money permitted under this Agreement;

(iii)    The Security Interest and Liens created by the Security Documents..

(b)    The Borrower will not amend any financing statements in favor of the Lender except as permitted by law.

Section 6.4    Indebtedness.    The Borrower will not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or any indebtedness for borrowed money or letters of credit issued on the Borrower's behalf, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except:

(a)    Any existing or future Obligations or any other obligations of the Borrower to the Lender;

(b)    Any indebtedness of the Borrower in existence on the date hereof and listed in Schedule 6.4 hereto; and

(c)    Any indebtedness relating to Permitted Liens.

Section 6.5    Guaranties.    The Borrower will not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except:

(a)    The endorsement of negotiable instruments by the Borrower for deposit or collection or similar transactions in the ordinary course of business; and

(b)    Guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons, in existence on the date hereof and listed in Schedule 6.4 hereto.

Section 6.6    Investments and Subsidiaries.The Borrower will not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person or Affiliate, including any partnership or joint venture, nor purchase or hold

-25-

beneficially any stock or other securities or evidence of indebtedness of any other Person or Affiliate.

Section 6.7    Dividends and Distributions. The Borrower will not declare or pay any dividends on any class of its stock, or make any payment on account of the purchase, redemption or other retirement of any shares of such stock, or other securities or evidence of its indebtedness or make any distribution in respect thereof, either directly or indirectly.

Section 6.8    Salaries.    The Borrower will not pay excessive or unreasonable salaries, bonuses, commissions, consultant fees or other compensation; or increase the salary, bonus, commissions, consultant fees or other compensation of any Director, Officer or consultant, or any member of their families.

Section 6.9    Substantial Asset Disposition.    The Asset Purchase Agreement shall be executed and in full force and effect on or before March __, 2010, and such Asset Purchase Agreement, together with any order entered by the Bankruptcy Court approving such Asset Purchse Agreement, shall not be modified, amended, or superseded absent the prior written consent of the Lender; such Asset Purchase Agreement shall provide for the consummation of the sale of substantially all of the Borrower's assets in accordance with the terms thereof and the terms of the Sale Order.

Section 6.10    Books and Records; Collateral Examination, Inspection and Appraisals.

(a)    The Borrower will keep accurate books of record and account for itself pertaining to the Collateral and pertaining to the Borrower's business and financial condition and such other matters as the Lender may from time to time request in which true and complete entries will be made in accordance with GAAP and, upon the Lender's request, will permit any officer, employee, attorney, accountant or other agent of the Lender to audit, review, make extracts from or copy any and all company and financial books and records of the Borrower at all times, to send and discuss with account Borrowers and other obligors requests for verification of amounts owed to the Borrower, and to discuss the Borrower's affairs with any of its Directors, Officers, employees or agents.

(b)    The Borrower hereby irrevocably authorizes all accountants and third parties to disclose and deliver to the Lender or its designated agent, at the Borrower's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding the Borrower.

(c)    The Borrower will permit the Lender or its employees, accountants, attorneys or agents, to examine and inspect any Collateral or any other property of the Borrower at any time during ordinary business hours.

Section 6.11    Account Verification.

(a)    The Lender or its agent may at any time and from time to time send or require the Borrower to send requests for verification of accounts or notices of assignment to account debtors and other obligors.  The Lender or its agent may also at any time and from time to time telephone account debtors and other obligors to verify accounts.

-26-

(b)     The Borrower shall pay when due each account payable due to a Person holding a Permitted Lien (as a result of such payable) on any Collateral.

Section 6.12     Compliance with Laws.

(a)     The Borrower shall (i) comply with the requirements of applicable laws and regulations, the non-compliance with which would materially and adversely affect its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance.

(b)     Without limiting the foregoing undertakings, the Borrower specifically agrees that it will comply with all applicable Environmental Laws and obtain and comply with all permits, licenses and similar approvals required by any applicable Environmental Laws, and will not generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any applicable Environmental Law.

(c)     The Borrower shall (i) ensure that no Owner shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Credit Facility or any other financial accommodation from the Lender to violate any of the foreign asset control regulations of OFAC or other applicable law, (iii) comply with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act as required by federal law and the Lender's policies and practices.

Section 6.13     Payment of Taxes and Other Claims. The Borrower will pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach thereto, (b) all federal, state and local taxes required to be withheld by it (including, without limitation, sales taxes), and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of the Borrower; provided, that the Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

Section 6.14     Maintenance of Properties.

(a)     The Borrower will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts; provided, however, that nothing in this covenant shall prevent the Borrower from discontinuing the operation and maintenance of any of its properties if such discontinuance is, in the Borrower's judgment, desirable in the conduct of the Borrower's business and not disadvantageous in any material respect to the Lender.  The Borrower will take all commercially reasonable steps necessary to protect and maintain its Intellectual Property Rights.

-27-

(b)     The Borrower will defend the Collateral against all Liens, claims or demands of all Persons (other than the Lender) claiming the Collateral or any interest therein.  The Borrower will keep all Collateral free and clear of all Liens except Permitted Liens.  The Borrower will take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights.

Section 6.15    Insurance.     The Borrower will obtain and at all times maintain insurance with insurers acceptable to the Lender, in such amounts, on such terms (including any deductibles) and against such risks as may from time to time be required by the Lender, but in all events in such amounts and against such risks as is usually carried by companies engaged in similar business and owning similar properties in the same general areas in which the Borrower operates.   Without limiting the generality of the foregoing, the Borrower will at all times maintain business interruption insurance including coverage for force majeure and keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles) and such other risks and in such amounts as the Lender may reasonably request, with any loss payable to the Lender to the extent of its interest, and all policies of such insurance shall contain a lender's loss payable endorsement for the Lender's benefit.     **UNLESS BORROWER PROVIDES EVIDENCE OF THE INSURANCE COVERAGE REQUIRED UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, LENDER MAY PURCHASE INSURANCE AT BORROWER'S EXPENSE TO PROTECT LENDER'S INTEREST IN THE COLLATERAL.   THIS INSURANCE MAY, BUT NEED NOT, PROTECT BORROWER'S INTERESTS.   THE COVERAGE THAT LENDER PURCHASES MAY NOT PAY ANY CLAIM THAT BORROWER MAY MAKE OR ANY CLAIM THAT IS MADE AGAINST BORROWER IN CONNECTION WITH THE COLLATERAL.   BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY LENDER, BUT ONLY AFTER PROVIDING EVIDENCE THAT BORROWER HAS OBTAINED INSURANCE AS REQUIRED BY THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.   IF LENDER PURCHASES INSURANCE FOR THE COLLATERAL, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING THE INSURANCE PREMIUM, INTEREST AND ANY OTHER CHARGES LENDER MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE.   THE COSTS OF THE INSURANCE MAY BE ADDED TO THE BORROWER'S OBLIGATIONS HEREUNDER.   THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE BORROWER MAY BE ABLE TO OBTAIN ON ITS OWN.**  Lender will furnish Borrower with notice of the purchase of any such insurance by Lender.

Section 6.16    Preservation of Existence.     The Borrower will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in an orderly, efficient and regular manner.

Section 6.17    Delivery of Instruments, etc.  Upon request by the Lender, the Borrower will promptly deliver to the Lender in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by the Borrower.

-28-

Section 6.18    Sale or Transfer of Assets; Suspension of Business Operations.

(a)    Except as contemplated by the Asset Purchase Agreement or otherwise consented to in writing by Lender, the Borrower will not sell, lease, assign, transfer or otherwise dispose of or abandon (i) all or a substantial part of its assets, or (ii) any Collateral or any interest therein (whether in one transaction or in a series of transactions) to any other Person other than the sale of Inventory in the ordinary course of business and will not liquidate, dissolve or suspend business operations.

(b)    Borrower shall timely meet all deadlines set forth in the Asset Purchase Agreement, unless otherwise agreed by Lender in writing in its sole discretion.

Section 6.19    Restrictions on Nature of Business.    The Borrower will not engage in any line of business materially different from that presently engaged in by the Borrower and will not purchase, lease or otherwise acquire assets not related to its business.

Section 6.20    Accounting.    The Borrower will not adopt any material change in accounting principles other than as required by GAAP.  The Borrower will not adopt, permit or consent to any change in its fiscal year.

Section 6.21    Place of Business; Name.    Except in accordance with the terms of the Asset Purchase Agreement, the Borrower will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business location without providing the Lender with thirty (30) days prior written notice.  The Borrower will not permit any tangible Collateral or any records pertaining to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest.  The Borrower will give Lender at least 30 days prior written notice in the event that Borrower changes its name or jurisdiction of organization.

Section 6.22    Constituent Documents; S Corporation Status.    The Borrower will not amend its Constituent Documents in any manner which would materially adversely affect its ability to repay the Obligations or Lender's rights hereunder.  The Borrower will maintain its S Corporation status and will comply with all reporting obligations to its shareholders.

Section 6.23    Affiliate Transactions.  The Borrower will not, directly or indirectly, enter into any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service with any Affiliate, except for those transactions and arrangements in existence as of the date of this Agreement and described on Schedule 6.23 attached hereto..

Section 6.24    Performance by the Lender.  If the Borrower at any time fails to perform or observe any of the foregoing covenants contained in this Article VI or elsewhere herein, and if such failure shall continue for a period of ten (10) calendar days after the Lender gives the Borrower written notice thereof (or in the case of the agreements contained in Section 6.13 and Section 6.15, immediately upon the occurrence of such failure, without notice or lapse of time), the Lender may, but need not, perform or observe such covenant on behalf and in the name, place and stead of the Borrower (or, at the Lender's option, in the Lender's name) and may, but need not, take any and all other actions which the Lender may reasonably deem necessary to cure

-29-

BOS 46,601,241v3 3-22-10

or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account Borrowers or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrower shall thereupon pay to the Lender on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Lender, together with interest thereon from the date expended or incurred at the Default Rate. To facilitate the Lender's performance or observance of such covenants of the Borrower, the Borrower hereby irrevocably appoints the Lender, or the Lender's delegate, acting alone, as the Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of the Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements required to be obtained, executed, delivered or endorsed by the Borrower hereunder.

Section 6.25    Financing Order; Administrative Priority; Lien Priority; Payment of Claims.    The Borrower will not:

(a)    At any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Order, except for modifications and amendments agreed to by the Lender;

(b)    at any time, suffer to exist a priority for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations;

(c)    at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of the Lender, except for Permitted Liens; and

(d)    prior to the date on which all Obligations have been fully paid and satisfied, the Borrower shall not pay any administrative expense claims except (i) Obligations due and payable hereunder and (ii) administrative expenses incurred in the ordinary course of the Borrower's business as contemplated by this Agreement and the Budget annexed hereto as Exhibit A.

## ARTICLE VII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

Section 7.1    Events of Default.    "Event of Default", wherever used herein, means any one of the following events:

(a)    Default in the payment of any amount owed by the Borrower to the Lender as and when due hereunder;

BOS 46,601,241v3 3-22-10

(b)     Default in the performance, or breach, of any covenant or agreement of the Borrower contained in this Agreement;

(c)     Any ownership interest of the Borrower shall be sold or transferred in any transaction other than in accordance with the terms of the Asset Purchase Agreement, or shall become subject to a Lien;

(d)     A Bidding Procedures Order has not been entered by the Bankruptcy Court on or before April 8, 2010;

(e)     A Sale Order has not been entered on of before April 26, 2010;

(f)     A sale of all or substantially all of the Borrower's assets pursuant to the terms and conditions of the Asset Purchase Agreement has not occurred on or before April 28, 2010;

(g)     Any representation or warranty made by the Borrower in this Agreement or by the Borrower (or any of its Officers) in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when deemed to be effective;

(h)     The rendering against the Borrower of an arbitration award, a final judgment, decree or order for the payment of money in excess of $10,000 and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

(i)     The Borrower shall liquidate, dissolve, terminate or suspend its business operation or otherwise fail to operate its business in the ordinary course, merge with another Person unless the Borrower is the surviving entity; or sell or attempt to sell all or substantially all of its assets, without the Lender's prior written consent; except as contemplated under the Asset Purchase Agreement and Sale Order.

(j)     An event of default shall occur under any Security Document;

(k)     Default in the satisfaction of any Obligation owed by the Borrower to the Lender hereunder;

(l)     The Lender believes in good faith that the prospect of payment in full of any part of the Obligations, or that full performance by the Borrower under the Loan Documents, is impaired, or that there has occurred any material adverse change in the business or financial condition of the Borrower;

(m)     The indictment of any Director or executive Officer of the Borrower for a felony offence under state or federal law.

(n)     The Borrower shall fail to comply or shall default in the performance of any term of this Agreement, the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, the US Bank Loan Agreement, the Loan Documents, the Financing Order or the Sale Order;

-31-

(o)     The Borrower (except following the Lender's prior written request or with the Lender's express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Order or any of the Loan Documents, without the Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender);

(p)     The Borrower shall file, or any other person shall obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization which does not provide for the full, final, and irrevocable repayment of all of the Obligations of the Borrower to the Lender upon the effectiveness of such plan, unless the Lender has expressly joined in or consented to such plan in writing;

(q)     The Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Lender under the Financing Order or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Order;

(r)     The Bankruptcy Court shall not have entered the Financing Order or the Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(s)     The Bankruptcy Court shall not have entered the Cash Collateral Order or the Cash Collateral Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(t)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrower or to terminate any license, franchise, or similar agreement, where such termination could have a Material Adverse Effect;

(u)     If any creditor of the Borrower receives any adequate protection payment which is not fully acceptable to the Lender in its sole discretion, or any Lien is granted as adequate protection other than as set forth in the Financing Order.

(v)     Borrower suspends or discontinues, or is enjoined by any court or governmental agency from continuing to conduct, all or any material part of its business (in a manner inconsistent with the Substantial Asset Disposition, the Substantial Asset Disposition Schedule, or such other orderly wind-down acceptable to Lender), or if a trustee, receiver or custodian is appointed for Borrower or any of its properties;

(w)     Conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

-32-

(x)     The Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(y)     A trustee is appointed pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(z)     An examiner with special powers is appointed pursuant to Section 1104(a) of the Bankruptcy Code; and

(aa)    The Borrower fails to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Borrower in connection herewith.

Section 7.2     <u>Rights and Remedies</u>. During any Default Period, the Lender may exercise any or all of the following rights and remedies, and the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed lifted or modified to the extent necessary to allow the Lender to take the actions described in this Section, or under any other Loan Document, without further notice or a hearing, which rights are hereby waived:

(a)     The Lender may, by notice to the Borrower, declare the Commitment to be terminated, whereupon the same shall forthwith terminate;

(b)     The Lender may, by notice to the Borrower, declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrower hereby expressly waives;

(c)     The Lender may, upon three (3) days prior written notice to the Borrower, apply any and all money owing by the Lender to the Borrower to the payment of the Obligations, in the Lender's sole discretion;

(d)     The Lender may, upon three (3) days prior written notice to the Borrower, exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process, and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and, in connection therewith, the Borrower will on demand assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties;

(e)     The Lender may exercise and enforce its rights and remedies under the Loan Documents;

(f)     The Lender may without regard to any waste, adequacy of the security or solvency of the Borrower, apply for the appointment of a receiver of the Collateral, to which

-33-

Case 10-42279-PBS     Doc 89     Filed 04/08/10     Entered 04/08/10 17:25:56     Page 69 of 78

appointment the Borrower hereby consents, whether or not foreclosure proceedings have been commenced under the Security Documents and whether or not a foreclosure sale has occurred;

(h)     The Lender may exercise any other rights and remedies available to it by law or agreement;

(i)     The Lender shall be entitled to seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, on not more than three (3) Business Days notice, subject to the Bankruptcy Court's calendar; and

(j)     If the Lender sells any of the Collateral on credit, the Obligations will be reduced only to the extent of payments actually received.  If the purchaser fails to pay for the Collateral, the Lender may resell the Collateral and shall apply any proceeds actually received to the Obligations.

Section 7.3     <u>Certain Notices</u>.     If notice to the Borrower of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given (in the manner specified in Section 8.3) at least ten calendar days before the date of intended disposition or other action.

# ARTICLE VIII

# <u>MISCELLANEOUS</u>

Section 8.1     <u>No Waiver; Cumulative Remedies; Compliance with Laws</u>.  No failure or delay by the Lender in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents.   The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.  The Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

Section 8.2     <u>Amendments, Etc.</u>     No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 8.3     <u>Notices; Communication of Confidential Information; Requests for Accounting</u>.   Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, (d) transmitted by telecopy, or (e) sent as electronic mail, in each case delivered or sent to the party to whom notice is being given to the business address, telecopier

-34-

number, or e mail address set forth below next to its signature or, as to each party, at such other business address, telecopier number, or e mail address as it may hereafter designate in writing to the other party pursuant to the terms of this Section. All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (a) the date received if personally delivered, (b) when deposited in the mail if delivered by mail, (c) the date delivered to the courier if delivered by overnight courier, or (d) the date of transmission if sent by telecopy or by e mail, except that notices or requests delivered to the Lender pursuant to any of the provisions of Article II shall not be effective until received by the Lender with confirmed receipt. All notices, financial information, or other business records sent by either party to this Agreement may be transmitted, sent, or otherwise communicated via such medium as the sending party may deem appropriate and commercially reasonable; provided, however, that the risk that the confidentiality or privacy of such notices, financial information, or other business records sent by either party may be compromised shall be borne exclusively by the Borrower.

Section 8.4    Further Documents.    The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lender's rights under the Loan Documents (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

Section 8.5    Costs and Expenses.    The Borrower shall pay on demand all costs and expenses, including reasonable attorneys' fees, incurred by the Lender in connection with the Obligations, this Agreement, the Loan Documents and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Obligations and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.

Section 8.6    Indemnity.    In addition to the payment of expenses pursuant to Section 8.5, the Borrower shall indemnify, defend and hold harmless the Lender, and any of its participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporations, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any of the following (collectively, "Indemnified Liabilities"):

(a)    Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents or the making of the Advances;

(b)    Any claims, loss or damage to which any Indemnitee may be subjected as a result of any violation of the covenant contained in Section 6.12(b); and

-35-

BOS 46,601,241v3 3-22-10

(c)     Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents or the use or intended use of the proceeds of the Advances.  Notwithstanding the foregoing, the Borrower shall not be obligated to indemnify any Indemnitee for any Indemnified Liability caused by the gross negligence or willful misconduct of such Indemnitee.

If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Borrower, or counsel designated by the Borrower and satisfactory to the Indemnitee, will resist and defend such action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Borrower's sole costs and expense.  Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding.  If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Borrower shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.  The Borrower's obligations under this Section 8.6 shall survive the termination of this Agreement and the discharge of the Borrower's other obligations hereunder.

Section 8.7     Intentionally Omitted.

Section 8.8     <u>Execution in Counterparts; Telefacsimile Execution</u>.  This Agreement and other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 8.9     <u>Retention of Borrower's Records</u>.     The Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings, or other papers delivered to the Lender by the Borrower or in connection with the Loan Documents for more than 30 days after receipt by the Lender.  If there is a special need to retain specific records, the Borrower must inform the Lender of its need to retain those records with particularity, which must be delivered in accordance with the notice provisions of Section 8.3 within 30 days of the Lender taking control of same.

Section 8.10     <u>Binding     Effect;     Assignment;     Complete     Agreement;     Sharing Information</u>.The Loan Documents shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights thereunder or any interest therein without the Lender's prior written consent.  To the extent permitted by law, the Borrower waives and will not assert against any assignee any claims, defenses or set-offs which the Borrower could assert against the

-36-

Lender. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower. This Agreement, together with the Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof. To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, this Agreement shall control. Without limiting the Lender's right to share information regarding the Borrower and its Affiliates with the Lender's participants, accountants, lawyers and other advisors, the Lender may share any and all information they may have in their possession regarding the Borrower and its Affiliates, and the Borrower waives any right of confidentiality it may have with respect to such sharing of information.

Section 8.11   Severability of Provisions.    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

Section 8.12   Headings.    Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 8.13   Governing Law; Jurisdiction, Venue; Waiver of Jury Trial.   The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the Commonwealth of Massachusetts.   The parties hereto hereby (i) consent to the personal jurisdiction of the Bankruptcy Court in connection with any controversy related to this Agreement; (ii) waive any argument that venue in any such forum is not convenient; (iii) agree that any litigation initiated by the Lender or the Borrower in connection with this Agreement or the other Loan Documents may be venued exclusively in the Bankruptcy Court or such federal court exercising jurisdiction over the Borrower's bankruptcy case; and (iv) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 8.14   Intentionally Omitted.

Section 8.15   Lender as Party-in-Interest.   The Borrower hereby stipulates and agrees that the Lender is and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Lender's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, the Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Loans, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), provided that the Lender will not exercise such right if the action or inaction by the Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 8.16   Waiver of Right to Obtain Alternative Financing.   In consideration of the Advances to be made to the Borrower by the Lender, Borrower hereby further waives any right it

-37-

may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any person other than the Lender, unless such financing would result in all of the Obligations to the Lender (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

Section 8.17    Credit Bids.  The Lender shall maintain its right to credit bid the Lender's claims under the this Agreement or the Financing Order pursuant to Section 363(k) of the Bankruptcy Code.

Section 8.18    Application of Payments to Obligations; Application of Proceeds of Collateral.

(a)    All proceeds from the sale of Collateral, whether realized through a Substantial Asset Disposition shall be immediately paid in cash by Borrower to Lender, and shall applied by Lender (i) first in satisfaction of outstanding Pre-petition Obligations (to the extent outstanding), and (ii) second in satisfaction of outstanding Obligations under this Agreement.

(b)    All payments of Obligations by Borrower to Lender shall be made as and when due hereunder, and shall applied by Lender (i) first in satisfaction of outstanding Pre-petition Obligations, and (ii) second in satisfaction of outstanding Obligations under this Agreement.

**THE BORROWER AND THE LENDER WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.**

[Signature Page Follows]

*BOS 46,601,241v3 3-22-10*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date set forth in the initial caption of this Agreement.

.

BORROWER:

LIQUIDATION OUTLET, LLC

By:_____
Name:
Title:

ADDRESS;

Liquidation Outlet, Inc.
1025 Valley Avenue
Puyallup, Washignton 98371 Attention:
Mr. Gary Woodring
Fax: (253) 840-2210

*with a copy to:*

Oldfield & Helsdon, PLLC
1401 Regents Boulevard, Suite 102
P.O. Box 64189
Fircrest, Washington 98466
Attention: Jeffrey P. Helsdon, Esq. Fax:
(253) 414-3500

LENDER:


LOI CAPITAL, LLC


By:_____
Name:
Title:

ADDRESS

LOI Capital, LLC c/o
Hudson Capital Partners, LLC
One Gateway Center, Ste. 402
Newton, Massachusetts  02458
Attention: Mr. David Peress, President
Fax: (617) 630-1510

*with a copy to:*

Greenberg Traurig, LLP
One International Place
Boston, Massachusetts 02110
Attention: Jeffrey M. Wolf, Esq.
Fax: (617) 310-6001

-2-

**Table of Exhibits and Schedules**

| | |
|---|---|
| Exhibit A | Initial Borrower's Budget |
| Exhibit B | Form of Revolving Note |
| Exhibit C | Compliance Certificate |
| Exhibit D | Premises |
| Exhibit E | Intentionally Omitted |
| Exhibit F | Form of Financing Order |
| Schedule 1.1 | Operating Accounts |
| Schedule 5.1 | Trade Names, Chief Executive Office, Principal Place of Business, and Locations of Collateral |
| Schedule 5.2 | Capitalization |
| Schedule 5.5 | Subsidiaries |
| Schedule 5.7 | Litigation Matters |
| Schedule 5.11 | Intellectual Property Disclosures |
| Schedule 5.12 | ERISA |
| Schedule 5.13 | Material Adverse Effect |
| Schedule 6.3 | Permitted Liens |
| Schedule 6.4 | Guaranties |

| 4 Week Cash Flow Summary | | | | | |
|---|---|---|---|---|---|
| **Week Beginning** | **3/21/10** | **3/28/10** | **4/4/10** | **4/11/10** | **4 Week** |
| **Week Ending** | **3/27/10** | **4/3/10** | **4/10/10** | **4/19/10** | **Total** |
| | | | | | |
| *Charlie's Produce* | (40,000) | (40,000) | (40,000) | (40,000) | (160,000) |
| *Liberty Dairy & Others* | | (12,800) | | | (12,800) |
| *Pepsico* | | (17,000) | | | (17,000) |
| *Soil Conditioners* | (1,335) | (1,335) | (1,335) | (1,335) | (5,340) |
| *Imports* | | (6,246) | | (30,106) | (36,352) |
| *Domestic* | | (32,086) | (148,076) | (123,205) | (303,367) |
| *Total Merchandise Needed* | (41,335) | (109,467) | (189,411) | (194,646) | (534,859) |
| | | | | | |
| Cash from Operations | 202,957 | 725 | 3,468 | 228,320 | 435,470 |
| Cash Available for Merch. Purchasing | 161,622 | (108,742) | (185,943) | 33,674 | (99,389) |

| Budget | | | | | |
|---|---|---|---|---|---|
| **Week Beginning** | **3/21/10** | **3/28/10** | **4/4/10** | **4/11/10** | **4 Week** |
| **Week Ending** | **3/27/10** | **4/3/10** | **4/10/10** | **4/19/10** | **Total** |
| | | | | | |
| *Total Revenue* | 335,000 | 333,000 | 357,000 | 367,000 | 1,392,000 |
| *Less: Credit Card fees* | (2,345) | (2,331) | (2,499) | (2,569) | (9,744) |
| *Net Revenue* | 332,655 | 330,669 | 354,501 | 364,431 | 1,382,256 |
| *Labor* | (60,812) | (60,449) | (64,805) | (66,621) | (252,687) |
| *Warehouse Labor* | (30,327) | (30,327) | (30,327) | (30,327) | (121,308) |
| *Admin Labor* | (6,318) | (6,280) | (6,733) | (6,922) | (26,253) |
| *Rent* | | (208,926) | (208,926) | | (417,852) |
| *Utilities* | (20,700) | (20,700) | (20,700) | (20,700) | (82,800) |
| Arco Fuel | (1,600) | (1,600) | (1,600) | (1,600) | (6,400) |
| Vehicle Repair | (808) | | (808) | (808) | (2,424) |
| Supplies | (1,666) | | (1,667) | (1,667) | (5,000) |
| Repairs | | (1,500) | | | (1,500) |
| Janatorial | | | (8,000) | | (8,000) |
| *OR DOT* | | (162) | | | (162) |
| *Advertising* | (7,467) | | (7,467) | (7,466) | (22,400) |
| Operating Expenses | (129,698) | (329,944) | (351,033) | (136,111) | (946,786) |
| NOI | 202,957 | 725 | 3,569 | 228,320 | 435,470 |