ASSET PURCHASE AGREEMENT

BY AND AMONG

HILCO MERCHANT RESOURCES, LLC

AND

LIQUIDATION OUTLET, INC.

*Modified APRIL 28, 2010*

## Exhibits

| | |
|---|---|
| Exhibit A | List of Stores and Distribution Center Locations |
| Exhibit B | Form of Agency Agreement |
| Exhibit C | Real Property Leases |
| Exhibit D | Form of Bill of Sale |
| Exhibit E | Form of Assignment and Assumption Agreement |
| Exhibit F | Cash Collateral Budget |
| Exhibit G | DIP Budget |

## Schedules

| | |
|---|---|
| Schedule 2.1(a) | Executory Contracts |
| Schedule 2.1(b) | Real Property Leases |
| Schedule 2.1(i) | Intellectual Property Rights |
| Schedule 2.1(j) | FF&E |
| Schedule 2.6(b) | Cash Payment Adjustment |
| Schedule 2.6(d)(ii) | Realty Cure Costs |
| Schedule 2.6(d)(iii) | Cure Costs |
| Schedule 2.6(e) | Assumed Obligations |
| Schedule 3.1 | Designated Liquidated Locations |
| Schedule 3.2(a) | Real Estate Occupancy Expenses |
| Schedule 4.3 | Governmental Authorizations |
| Schedule 4.5 | Required Consents |
| Schedule 4.6 | Litigation |
| Schedule 4.12 | Discounts and Promotions |
| Schedule 4.13(a) | Real Property Lease Defaults, Etc. |
| Schedule 4.13(b) | Condemnation Proceedings |
| Schedule 6.1 | Conduct of Business |

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of April 2?, 2010 (this "Agreement") is entered into by and between Hilco Merchant Resources, LLC, a Delaware limited liability company ("Purchaser"), and Liquidation Outlet, Inc., a Washington corporation and debtor-in-possession ("Seller"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

WHEREAS, Seller conducts retail sales of close out merchandise (the "Business") through thirty-eight (38) retail stores identified on Schedule 1 attached hereto (each a "Store" and collectively the "Stores"); and

WHEREAS, Seller desires to sell, transfer, convey, assign and deliver the Acquired Assets (as defined below) and to assign the Assumed Obligations (as defined below), and Purchase desires to purchase, take delivery of, and assume such Acquired Assets and Assumed Obligations, upon the terms and subject to the conditions set forth herein; and

WHEREAS, Seller has filed and commenced a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Western District of Washington, Tacoma Division (the "Bankruptcy Court"); and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (as defined below), and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.      Definitions.

1.1.    Definitions. The following terms, as used herein, have the following meanings:

"Acquired Assets" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"Agency Agreement" means that certain Agency Agreement to be entered into by the Seller and the Purchaser, in its capacity as Liquidating Agent for the Seller at the Closing, a copy of which is attached hereto as Exhibit B.

"Agreement" shall have the meaning ascribed to such term in the Preamble hereof.

"Alternative Transaction" shall mean any transaction where all or any part of the Acquired Assets is conveyed, directly or indirectly, whether by sale, merger, consolidation, lease, transfer of equity interests, plan of reorganization or liquidation, sale of control of Seller or otherwise, and whether in one or more transactions or series of transactions, to one or more persons other than Purchaser.

"Assigned Contracts" shall have the meaning ascribed to that term in Section 2.1(a) hereof.

"Assigned Lease" shall have the meaning ascribed to that term in Section 2.1(b) hereof.

"Assignment and Assumption Agreement" shall have the meaning ascribed to such term in Section 2.10(a) of this Agreement.

"Assumed Obligations" shall have the meaning ascribed to that term in Section 2.3 hereof.

"Auction" shall mean the auction conducted by the Seller with respect to the sale of the Acquired Assets.

"Avoidance Actions" means all avoidance claims or other causes of action, whether arising under the Bankruptcy Code or otherwise, and the proceeds thereof, which are available to Seller under Section 510 or under any of Sections 542 through 553 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted.

"Bankruptcy Case" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"Bankruptcy Court" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Books and Records" shall have the meaning ascribed to such term in Section 2.1(k) hereof.

"Business" shall have the meaning ascribed to such term in Recitals to this Agreement.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts are authorized or required by law to close.

2

"Cash Payment" shall have the meaning ascribed to such term in Section 2.6(a) hereof.

"Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"Closing" shall have the meaning ascribed to such term in Section 2.9 of this Agreement.

"Closing Date" means the date of the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Corporate Headquarters" means the corporate offices of Seller located at 1025 Valley Avenue NW, Puyallup, Washington 98371.

"Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1) (A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts, Assigned Leases, and Intellectual Property Rights to Purchaser as provided herein.

"Defective Merchandise" means such items of inventory that are non-first quality inventory, such as parts, inventory unsaleable in its current physical condition, incomplete sets of inventory intended to be sold as a set, mismatched sets, inventory that is spoiled or having an expiration date on or before the date of the Closing, and used or previously owned, damaged, shopworn or soiled inventory.

"Designated Liquidation Locations" shall have the meaning ascribed to such term in Section 3.1 hereof.

"Designation Rights" shall have the meaning ascribed to such term in Section 3.2 hereof.

"DIP Lender" means LOI Capital, LLC in its capacity as the Lender under that certain Debtor In Possession Credit and Security Agreement dated as of April 9, 2010, between LOI Capital, LLC, as Lender, and the Seller, as Borrower, together with its successors and assigns in such capacity.

"Distribution Center" means those distribution center operated by Seller and described on Exhibit A attached hereto.

"Dropout Property" shall have the meaning ascribed to such term in Section 3.2(a)(iii) hereof.

"Employee Manuals" shall have the meaning ascribed to such term in Section 2.1(m) of this Agreement.

"End Date" shall have the meaning ascribed to such term in Section 12.1(b) of this Agreement.

"Environmental Laws" shall have the meaning ascribed to such term in Section 4.13(e)(i) of this Agreement.

3

"Excluded Assets" shall have the meaning ascribed to such term in <u>Section 2.2</u> hereof.

"Excluded Liabilities" shall have the meaning ascribed to such term in <u>Section 2.4</u> of this Agreement.

"Executory Contract Option Period" shall have the meaning ascribed to such term in <u>Section 3.3</u> hereof.

"Executory Contracts" shall have the meaning ascribed to such term in <u>Section 2.1(a)</u> hereof.

"FF&E" means fixtures, furnishings and equipment owned by Seller and utilized in the Business (including, without limitation, motor vehicles and rolling stock).

"Final Inventory Report" shall have the meaning ascribed to such term in <u>Section 2.7(b)</u> of this Agreement.

"HSR Act" shall have the meaning ascribed to such term in <u>Section 4.3</u> of this Agreement.

"Initial Cash Payment" shall have the meaning ascribed to such term in <u>Section 2.6(a)</u>.

"Inventory Date" shall have the meaning ascribed to such term in <u>Section 2.7(a)</u> of this Agreement.

"Inventory Dispute Period" shall have the meaning ascribed to such term in <u>Section 2.7(b)</u> of this Agreement.

"Inventory Completion Date" shall have the meaning ascribed to such term in <u>Section 2.7(a)</u> hereof.

"Inventory Taking" shall have the meaning ascribed to such term in <u>Section 2.7(a)</u> hereof.

"Inventory Taking Service" shall have the meaning ascribed to such term in <u>Section 2.7(a)</u> hereof.

"Inventory Threshold" shall have the meaning ascribed to such term in <u>Section 2.6(b)</u> hereof.

"Intellectual Property Right" means, to the extent that Seller is permitted by law to transfer such assets to Purchaser without obtaining any third-party consents, all rights in and to any trademark, service mark, trade name, brand name, slogan, license, invention (whether or not patented or patentable), patent (licensed, owned or applied for), trade secret, copyright (licensed or owned), know-how patent application (including any registrations or applications for registration of any of the foregoing), and any other intellectual property in any and all jurisdictions worldwide utilized by Seller in its Business and any derivatives thereof, all systems manuals and documentation, all systems software and any applicable upgrades, all systems

4

licenses and other proprietary rights and general intangibles relating to the operation of the Business, including any internet domain names and addresses and any "800" or toll free number or any other similar type of proprietary intellectual property right which is related to the business.

"Lease Assumption Notice" shall have the meaning ascribed to such term in Section 3.2(a)(iv) hereof.

"Lease Marketing Period" shall have the meaning ascribed to such term in Section 3.2(a)(i) of this Agreement.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or other encumbrance in respect of such property or asset.

"Liquidated Other Fixed Assets" shall have the meaning ascribed to such term in Section 2.6(c)(i) hereof.

"Liquidation Agent" means Purchaser, serving in its capacity as liquidating agent on behalf of the Seller with respect to the Designated Liquidation Locations, pursuant to the Agency Agreement.

"Liquidation Election Period" shall have the meaning ascribed to such term in Section 2.6(c)(i) of this Agreement.

"Liquidation Merchandise" means all Merchandise located in the Designated Liquidation Locations.

"Material Adverse Effect" means a material adverse effect on the Business and the Acquired Assets, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the proposed Transactions or the public announcement thereof,(ii) changes or conditions affecting the industry generally in which Seller operates, (iii) changes in economic, regulatory or political conditions generally, (iv) changes resulting from the commencement or continuation of the Bankruptcy Case, (v) actions taken by the Seller pursuant to (or as contemplated by) orders entered by the Bankruptcy Court in the Bankruptcy Case, or (vi) changes in the financial or stock markets in the United States of America.

"Merchandise" means (i) all finished goods inventory that is owned by Seller and located at a Store or the Distribution Center or Seller's Corporate Headquarters on the Closing Date, and (ii) On Order Merchandise; provided, however, notwithstanding the foregoing, "Merchandise" shall not include (A) goods which belong to sub-lessees, licensees or concessionaires of Seller, or (B) goods held by Seller on memo, on consignment, or as bailee, or (C) solely for purposes of determining the aggregate Retail Value of the Merchandise for purposes of calculating the Purchase Price hereunder (and any adjustment thereto pursuant to Section 2.6(b), Defective Merchandise.

"Merchandise Floor" shall have the meaning ascribed to such term in Section 4.10 hereof.

5

"On Order Merchandise" means all finished goods inventory salable in the ordinary course ordered and paid for by Seller and received in the Distribution Center within twenty-one (21) days after the Closing Date.

"Other Fixed Assets" shall have the meaning ascribed to such term in Section 2.6(b) hereof.

"Other Fixed Assets Threshold" shall have the meaning ascribed to such term in Section 2.6(b) hereof.

"Party" and "Parties" shall have the meaning ascribed to such term in the Preamble of this Agreement.

"Permitted Liens" shall have the meaning ascribed to such term in Section 4.8(c)(ii) hereof.

"Petition Date" means March 25, 2010.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a governmental unit or political subdivision thereof.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.6 hereof.

"Purchaser" shall have the meaning ascribed to such term in the Preamble hereto.

"Purchaser Appraiser" shall have the meaning ascribed to such term in Section 2.6(c)(i) hereof.

"Property Dropout Notice" shall have the meaning ascribed to such term in Section 3.2(c) hereof.

"Real Estate Occupancy Expenses" means the actual amounts incurred of rent, CAM, real estate and use taxes, HVAC, utilities (including base telephone charges), ordinary repairs and maintenance, ordinary course third party cleanings, and fixed general liability insurance for each location subject to a Real Property Lease on a per diem basis in an amount not to exceed the amounts set forth on Schedule 3.2(a) attached hereto for each such location; provided, however, that per diem Real Estate Occupancy Expenses relative to the Distribution Center and Seller's Store located at 210 N. 5th Avenue, Yakima, Washington shall in no event be less than $200,000 in the aggregate notwithstanding Purchaser's delivery of a Dropout Notice with respect to either or both such locations.

"Real Property Leases" means the non-residential real property leases of Seller described on Exhibit B hereof.

"Realty Cure Costs" means Cure Costs for Assigned Leases, not to exceed the per Assigned Lease amount reflected on the Schedule 2.6(d)(ii).

"Referee Appraiser" shall have the meaning ascribed to such term in Section 2.6(c)(i) hereof.

"Retail Value" shall have the meaning ascribed to such term in Section 2.6(b) hereof.

"Remaining Cash Payment" shall have the meaning assigned to that term in Section 2.6(a) hereof.

"Retained Other Fixed Assets" shall have the meaning ascribed to such term in Section 2.6(c)(i) hereof.

"ROFA Liquidation Value" shall have the meaning ascribed to such term in Section 2.6(c)(i) hereof.

"Sale Hearing" means the hearing held by the Bankruptcy Court in the Bankruptcy Case to consider entry of the Sale Order.

"Sale Motion" means the pleadings filed by Seller with the Bankruptcy Court seeking approval of this Agreement, the Agency Agreement and such other and ancillary documents and agreements hereto and thereto necessary and incident to the implementation of the transactions contemplated hereunder.

"Sale Order" shall have the meaning ascribed to that term in Section 8.4(a) hereof.

"Seller" shall have the meaning ascribed to such term in the Preamble hereto.

"Seller Appraiser" shall have the meaning ascribed to such term in Section 2.6(c)(i) hereof.

"SKU" means the unique stock keeping unit identifier assigned to identical pieces of Merchandise.

"Store Closing Sale" shall have the meaning ascribed to such term in Section 3.1 hereof.

"Stores" has the meaning set forth in the Recitals to this Agreement.

"Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"Transactions" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Transaction Documents" shall have the meaning ascribed to such term in Section 4.2 hereof.

7

"Transfer Taxes" shall have the meaning ascribed to such term in Section 9.2 of this Agreement.

"Transferred Employees" means those current employees of Seller who are employed by Purchaser on or after the Closing Date.

"WARN Act" shall have the meaning ascribed to such term in Section 2.4 of this Agreement.

2.    Purchase and Sale.

2.1.    Purchase and Sale. Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, on an "as is, where is" basis except as expressly set forth in Section 4 hereof, all right, title and interest of Seller in and to the following assets, properties and rights, to the extent owned, held or primarily used in the conduct of the Business, free and clear of all Liens and Claims (other than Permitted Liens and the Assumed Obligations) to the maximum extent permitted by Section 363 of the Bankruptcy Code (the "Acquired Assets"):

(a)    the contracts, leases (other than Real Property Leases), warranties, commitments, purchase and sale orders, and agreements relating to Intellectual Property Rights, whether oral or written, identified on Schedule 2.l(a) which are related to the Business (collectively, the "Executory Contracts"), solely to the extent that such Executory Contracts are designated by Purchaser either on or prior to the date of the Auction or such other date prior to the expiration of the Executory Contract Option Period, to be assumed and assigned to Purchaser and to the extent such Executory Contracts are assignable under bankruptcy law or applicable non-bankruptcy law without the consent of the counterparty(ies) thereto (to the extent so designated, collectively, the "Assigned Contracts"), together with the right to receive income in respect of such Assigned Contracts on and after the Closing Date, and any causes of action relating to past or current breaches of the Assigned Contracts;

(b)    all of Seller's rights in and to those certain Real Property Leases identified in Schedule 2.1(b), together with all permanent fixtures, improvements and appurtenances thereto and associated therewith, as the same may be designated by Purchaser for assumption and assignment to Purchaser or one or more of its designees prior to the expiration of the Lease Marketing Period (to the extent so designated, the "Assigned Leases");

(c)    Designation Rights with respect to the Real Property Leases;

(d)    all Merchandise;

(e)    all accounts, accounts receivable, contract rights to payment, payment intangible notes, and other receivables and amounts owed to the Seller;

(f)    any supplier rebate or credit;

8

(g)     all prepaid assets and deposits (including utility deposits), security deposits, deposits with creditors and other deposits of any kind or nature whatsoever;

(h)     the right to be engaged and serve as Seller's exclusive agent for the limited purpose of: (i) selling all of the Liquidation Merchandise located or to be located in the Designated Liquidation Locations by conducting the Store Closing Sale; and (ii) disposing of the Liquidated Other Fixed Assets, in each case in accordance with the terms of the Agency Agreement;

(i)     all transferable Intellectual Property Rights related to the Business, including the items listed on Schedule 2.1(i), and any causes of action relating to past or current infringement of the Intellectual Property Rights;

(j)     all owned FF&E, machinery, equipment, personal property, office equipment, furnishings, computer hardware and spare parts relating thereto, motor vehicles, fork lifts, rolling stock, wherever located, including the items listed on Schedule 2.1(j); provided, however, that any such personal property located in the Corporate Headquarters may be used by Seller to the extent necessary, without charge, in connection with the winding-up of the Seller's estate and/or the closing of the Bankruptcy Case and in connection with Seller's performance under the Agency Agreement, and any such personal property that is needed by Seller and is being so used by Seller shall not be removed from the Corporate Headquarters (without Seller's prior consent) until Seller no longer needs to use such assets (it being understood that any damage or loss to such personal property occurring after the Closing shall be the responsibility of Seller unless such damage or loss was caused by Purchaser or Purchaser's representatives or agents);

(k)     all books, records and other documents (whether on paper, computer diskette, tape or other storage media) of Seller relating to the Business or the Acquired Assets (provided that Seller shall be entitled to retain copies of such books, records and other documents), including property records, purchase and sale records, credit data, marketing, advertising and promotional materials, personnel and payroll records of Transferred Employees (to the extent permitted by applicable law), accounting and financial records, fixed asset lists, customer lists, customer records and information (including internet mailing addresses and Household customers), inventory history, historical financing information (including reserve calculations), fixed asset information, mailing and supplier lists, parts lists, correspondence, studies, sales history, files and similar items, other than incorporation documents and corporate minute books (collectively, the "Books and Records"); provided, however, Purchaser shall be entitled to exclude any Books and Records from Acquired Assets by giving written notice of the same to the Seller;

(l)     all advertising commercials, videos, photography, and advertising equipment used internally, together with all internal and external signage located in or used in connection with the Business;

(m)     all manuals, training materials, and other documentation relating to employee benefits, treatment and conduct, videos, DVDs, CDs or training software related to the Business (collectively, the "Employee Manuals"); provided, however, that Seller shall not

9

provide Purchaser with employee personnel files or information therefrom without the express written permission of said employees;

(n)     proceeds of the Agency Agreement other than expenses payable to Seller by the Liquidating Agent under the Agency Agreement;

(o)     all causes of action relating to the Acquired Assets arising on or prior to the Closing Date, other than Avoidance Actions and other Excluded Assets; and

(p)     all prepaid assets and deposits, including security deposits, deposits with creditors and other deposits of any kind or nature whatsoever, but only insofar as they are related to the Acquired Asset(s).

2.2.    Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the Acquired Assets shall not include any assets, properties or rights not specifically identified in Section 2.1, including the following (the "Excluded Assets"):

(a)     all Avoidance Actions;

(b)     the minute books and organizational documents of Seller;

(c)     all insurance policies relating to the Business, all claims arising under such policies (whether prior to or after the Closing), and all credits, premium refunds, proceeds, causes of action or rights thereunder;

(d)     all rights of Seller arising under this Agreement or the Agency Agreement or in connection with the Transactions;

(e)     any Tax refund, Tax rebate or Tax reimbursement due to Seller or its Affiliates and relating to the Business or any U.S. tax net operating loss of Seller;

(f)     any amounts payable to Seller under the Agency Agreement;

(g)     all books and records related to Excluded Assets or any Books and Records which Purchaser elects not to acquire pursuant to Section 2.1(i) hereof;

(h)     any unexpired lease or executory contract not identified as an Assigned Contract or Assigned Lease;

(i)     any right to overfunding or refunded assets from any employee benefit plan or workers' compensation program;

(j)     all cash and cash equivalents (including undeposited checks, cash located in each of the registers located in the Stores, and cash located in banks or other financial institutions; and

(k)     any other asset not included within the definition of Acquired Assets.

10

2.3. <u>Assumed Obligations</u>. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Seller or the Business (the "<u>Assumed Obligations</u>"):

(a)     all Cure Costs for Assigned Contracts;

(b)     all Realty Cure Costs for Assigned Leases;

(c)     customer service and warranty claims arising after the Closing Date with respect to merchandise sold at the Stores or Distribution Centers (other than the Designated Liquidation Locations) on or after Closing Date;

(d)     all liabilities and obligations of Seller related to or arising under the Assigned Contracts, Assigned Leases, and Intellectual Property Rights from and after the Closing;

(e)     all costs, expenses and liabilities pro rated to Purchaser as set forth in this Agreement (including <u>Section 9.3</u>); and

(f)     With respect to any Store or the Distribution Center which has not been designated as a Designated Liquidation Location, Real Estate Occupancy Expenses and payroll and benefits relative to employees of the Seller located in such Stores and Distribution Center.

2.4. <u>Excluded Liabilities</u>. Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Obligations and is not assuming any other liability or obligation of Seller of any nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or noncontingent, liquidated or unliquidated or otherwise, including severance, termination pay, accrued vacation, pension, profit sharing or any other employee benefit plans, compensation or retiree medical or other benefits and obligations, or any obligation, claim or amount for employees, or any obligation, claim or amount under the Workers Adjustment and Retraining Notification Act ("<u>WARN Act</u>") or COBRA, product-related liabilities (other than as provided for in <u>Section 2.3(c)</u> hereof) or liabilities arising under Environmental Laws. All such other liabilities and obligations shall be retained by and remain obligations and liabilities of Seller (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>").

2.5. <u>Assignment of Contracts and Rights</u>. To the maximum extent permitted by the Bankruptcy Code, the Assigned Contracts, the Assigned Leases, and Intellectual Property Rights shall be assumed by Seller and assigned to Purchaser or one or more of its designees pursuant to Section 365 of the Bankruptcy Code. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Acquired Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder. If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 and/or 365 of the Bankruptcy Code other than as a result of the failure to pay Cure Costs which are not Assumed Obligations, then such Acquired Assets shall not be

11

transferred hereunder and the Closing shall proceed with respect to the remaining Acquired Assets without any reduction in the Purchase Price.

### 2.6. Purchase Price; Allocation of Purchase Price.

(a)     In consideration for the sale, transfer and delivery of the Acquired Assets, and in addition to assuming the Assumed Obligations, Purchaser shall pay to Seller cash in the amount of Six Million Five Hundred Fifty Thousand Dollars ($6,550,000.00) (the "Cash Payment"). On the Closing Date, Purchaser shall deliver to Seller by wire transfer of immediately available federal funds to a bank account (or accounts) designated in writing no later than one (1) day prior to the Closing Date by Seller to Purchaser the amount of $3,000,000.00 (the "Initial Cash Payment"). Within five (5) Business Days after the reconciliation and verification of the Final Inventory Report by Seller and Purchaser, Purchaser shall tender the remaining portion of the Cash Payment (as adjusted pursuant to Section 2.6(b) hereof) (the "Remaining Cash Payment"). The Cash Payment may be subject to further adjustment pursuant to Section 2.6(c) below.

(b)     The Cash Payment has been determined based upon inventory information provided by the Seller showing Merchandise as of December 31, 2009 having a Retail Value of not less than $13,100,000.00 (the "Inventory Threshold") and a value for all owned furniture, fixtures, equipment, vehicles and rolling stock ("Other Fixed Assets") of $400,000.00 (the "Other Fixed Assets Threshold"). Pursuant to Section 2.7 hereof, the parties agree to conduct the Inventory Taking and track Gross Rings to determine the actual Retail Value of the Seller's Merchandise at Closing, and the Cash Payment shall be adjusted as provided on Schedule 2.6(b)(1)attached hereto for each dollar by which the actual aggregate Retail Value of the Merchandise at Closing exceeds or is less than the Inventory Threshold. As used herein "Retail Value" shall mean, with respect to each item of Merchandise, the lowest ticketed or marked price of each such item as of the Closing Date; provided that in determining the aggregate Retail Value of the Merchandise (i) Defective Merchandise shall be excluded, (ii) items of out of season merchandise (i.e., items relating exclusively to a season or holiday falling more than two (2) months after the Closing Date) shall be valued at the lower of (A) the lowest ticketed or marked price, or (B) 50% of the original retail price of such item, and (iii) items of On Order Merchandise received at the Distribution Center following the Closing Date shall be valued at the lowest ticketed or marked price for each such item (established in accordance with Seller's historical procedures) multiplied by the applicable Adjustment Factor percentage set forth on Schedule 2.6(b)(2) attached hereto. Any inventory arriving at the Distribution Center after the date twenty-one (21) days following the Closing Date shall be excluded from Merchandise for purposes of determining the aggregate Retail Value of the Merchandise for purposes of this Section 2.6(b). Any inventory ordered by Seller prior to the Closing Date but arriving at the Distribution Center after the Closing Date which has not been paid for in full by Seller prior to the Closing Date but arriving at the Distribution Center after the Closing Date which has not been paid for in full by Seller may be included in Merchandise as mutually agreed by Seller and Purchaser, and the cost to Purchaser for any such inventory to be included in Merchandise shall be Seller's cost for such inventory.

(c)     The Purchase Price may be subject to increase based upon the value of the Other Fixed Assets as determined by the Parties following the Closing in accordance with the following provisions of this Section 2.6(c).

(i)     Within thirty (30) days (or such longer period as the Parties shall mutually agree) following the Closing Date (the "Liquidation Election Period"), Purchaser may elect (in its sole discretion) whether to continue the operation of the Business or to dispose of any or all of the Acquired Assets through liquidation (including, without limitation, any or all of the Other Fixed Assets ("Liquidated Other Fixed Assets")) pursuant to Section 3 hereof. In the event that Purchaser does not elect to liquidate any or all of the Other Fixed Assets (such remaining Other Fixed Assets being referred to herein as (the "Retained Other Fixed Assets"), following the expiration of the Liquidation Election Period the Seller shall be entitled to select an auctioneer previously used by the Bankruptcy Court (the "Seller Appraiser") to estimate the net liquidation value of such Retained Other Fixed Asset(s) (the "ROFA Liquidation Value"). In the event that Purchaser disputes the ROFA Liquidation Value, Purchaser shall be entitled to select an auctioneer previously used in matters before the Bankruptcy Court or an auctioneer of recognized national standing to provide an alternate estimate of the ROFA Liquidation Value (the "Purchaser Appraiser") at Purchaser's expense. The Seller Appraiser and the Purchaser Appraiser shall select a third auctioneer previously used in matters before the Bankruptcy Court or an auctioneer of recognized national standing (the "Referee Appraiser") to estimate the ROFA Liquidation Value. The average of the three appraisals shall conclusively determine the ROFA Liquidation Value. Each Party shall bear its own expenses, including attorney's fees, for any dispute in connection with determining the ROFA Liquidation Value.

(ii)     Following the completion of the liquidation of all Liquidated Other Fixed Assets by the Purchaser and determination of the ROFA Liquidation Value pursuant to the provisions of Section 2.6(c)(i) above with respect to Retained Other Fixed Assets, the Purchase Price shall be increased, if applicable, by an amount equal to 50% of the sum of (A) (1) the total amount realized by Purchaser from liquidation of Liquidated Other Fixed Assets, less all actual out of pocket costs and expenses incurred by the Purchaser attributable to the disposition of such Other Fixed Assets, plus (2) the ROFA Liquidation Value of all Retained Other Fixed Assets, less (B) the Other Fixed Assets Threshold. Purchaser shall pay to Seller any such positive amount within ten (10) Business Days following the later of completion of liquidation of the Liquidated Other Fixed Assets or final determination of the ROFA Liquidation Value of the Retained Other Fixed Assets as provided above.

(d)     In addition to the Cash Payment and Assumed Obligations, Purchaser shall pay the following to Seller:

(i)     All amounts due and payable under the Agency Agreement; and

(ii)     Purchaser shall pay the Cure Costs for the Assigned Contracts and the Realty Cure Costs for the Assigned Leases; provided, however, that

13

Purchaser's obligation to pay the Realty Cure Costs for the Assigned Leases shall not exceed the per Assigned Lease amount reflected on the Schedule 2.6(d)(ii); provided, further that such amounts shall be payable by Purchaser upon the earlier of three (3) Business Days after (x) entry of an order of the Bankruptcy Court fixing the Cure Costs due to a landlord of an Assigned Lease, or the nondebtor party to an Assigned Contract; or (y) delivery of a written acknowledgment or statement of the Cure Costs, signed by both the Seller and the subject landlord for a Assigned Lease, or the nondebtor party to an Assigned Contract, as applicable.

The aggregate of subsections 2.6(a), (b), (c) and (d) hereinafter being referred to as the "Purchase Price."

(e)　　Purchaser and Seller agree that the Purchase Price, applicable Assumed Obligations and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder and Schedule 2.6(e) hereof (such schedule to be determined jointly by Purchaser and Seller prior to Closing). Purchaser and Seller each agrees to provide the other promptly with any other information required to complete Schedule 2.6(e). Such allocation shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the Parties hereto agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income tax returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state laws and regulations.

2.7.　　Physical Inventory.

(a)　　Commencing on the first day after the Closing Date, Seller and Purchaser shall cause to be taken a SKU level physical inventory of the Merchandise (the "Inventory Taking"), which Inventory Taking shall be completed no later than seven (7) days after the Closing Date (the "Inventory Completion Date", and the date of the Inventory Taking at each of the Stores and the Distribution Center being the "Inventory Date" for each such Store and Distribution Center). Seller and Purchaser shall jointly employ a mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking, or if Seller and Purchaser mutually agree, shall jointly conduct the Inventory Taking without utilizing a third party inventory taking service. The DIP Lender (to the extent not the Successful Bidder) shall have the right to have a representative present at the Inventory Taking and shall have the right to review and verify the listing and tabulation of the Inventory Taking Service. On Order Merchandise shall be counted and included in Merchandise when it arrives at the Distribution Center pursuant to procedures mutually agreed by Seller and Purchaser. The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed by Seller and Purchaser. Purchaser and Seller shall each be responsible for 50% of the fees and expenses of the Inventory Taking Service, if such service is utilized. In the event that no third party Inventory Taking Service is utilized, then each of Seller and Purchaser shall bear their respective costs and expenses incurred in the Inventory Taking. Seller and Purchaser (and, to the extent LOI Capital, LLC is not the successful Purchaser, the DIP Lender) shall each have the right to have representatives present during the Inventory Taking, and shall each have

14

the right to review and verify the listing and tabulation of the Inventory Taking Service. Purchaser and Seller agree that (i) during the conduct of the Inventory Taking in each of the Stores and the Distribution Center, the applicable location shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking at such location has been completed, and (ii) prior to completion of the Inventory Taking at each Store location, discounts offered on any item of Merchandise in the Stores shall not exceed 15%, provided that Purchaser may elect to offer a discount greater than 15% at the Stores so long as (A) Purchaser notifies the Seller and counsel for the Official Committee of Unsecured Creditors in the Bankruptcy Case (and, to the extent LOI Capital, LLC is not the successful Purchaser, the DIP Lender) in writing of any such discount offered in excess of 15%, and (B) the Gross Up Percentage specified in Section 2.7(c) below shall automatically be increased by any incremental discount offered by the Purchaser in excess of 15% with respect to all sales through the effected Stores at such increased discount.

(b)   Each of Seller and Purchaser (and, to the extent LOI Capital, LLC is not the successful Purchaser, the DIP Lender) shall have a period of ten (10) Business Days to review and raise any objections with respect to reconciliation of the Inventory Taking following the delivery thereof (the "Inventory Dispute Period"), during which time each such party may dispute any amounts reflected in the Inventory Taking by giving notice in writing to the other parties specifying each of the disputed items and setting forth in reasonable detail the basis for such dispute. Failure by Seller or Purchaser or the DIP Lender to dispute amounts or items reflected in the Inventory Taking before the expiration of the Inventory Dispute Period shall be deemed an acquiescence thereto by such party. If within ten (10) Business Days after delivery of any notice of dispute, the parties are unable to resolve all of such disputed items, then any remaining items in dispute shall be submitted to the Bankruptcy Court. The final audited report of the aggregate Retail Value of the Merchandise by the Inventory Taking Service, after verification and reconciliation thereof by Seller and Purchaser, is referred to as the "Final Inventory Report."

(c)   For the period from the Closing Date to the Inventory Date for each Store and the Distribution Center, Purchaser and Seller shall utilize the "gross rings" method to track sales of Merchandise for purposes of calculating any adjustment to the Purchase Price pursuant to Section 2.6(b) hereof, and the parties shall jointly keep (i) a strict count of net sales of Merchandise less applicable sales taxes ("Gross Rings"), and (ii) cash reports of sales at each Store. For purposes of calculating any adjustment to the Purchase Price pursuant to Section 2.6(b) hereof, Merchandise sold through the Stores prior to the applicable Inventory Date for such Stores and tracked using the "Gross Rings" method shall be included in Merchandise hereunder, and an amount equal to the product (A) Gross Rings divided by (B) the reciprocal of the discount utilized pursuant to Section 2.7(a), with the result then multiplied by 102.5%. For illustrative purposes, if the Gross Rings were \$.85 and the discount utilized was 15%, the calculation would be as follows:

$$\$.85/(1-15\%) = \$1.00 \times 102.5\% = \$1.025.$$

2.8.   Intentionally Omitted.

2.9.   Closing. The closing (the "Closing") of the purchase and sale of the Acquired Assets and the assumption of the Assumed Obligations shall take place at the offices of Oldfield & Helsdon, PLLC no later than two (2) Business Days after satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree.

2.10.   Deliveries by Seller. At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)   a Bill of Sale substantially in the form attached hereto as Exhibit D and an Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption Agreement"), each duly executed by Seller, pursuant to which Seller shall transfer and convey the Acquired Assets to Purchaser;

(b)   the Agency Agreement duly executed by Seller;

(c)   all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing and required in connection with the conveyance of the Acquired Assets to Purchaser pursuant to this Agreement; and

(d)   a certified copy of the Sale Order.

2.11.   Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)   the Initial Cash Payment, and all other amounts payable to Seller on the Closing Date pursuant to Section 2.6(d);

(b)   the Assignment and Assumption Agreement, the Agency Agreement, each duly executed by Purchaser; and

(c)   all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing in connection with the consummation of the Transactions pursuant to this Agreement.

2.12.   "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, SUBJECT TO THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN SECTION 4 OF THIS AGREEMENT, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND FOLLOWING CLOSING SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION

OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ACQUIRED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 4, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

3.  Liquidation of Certain Assets Assumption/Assignment Option Period.

3.1.  Assets to be Liquidated; Proceeds. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, and subject further to the terms of the Agency Agreement, the Liquidating Agent shall act as Seller's exclusive agent for the purpose of liquidating the Liquidation Merchandise and Other Fixed Assets in (i) those Stores and the Distribution Center identified in Schedule 3.1 hereto, and (ii) such additional Stores and Business locations as Purchaser shall designate to Seller in writing prior to the expiration of the Liquidation Election Period (such locations, the "Designated Liquidation Locations") through the conduct of "going out of business," "store closing," bankruptcy liquidation or similar themed sales or other types of sales described in the Agency Agreement (the "Store Closing Sales"). The terms, conditions and procedures applicable to the conduct of the Store Closing Sales in the Designated Liquidation Locations and as concerns the sale or other disposition of the Liquidation Merchandise and Liquidated Other Fixed Assets from the Designated Liquidation Locations are set forth in the Agency Agreement. Subject to entry by the Bankruptcy Court of the Sale Order, the Liquidating Agent or Purchaser shall be entitled to conduct Store Closing Sales at the Stores leased pursuant to the applicable Real Property Leases in accordance with the sale guidelines attached to the Agency Agreement.

3.2.  Lease Designation Rights. Purchaser shall have the exclusive right to act as Seller's agent for the limited purposes of marketing and disposing of the Real Property Leases through the conclusion of the Lease Marketing Period (as defined below), and to designate the ultimate assignee of all of the Seller's right, title and interest in and to such Real Property

Leases, together with all permanent fixtures and improvements (hereinafter, the "Designation Rights").

(a)     Purchaser shall be obligated to reimburse Seller for Real Estate Occupancy Expenses for the Designated Liquidation Locations attributable to the period from the Closing Date through the date sixty (60) days after the Closing Date (the "Lease Marketing Period"), on a per location, per diem basis limited to the categories and amounts set forth on Schedule 3.2(a) hereto (provided, however, Purchaser and Seller agree that there shall be no duplication of payment obligations in respect of occupancy-related expenses under this Agreement and the Agency Agreement). Purchaser shall pay the weekly allocable share of any such Real Estate Occupancy Expenses on Wednesday of each week during the Lease Marketing Period; provided, however, on each Tuesday, Seller shall provide Purchaser (or its designees) invoices reasonably acceptable to Purchaser in support of the actual expenses incurred during the prior week.

(b)     During the Lease Marketing Period, Seller agrees to cooperate reasonably with Purchaser to arrange for the sale of the Seller's leasehold interests in the Real Property Leases that Purchaser determines. Without limiting the generality of the foregoing, Seller agrees (i) to provide Purchaser with all due diligence materials and information as Purchaser shall reasonably request in connection with its efforts to market and attempt to sell the Real Property Leases (including complete copies of the subject leases and any abstracts prepared with respect thereto, and all communications with the lessors thereunder, all property surveys, all environmental reports and tax and utility records), and (ii) to cooperate with Purchaser, its agents and any potential purchasers of any of the Real Property Leases and to provide reasonable access to such locations.

(c)     At any time prior to the expiration of the Lease Marketing Period for each Real Property Lease, Purchaser shall have the right, which right may be exercised at any time and from time to time in Purchaser's sole and absolute discretion, to provide written notice to the Seller (each such notice, a "Lease Assumption Notice") of Purchaser's election to require the Seller to assume the applicable Real Property Lease identified in the subject Lease Assumption Notice(s) and assign same to Purchaser's designee. Within fifteen (15) days following the date Purchaser delivers a Lease Assumption Notice to Seller, Seller shall, at no additional cost or expense to Purchaser (other than payment of Cure Costs under the Assigned Lease), take all requisite actions (including actions required under section 363 and/or section 365 of the Bankruptcy Code, as applicable) to assume and assign such Assigned Lease(s) to the designee identified by Purchaser in such Lease Assumption Notice(s). Without limiting the generality of the foregoing, upon receipt of a Lease Assumption Notice, Seller shall use its commercially reasonable efforts to obtain the entry of an order of the Bankruptcy Court approving the sale or assumption of the Assigned Lease(s) and the assignment of such lease(s) to the specified designee. As used herein, the term "commercially reasonable efforts" shall not require the Seller to pay any funds (including Cure Costs) or assume any claims, but shall expressly require Seller or its chapter 11 estate to expend or incur fees, costs and expenses for the payment of Seller's attorneys and other professionals whose services may reasonably be required in connection with the prosecution of any motion seeking the entry of any such assumption and assignment order. All Cure Costs attributable to the assumption and assignment of an Assigned Lease shall be paid by Purchaser (or any designee thereof). Purchaser shall have

18

no further obligation or liability with respect to the Real Property Leases (other than any Assigned Leases that is assigned to Purchaser) (including any obligation to continue to pay any expenses with respect thereto), upon termination of the Lease Marketing Period.

(d)     At any time prior to the expiration of the Lease Marketing Period, Purchaser shall have the right, which right may be exercised at any time and from time to time in Purchaser's sole and absolute discretion, to provide written notice to the Seller (each such notice, a "Property Dropout Notice") of Purchaser's election to discontinue its efforts to market and attempt to sell any Real Property Lease (each a "Dropout Property" and collectively, the "Dropout Properties"). Upon Seller's receipt of a Property Dropout Notice, Purchaser's obligation to pay Real Estate Occupancy Expenses for the Dropout Property described therein shall continue until the date five (5) days after the Purchaser delivers the Property Dropout Notice for such Dropout Property. Upon Purchaser's delivery of a Property Dropout Notice, the affected Real Property Lease shall revert to Seller, and Seller may dispose of such property in such manner as Seller may elect, and all proceeds realized upon a disposition of same shall be the exclusive property of Seller. For the avoidance of doubt, any election by Purchaser to cause Seller to assume and assign a Real Property Lease to Purchaser or its designee shall, upon approval by the Bankruptcy Court of the same, be irrevocable, and following approval by the Bankruptcy Court of the assignment of any Real Property Lease to Purchaser or its designee, Purchaser shall no longer be permitted to designate such Real Property Lease as a Dropout Property.

(e)     Regardless of whether Purchaser directs Seller to reject any one or more Real Property Leases at any time, the legal cost and expenses of the rejection at any time of anyone or more such leases, including the filing and prosecution of any motions or other pleadings with respect to the same, shall be borne solely by the Seller and its chapter 11 estate.

3.3     Executory Contract Period. (a) Purchaser shall have thirty (30) days after the Closing Date, unless Purchaser earlier designates to Seller in writing that it does not want to have an Executory Contract assigned to it (the "Executory Contract Option Period") to designate an Executory Contract as an Assigned Contract. In addition to the rights granted to Purchaser pursuant to the Agency Agreement with respect to the Designated Liquidation Locations, Seller hereby appoints Purchaser its agent-in-fact for the sole purpose of allowing Purchaser to continue to operate under the Executory Contracts until such time as Purchaser either designates such contract as an Assigned Contract, or designates that it does not want to have such contract assumed and assigned to it; provided, however, during such period, Purchaser shall be responsible for all obligations arising from or in connection with such Executory Contract(s), which amount shall be paid by Purchaser to Seller on a weekly basis as part of the weekly reconciliation that is done in connection with the Agency Agreement.

4.     Representations and Warranties of Seller. Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date hereof as follows:

4.1.     Organization. Seller is a corporation validly existing under the laws of the State of Washington and has the corporate power and authority to own, lease and operate the Acquired Assets, and to carry on in all material respects the Business as now being conducted.

19

4.2.     Corporate Authorization. The execution, delivery and performance by Seller of this Agreement, the Agency Agreement and all other documents, instruments and agreements contemplated hereby or thereby (collectively, the "Transaction Documents") and the consummation of the Transactions are within Seller's corporate powers and have been duly authorized by all necessary action on the part of Seller. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, this Agreement and each other Transaction Document constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

4.3.     Governmental Authorization. Except as disclosed in Schedule 4.3, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents and the consummation of the Transactions contemplated hereby by Seller require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, (ii) compliance with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), and (iii) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

4.4.     Noncontravention. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents and the consummation of the Transactions do not and will not (i) violate Seller's articles or certificate of incorporation or bylaws, (ii) assuming compliance with the matters referred to in Section 4.3, violate any applicable law, rule, regulation, judgment, injunction, order or decree, (iii) constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Acquired Asset to which Seller is entitled under any provision of any agreement or other instrument binding upon Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (iv) result in the creation or imposition of any Lien on any Acquired Asset.

4.5.     Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 4.5, there is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement and the other Transaction Documents.

4.6.     Litigation. Except as disclosed in Schedule 4.6, as of the date hereof, there is no action, suit, investigation or proceeding pending or, to the best of Seller's knowledge, threatened against or affecting, the Acquired Assets before any court or arbitrator or any governmental body, agency or official which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.7.     Compliance with Laws and Court Orders. Seller is not in violation of any law, rule, regulation, judgment, injunction, order or decree applicable to the Acquired Assets or the conduct of the Business, except for violations, which would not reasonably be expected to have a Material Adverse Effect.

4.8.     Sufficiency of and Title to the Acquired Assets.

(a)     The Acquired Assets constitute all of the material property and assets owned, held or primarily used in the conduct of the Business (other than the Excluded Assets).

(b)     Upon consummation of the Transactions, Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Acquired Assets, free and clear of all Liens and Claims to the maximum extent permitted by the Bankruptcy Code, other than Assumed Obligations and Permitted Liens.

(c)     No Acquired Asset is subject to any Lien, except:

(i)     Liens for Taxes, assessments and similar charges that are not yet due and payable; and

(ii)     Liens which will attach to the proceeds of sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or will not survive the Closing (clauses (i) and (ii) of this Section 4.8(c) are, collectively, the "Permitted Liens").

4.9.     Certain Fees. Seller has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.10.     Minimum Retail Value of Merchandise. The aggregate Retail Value of the Merchandise shall not be less than $8,000,000 (the "Merchandise Floor").

4.11.     Intellectual Property. There has been no material loss, cancellation, termination or expiration of any of the registrations or patents underlying the Intellectual Property Rights since the Petition Date. To the best of Seller's knowledge, the Business does not cause Seller to infringe or violate any of the patents, trademarks, service marks, trade names, mask works, copyrights, trade secrets, proprietary rights or other intellectual property of any other person, and Seller has not received any written or oral claim or notice of infringement or potential infringement of the intellectual property of any other Person. To the best of Seller's knowledge, there is no infringement of the Intellectual Property by any third party.

4.12.     Merchandise.

(a)     Except as described on Schedule 4.12 attached hereto, since March 1, 2010, Seller has not (i) offered discounts on sales of merchandise off of regular retail prices (including by reason of point of sale discounts, or in-store or advertised promotions or circulars), or (ii) conducted any promotions or advertised sales at the Stores.

(b)     Seller has not since March 1, 2010, and shall not have up to the Closing Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business and except for the effects of the termination of promotional events.

21

(c)     Seller has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns). All pricing files and records relative to the Merchandise have been made available to Purchaser.

(d)     Seller shall ticket or mark all items of Merchandise received at the Stores and the Distribution Center prior to the Closing Date in a manner consistent with similar Merchandise located at such locations.

(e)     Since March 1, 2010, Seller has not transferred and shall not transfer to or from the Stores or the Distribution Center, any merchandise or goods outside the ordinary course in anticipation of the Closing or of the Inventory Taking.

(f)     To the best of Seller's knowledge, all Merchandise is in material compliance with all applicable federal, state, or local product safety laws, rules, and standards. Seller shall provide Purchaser with its historic policies and practices, if any, regarding product recalls prior to the Closing Date.

4.13.   Real and Personal Property Leases.

(a)     Except as set forth Schedule 4.13(a) hereto, to the best of Seller's knowledge, each of the Real Property Leases is legal, valid, binding, enforceable and in full force and effect, and subject to the entry of the Sale Order, no event of default on the part of Seller currently exists thereunder, no event has occurred thereunder that after the giving of notice and the passage of any applicable cure period would constitute an event of default, and Seller has neither delivered nor received any written notice from the non debtor party to any such lease of the termination thereof (excluding in each case defaults to be cured by Bankruptcy Court order). Subject to entry of the Sale Order and applicable orders of the Bankruptcy Court approving the assignment of Assigned Leases, each of the Real Property Leases may be freely assigned (without third party consent) by Seller to Purchaser, or to any Purchaser designee in accordance with the procedures and provisions of Section 3.2 hereof.

(b)     Except as set forth on Schedule 4.13(b), there are no pending or, to the best of Seller's knowledge, threatened condemnation proceedings against any of the locations subject to a Real Property Lease.

(c)     to the best of Seller's knowledge, there is no pending or proposed special assessment affecting or which may affect the Real Property Leases.

(d)     Seller has provided or otherwise made available to Purchaser prior to the date of this Agreement the following items to the extent same, or the information from which same can be prepared, are in the possession or control of Seller:

(i)     True, complete and accurate copies of all Real Property Leases, including all material amendments to and assignments of them; and

22

(ii)     True, complete and accurate copies of all environmental inspection reports with respect to the Real Property Lease locations and all other material environmental documents relating to the Business in Seller's possession. Without in any way modifying the obligations of Seller pursuant to this Agreement, Purchaser acknowledges that this Section 4.13(d) imposes no obligation on Seller to obtain new environmental inspection reports, surveys, title policies or commitments or site plans with respect to the Real Property Lease locations.

(e)     Except as disclosed in the environmental inspection reports provided or otherwise made available by Seller to Purchaser, to the best of Seller's knowledge:

(i)     The Real Property Lease locations are in material compliance with and have no material contamination or other material liabilities arising under all federal, state, local and foreign statutes, regulations, orders and ordinances, and all common law concerning occupational health and safety, pollution or protection of the environment, as amended and in effect on or prior to the date the Sale Order is entered (hereinafter, the "Environmental Laws"); and

(ii)     Seller has all material permits, licenses, and other authorizations that are required pursuant to Environmental Laws for the occupation and operation of the Real Property Lease locations.

4.14.     Benefit Plans. The Seller does not maintain, sponsor, contribute to, or have any obligation to contribute to, or have any liability or potential liability under or with respect to (i) any "multiemployer plan" as defined in Section 3(37) or 4001 (a)(3) of ERISA, or (ii) any employee benefit plan, program or arrangement that provides for post-employment medical or health benefits (other than health continuation coverage required by COBRA) and that would result in any obligation or liability to Purchaser.

5.     Representations and Warranties of Purchaser. Purchaser represents and warrants to Seller as follows:

5.1.     Organization. Purchaser is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

5.2.     Corporate Authorization. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Documents and the consummation of the Transactions contemplated hereby are within the corporate powers of Purchaser and have been duly authorized by all necessary corporate action on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

5.3.     Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Documents and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) consents, approvals or authorizations of, or declarations or

23

filings with, the Bankruptcy Court, (ii) compliance with the HSR Act (if applicable), and (iii) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

5.4. Noncontravention. Neither the execution and delivery of this Agreement and the other Transaction Documents nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of the articles or certificate of incorporation or by laws of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any governmental entity; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any law, order, injunction or decree applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

5.5. Financing/Adequate Assurance. Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder. Purchaser is capable of satisfying the conditions contained in Sections 365(b)(I)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts, Assigned Leases, and Intellectual Property Rights.

5.6. Litigation. There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any court or arbitrator or any governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

5.7. Certain Fees. Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

5.8. Inspections; No Other Representations. Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of properties and assets such as the Acquired Assets and assumption of liabilities such as the Assumed Obligations as contemplated hereunder. Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Purchaser acknowledges that Seller has given Purchaser complete and open access to the key employees, documents and facilities of the Business. Purchaser acknowledges and agrees that the Acquired Assets are being sold on an "as is, where is" basis and Purchaser agrees to accept the Acquired Assets and the Assumed Obligations in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express

24

or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement. Without limiting the generality of the foregoing, Purchaser acknowledges that Seller makes no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business, or (ii) any other information or documents made available to Purchaser or its counsel, accountants, representatives, agents or advisors with respect to the Business, except as expressly set forth in this Agreement.

      6.        Covenants of Seller. Seller agrees that:

      6.1.     Conduct of the Business. Except as may be required by the Bankruptcy Court, except for the consequences resulting from the commencement and continuation of the Bankruptcy Case, and except as may be required or contemplated by this Agreement, from the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, Seller shall use its commercially reasonable efforts to conduct the Business in the ordinary course consistent with past practice and to preserve intact the business organizations and relationships with third parties (including suppliers and customers) and to keep available the services of the present employees of the Business including, specifically (i) selling inventory during such period at customary prices, (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public, (iii) not returning inventory to vendors and not transferring inventory or supplies between or among Stores outside the ordinary course of business, (iv) not making any voluntary, material management personnel moves or changes at the Stores outside the ordinary course of business, and (v) cooperating reasonably with Purchaser to cancel Open Purchase Orders provided that doing so does not require Seller to incur any expense or to incur any obligation or liability to any third party vendor (unless Purchaser agrees to reimburse Seller for such expense and to pay any such obligation or liability); provided, however, notwithstanding any other provision of this Agreement, Seller shall be entitled to give notices under the WARN Act to employees at any Store, Distribution Center and/or the Corporate Headquarters that may be covered by the WARN Act. Without limiting the generality of the foregoing, from the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, except (i) as disclosed on Schedule 6.1, (ii) as may be required by the Bankruptcy Court, (iii) in the ordinary course consistent with past practice, (iv) for the consequences resulting from the commencement and continuation of the Bankruptcy Case, or (v) as may be required or contemplated by this Agreement, Seller will not (without the prior written consent of Purchaser):

      (a)     with respect to the Business acquire a material amount of assets from any other Person or sell, lease, license or otherwise dispose of any Acquired Assets except for (1) sales of Merchandise in the ordinary course of business, or (2) pursuant to existing contracts or commitments disclosed to Purchaser;

      (b)     agree or commit to do any of the foregoing;

          (i)     place any orders for additional Merchandise; or

25

(ii)    take any action that would reasonably be expected to cause the failure of any condition contained in Section 10.2 (other than actions taken by Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Case).

6.2.    Access to Information. From the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of the Business for the purposes of evaluating the Business and all properties, books, accounts, records and documents of, or relating to, the Business.

6.3.    Notices of Certain Events. Seller shall promptly notify Purchaser of:

(a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)    any material written communication from any governmental or regulatory agency or authority in connection with or relating to the Transactions; and

(c)    the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.6.

7.    Covenants of Purchaser. Purchaser agrees that:

7.1.    Access. On and after the Closing Date, Purchaser will afford promptly to Seller and its counsel, financial advisers and other agents reasonable access during normal business hours to its properties, Books and Records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Bankruptcy Case, the preparation and confirmation of a plan in the Bankruptcy Case, other matters relating to the winding-up of the Seller's estate and/or the closing of the Bankruptcy Case, or to permit Seller to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; provided, however, after the first six (6) months after the Closing Date, Seller shall reimburse Purchaser for a mutually agreed upon reasonable per diem charge for such Transferred Employee's time, to the extent necessary for the wind-up of Seller's bankruptcy proceedings or such other matter as are contemplated by this Section 7.1; provided, further, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser. Seller will hold, and will use its commercially reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 7.1.

26

7.2. Insurance. To the extent that any insurance policies of Seller or any of its Affiliates cover any loss, liability, claim, damage or expense relating to the Business and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser shall cooperate with Seller in submitting and pursuing such claims.

7.3. Adequate Assurance. In connection with entry of the Sale Order, Purchaser shall take any and all actions needed to provide "adequate assurance of future performance" with respect to the Assigned Contracts, Assigned Leases, and any Intellectual Property Rights pursuant to section 365 of the Bankruptcy Code.

7.4. Assumed Obligations. From and after the Closing Date, Purchaser shall (a) pay, perform and discharge, promptly when payment or performance is due or required, all of the Assumed Obligations, (b) take all actions necessary to satisfy its obligations under the terms and conditions of each of the Assigned Contracts, Assigned Leases, and Intellectual Property Rights, and (c) indemnify and hold harmless Seller from and against any damages arising out of a breach by Purchaser of this Section 7.4.

7.5. Books and Records. Solely to the extent that Purchaser takes physical possession of the Books and Records (or such lesser position thereof as Purchaser may desire). Purchaser shall preserve and maintain such Books and Records for a period of eighteen (18) months after the Closing Date. After the expiration of such eighteen month period, Purchaser shall not dispose of or destroy any of the Books and Records unless Purchaser shall have (a) given Seller not less that 20 days prior written notice of Purchaser's intent to dispose of or destroy such Books and Records, and (b) afforded Seller the opportunity to take possession of such Books and Records prior to the time of any such disposal or destruction.

7.6. Employee Matters. Purchaser, in its sole discretion, shall make offers of employment to employees associated with the operation of the Stores and Distribution Centers other than the Designated Liquidation Locations. The exact identity and number of the Transferred Employees shall be provided to the Seller by Purchaser on or before the conclusion of the Liquidation Election Period. Prior to the designation of an employee as a Transferred Employee by Purchaser, all such employees shall remain employees of Seller, and Purchaser shall have no obligation in respect of any such employee except to the extent the wages and benefits of such employee is included in Expenses payable under the Agency Agreement. Seller shall assist Purchaser in effecting the change of employment of the Transferred Employees following designation as a Transferred Employee in an orderly fashion. Nothing herein expressed or implied shall confer upon any employee of Seller, any Transferred Employee, any other employee or any legal representative thereof any rights or remedies, including any right to employment or continued employment for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement. Purchaser is not assuming, and shall not be responsible for, any of Seller's obligations to its employees, and shall not be considered a successor employer and shall not have successor employer liability with respect to any employee benefits, collective bargaining agreement, the WARN Act, COBRA, and/or any severance or key employee retention bonus program as may be approved by the Bankruptcy Court.

8. Covenants of Purchaser and Seller. Purchaser and Seller agree that:

8.1.    Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary under applicable laws and regulations to consummate the Transactions contemplated by this Agreement prior to the End Date; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case. Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to vest in Purchaser good title to the Acquired Assets or to evidence the assumption by Purchaser of the Assumed Obligations.

8.2.    Certain Filings. Seller and Purchaser shall cooperate in good faith with one another (i) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assigned Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

8.3.    Public Announcements. Purchaser and its Affiliates shall not make any public announcements or statements concerning the Transactions without the prior written consent of Seller. Purchaser acknowledges and agrees that Seller may provide copies of this Agreement to parties in interest in the Bankruptcy Case, and those parties to whom Seller determines it is necessary to provide copies as necessary or desirable in connection with the Bankruptcy Case. Seller also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by law.

8.4.    Bankruptcy Issues.

(a)    Seller and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of one or more orders (collectively, the "Sale Order") of the Bankruptcy Court in the Bankruptcy Case (i) approving this Agreement and the Agency Agreement, (ii) authorizing the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and/or assignment of the Assigned Contracts, Assigned Leases and the Intellectual Property Rights (if applicable) pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the Liquidating Agent or Purchaser to conduct Store Closing Sales at the Stores and the Distribution Center in accordance with the sale guidelines attached to the Agency Agreement, and (v) approving and authorizing the Transactions. In connection with the assumption and/or assignment of the Assigned Contracts, Assigned Leases and any Intellectual Property Rights pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions required to provide "adequate assurance of future performance" by Purchaser under the Assigned Contracts, Assigned Leases and such Intellectual Property Rights after the Closing. Seller and Purchaser shall consult with one another regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect, the Bankruptcy Court's entry of the Sale Order.

28

(b) [*Reserved*].

8.5.　Notices. If at any time prior to the End Date (i) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (ii) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 13.1, in writing of such breach. Upon such notice of breach, the breaching Party shall have ten (10) days to cure such breach prior to the exercise of any remedies in connection therewith.

9.　Tax Matters.

9.1.　Tax Cooperation. Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Seller and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Acquired Assets or the Business.

9.2.　Allocation of Taxes. The Parties acknowledge and agree that the Transactions are being consummated in contemplation of a plan to be confirmed in the Bankruptcy Case pursuant to Section 1129 of the Bankruptcy Code. As a result, as contemplated by Section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document to evidence, effectuate or perfect the rights, transfers and interests contemplated by this Agreement, shall be free and clear of any and all transfer taxes, stamp taxes or similar taxes. All deeds, instruments, orders and agreements transferring the Acquired Assets to Purchaser shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the District of Washington, in contemplation of a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(c)."

In the event that, notwithstanding the provisions of Section 1146(c) of the Bankruptcy Code or for any other reason, any sales, use, transfer or other similar taxes or charges (the "Transfer Taxes") are assessed at Closing or at any time thereafter on the transfer of any Acquired Assets, then in each instance such taxes or charges incurred as a result of the transactions contemplated hereby shall be paid by Seller. Purchaser and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

10.　Closing Conditions.

10.1.　Conditions to Obligations of Purchaser and Seller. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case, in form and substance reasonably acceptable to Seller and Purchaser (including a finding that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and waiving any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(g) or 6006(d), and as of the Closing Date the Sale Order shall be in full force and effect and shall not have been vacated or reversed and shall not then be stayed;

(b)     No injunction, stay or similar order or decree, issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions; and

(c)     Any applicable waiting period under the HSR Act relating to the Transactions shall have expired or been terminated.

10.2.   Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)     [Reserved];

(b)     [Reserved];

(c)     [Reserved];

(d)     Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date; and

(e)     the representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect.

10.3.   Conditions to Obligations of Seller. The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date;

(b)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and

30

(c)     Seller shall have received all documents it may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Seller.

11.     Survival; Indemnification.

11.1.     Survival. The (a) representations and warranties of Seller, and covenants and agreements of Seller that by their terms are to be performed at or before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing. The covenants and agreements of Seller contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.

11.2.     Indemnification. Each of Purchaser and Seller agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party. There shall be no post-Closing indemnification of Purchaser by Seller with respect to any matter not set forth in this Section 11.2.

12.     Termination.

12.1.     Grounds for Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Purchaser;

(b)     by Seller or Purchaser, if the Closing shall not have been consummated on or before the later of (i) April 29, 2010, or (ii) 10 days after any notice delivered pursuant to Section 8.5, provided that no timely cure has been effected (the later of clause (i) and (ii), the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)     by Seller or Purchaser, if any condition set forth in Section 10.1 is not satisfied, and such condition is incapable of being satisfied by the End Date;

(d)     by Purchaser, if any condition set forth in Section 10.2 has not been satisfied, and such condition is incapable of being satisfied by the End Date or shall not have been cured during the 10 day period referred to in Section 8.5; or

(e)     by Seller, if any condition set forth in Section 10.3 has not been satisfied, and such condition is incapable of being satisfied by the End Date or shall not have been cured during the 10 day period referred to in Section 8.5.

The Party desiring to terminate this Agreement pursuant to this Section 12.1 (other than pursuant to Section 12.1(a))) shall give notice of such termination to the other Party in accordance with Section 13.1.

12.2. Effect of Termination. If this Agreement is terminated as permitted by Section 12.1, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, counsel, financial adviser, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in Section 2.8. The provisions of Sections 2.8, 11.2, 12.2, 12.3, 12.4, 13.1, 13.4, 13.5, 13.6, 13.9 and 13.10 shall survive any termination hereof pursuant to Section 12.1.

12.3. Expenses. All costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense. If Seller and Purchaser are required to make any filing under the HSR Act in connection with the Transaction, each of Seller and Purchaser shall be responsible for paying one-half of the associated filing fee.

12.4. Force Majeure. If between the date of execution and delivery of this Agreement and the Closing Date, any casualty or act of God prevents the conduct of business in the ordinary course of any Store or Distribution Center resulting in a Material Adverse Effect, then Purchaser may elect either to receive an adjustment to the Cash Payment in an amount to be mutually agreed upon by Purchaser and Seller.

13. Miscellaneous.

13.1. Notices. All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

Hilco Merchant Resources, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention Joseph Malfitano
(847) 509-1100

if to Seller, to:

Liquidation Outlet, Inc.
1025 Valley Avenue
Puyallup, Washignton 98371
Attention: Mr. Gary Woodring
Fax: (253) 840-2210

*with a copy to (which shall not constitute notice):*

Oldfield & Helsdon, PLLC
1401 Regents Boulevard, Suite 102
P.O. Box 64189
Fircrest, Washington 98466
Attention: Jeffrey P. Helsdon, Esq.
Fax: (253) 414-3500

32

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

13.2.    Waivers. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

13.3.    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party.

13.4.    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Washington and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of law that would provide for application of another law.

13.5.    Jurisdiction.

(a)    Prior to the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the Agency Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

(b)    Upon the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the Agency Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement and the Agency Agreement shall be deemed to have arisen from a transaction of business in the State of Washington, and each of the Parties hereby irrevocably consents to the jurisdiction of the courts of such state (and of the appropriate appellate courts

33

therefrom) in any such suit, action or proceeding and to venue in the superior court of the Sate of Washington in and for the county of Pierce and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the superior court of the State of Washington in and for the county of Pierce or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

13.6.    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

13.7.    Third Party Beneficiaries. No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder

13.8.    Entire Agreement; Amendments: Counterparts. This Agreement, the Agency Agreement (including the Schedules and Exhibits hereto and thereto) set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

13.9.    Captions, Headings, Interpretation. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

13.10. Disclosure Schedules. The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Seller of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material. If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

This Agreement incorporates by reference all Exhibits and Schedules previously docketed with the Court to the extent not modified herein.

Purchase Price Adjustment Schedule

A. To the extent the aggregate Retail Value of the Merchandise *exceeds* the Inventory Threshold, the Purchase Price shall be adjusted upwards by $.50 for each dollar by which the aggregate Retail Value of the Merchandise exceeds the Inventory Threshold.

B. To the extent the aggregate Retail Value of the Merchandise *is less than* the Inventory Threshold, the Purchase Price shall be adjusted downwards by an amount equal to the applicable Adjustment Factor set forth below multiplied by the difference between the Inventory Threshold and the actual aggregate Retail Value of the Merchandise:

| Retail Value of the Merchandise | Adjustment Factor |
|---|---|
| $12,100,001 to $13,100,000 | 50% |
| $11,600,001 to $12,100,000 | 54% |
| $11,100,001 to $11,600,000 | 56% |
| $10,500,001 to $11,100,000 | 58% |
| $10,100,001 to $10,500,000 | 60% |
| Below $10,100,000 | 61% |

The adjustment to the Purchase Price set forth in the table above shall be made on an incremental basis. Example: if the Retail Value of the Merchandise were to be $10,500,001, the adjustment to the Purchase Price would be as follows:

$12,100,001 to $13,100,000 = 50% = $500,000
$11,600,001 to $12,100,000 = 54% = $270,000
$11,100,001 to $11,600,000 = 56% = $280,000
$10,500,001 to $11,100,000 = 58% = $348,000

Total adjustment:                    $1,398,000

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

~~LOI CAPITAL, LLC,~~ HILCO MERCHANT
Resources, LLC

By: _____

Name: Benjamin Nortman

Title: Executive Vice President

SELLER:

LIQUIDATION OUTLET, INC.

By: _____

Name: _____

Title: Pres

Schedule 2.6(b)(2)

## On Order Inventory Adjustment Schedule

| On Order Inventory Received: | Adjustment Factor |
|---|---|
| Within 7 days following the Closing Date | 85% |
| Between 8 and 14 days following the Closing Date | 75% |
| Between 15 and 21 days following the Closing Date | 65% |

# Schedule 3.2(a)
# Real Estate Occupancy Expenses

# Liquidation Outlet dba Dollar Store
"Sale on Everything"/"Store Closing"
Per Diem Occupancy Analysis -Schedule 3.3.1.OI

| Store No. | Location | Rent | CAM | RE Taxes | Utilities | Ins | Pest | Prin | Water | Legal | Utilities | Tot | PP Taxes | Alarm | Res |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Lakewood | 19,701 | 1,738 | 2,789 | 85 | 0 | 0 | 0 | 0 | 0 | 2,804 | 152 | 66 | | 39 |
| 4 | Puyallup | 11,064 | | | | | | | | | 2,474 | 73 | 59 | | 39 |
| 5 | Bremerton - 6th st | 11,906 | 44 | | | | 10 | | | | 1,386 | 76 | | | 39 |
| 6 | Sunnyside | 1,592 | 150 | 772 | | 3 | | 208 | | | 228 | 101 | | | |
| 7 | Yakima - Nob Hill | 5,000 | | | 1,700 | | | | | | 2,250 | 75 | | | 39 |
| 8 | Seattle - 15th Ave | 6,000 | | 1,200 | | | | | | | 361 | 80 | | | 39 |
| 9 | Ephrata | 2,138 | | | | | | | | | 3,369 | 77 | | | 39 |
| 10 | Ryan | 8,048 | | | | | | | | | 4,702 | 78 | 5 | | 39 |
| 11 | Yakima - 5th Ave | 18,750 | | 756 | | | | | | | 865 | 76 | | | 39 |
| 12 | Aberdeen | 5,429 | | | 611 | | | | | | 1,381 | 76 | | | 39 |
| 13 | Bellingham | 4,944 | 2,989 | | | | | | | | 3,429 | 76 | | | 65 |
| 14 | Ranton | 6,265 | 2,595 | | | | | | | | 1,636 | 76 | | | 119 |
| 15 | Renton | 3,371 | | 123 | | | | | | 155 | 1,303 | 77 | 62 | | 39 |
| 18 | Tumwater | 4,499 | | | | | | | | | 2,378 | 75 | 4 | | 39 |
| 19 | Spokane Valley | 7,208 | | | | | | | | | 871 | 77 | | | 39 |
| 20 | Spokane Valley - 10518 E Sprague | 12,841 | | | | | | | | | 1,541 | 77 | | | 39 |
| 21 | Spokane - 16th st | 5,500 | 833 | 760 | | | | 17 | | | 2,919 | 80 | | | 39 |
| 22 | Spokane - W Francis | 3,716 | 1,455 | 467 | | 83 | | | | | 4,054 | 78 | | | 39 |
| 23 | Lacey | 3,716 | 1,421 | | | 199 | | | | | | | | 64 | |
| 24 | Tacoma, 72rd St | 11,013 | 4,830 | 2,468 | | | | | | 179 | 5,277 | 112 | | | 49 |
| 25 | Tacoma - 6th Ave | 8,300 | 3,300 | | | | | | | | 787 | 78 | | | 39 |
| 26 | Bremerton - Wheaton | 6,263 | 752 | | | | | | | | 1,714 | 76 | | | 39 |
| 27 | Centralia | 3,760 | | | | | | | | | 2,823 | 76 | | | 39 |
| 31 | Federal Way | 8,263 | | | | | | | | | 3,865 | 87 | 4 | | 39 |
| 32 | Renton - Washington | 7,284 | | | 868 | | | | | | 2,398 | 199 | | | 39 |
| 34 | Spokane - 17th Ave | 7,000 | | 899 | | 376 | | | | | 3,907 | 83 | | | 199 |
| 35 | Milton-Freewater | 10,202 | 386 | | | | | | | | 1,489 | 77 | | | 112 |
| 36 | E. Wenatchee | 9,983 | 490 | 761 | | 226 | | | | | 62 | 77 | 3 | | 39 |
| 37 | Milton-Freewater | 8,140 | 154 | | | 100 | | | | | 4,515 | 76 | 4 | | 39 |
| 38 | Port Angeles | 10,915 | | 2,350 | | | | | | | 1,256 | 123 | | | 39 |
| 39 | Spokane - Market St | 12,760 | 4,000 | | | | | | | | 2,914 | 91 | | | 63 |
| 40 | Redmond | 12,542 | | | | | | | | | 6,994 | 83 | | | 140 |
| 41 | Burien | 10,101 | 297 | | | | | | | | 2,061 | 83 | | | 39 |
| 42 | Albany | 8,569 | | | | | | | | | 2,254 | 83 | 111 | | 39 |
| 43 | Olympia | | | | | | | | | | 1,855 | 163 | 62 | | 39 |
| | Newberg | | | | | | | | | | | | | | |
| 38 | Total | 259,113 | 29,753 | 13,424 | 2,257 | 1,814 | 0 | 22 | 361 | 179 | 89,571 | 3,460 | 354 | | 1,844 |
| | Warehouse | 73,600 | | | | | 10 | | | | 9,286 | | | | |
| | Grandtotal | 372,713 | 29,752 | 13,424 | 2,257 | 1,814 | 0 | 22 | 361 | 179 | 98,871 | 3,460 | 354 | | 1,844 |
| | Stores Daily | 9,890 | 978 | 441 | 74 | 60 | | | 12 | 6 | 2,946 | 116 | 11 | | 61 |
| | Per Diem | 1,812 | 180 | 81 | 14 | 11 | 10 | 22 | 2 | 1 | 543 | 20 | 2 | | 11 |
| | Per Store Week | | | | | | | | | | | | | | |